UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
**THE ESTATE OF MIGUEL ANTONIO RICHARDS**
by **SAREKHI SHAMEILA STEPHENS**,
as Administrator of the goods, chattels,
and credit of the deceased
**MIGUEL ANTONIO RICHARDS**,

          Plaintiff,

          -against-

**THE CITY OF NEW YORK**,
Police Officer **JESUS RAMOS**,
Police Officer **MARK FLEMING**,
Police Officer **REDMOND MURPHY**, and
Police Officer **MARCOS OLIVEROS**,
individually and in their official capacities,

          Defendants.

------------------------------------------------------------------x

        **COMPLAINT**

        **JURY TRIAL**

## NATURE OF THE ACTION

1.     This is an action for damages and attorney fees pursuant to the 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States of America, and common law of the State of New York and the New York State Constitution.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1343(a) and supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a).

**3.**     Venue lies in the Southern District of New York, because the events giving rise to this action occurred in Bronx County, New York, which is located within this the Southern District of New York.

## PARTIES

4.      At the time of the events described herein, the decedent **MIGUEL ANTONIO RICHARDS** ("**RICHARDS**") resided in Bronx County in the City and State of New York. **RICHARDS** was a citizen of Jamaica living in the United States as part of a college exchange program.

5.      **SAREKHI SHAMEILA STEPHENS** ("**STEPHENS**") was duly appointed as fiduciary to Plaintiff **THE ESTATE OF MIGUEL ANTONIO RICHARDS** via the issuance of Letters of Administration with Limitations by the Bronx County Surrogate's Court on February 22, 2018.

6.      Defendant **THE CITY OF NEW YORK** is a municipal corporation domiciled in and organized under the laws of the State of New York.  It operates the New York Police Department ("NYPD"), a departmental agency of **THE CITY OF NEW YORK** responsible for the appointment, training, supervision, promotion, and discipline of police officers, including the individual officers named as defendants herein. Pursuant to N.Y.C. Charter § 396, **THE CITY OF NEW YORK** is the party to be named in an action for the recovery of penalties for the violations stated herein.

7.      Defendants Police Officer **JESUS RAMOS** ("**RAMOS**"), Police Officer **MARK FLEMING** ("**FLEMING**"), Police Officer **REDMOND MURPHY** ("**MURPHY**"), and Police Officer **MARCOS OLIVEROS** ("**OLIVEROS**") were, at all times relevant herein, officers, employees and agents of the NYPD.  Upon information and belief, at all relevant times herein, **RAMOS** and **OLIVEROS** were assigned to the Emergency Services Unit. **RAMOS**, **FLEMING**, **MURPHY**, and **OLIVEROS** are sued in their individual and official capacities.

8.      At all times relevant herein, all individual defendants were acting under color of state law.

2

## STATEMENT OF FACTS

9.      On September 6, 2017, **RICHARDS** was inside his bedroom located at 3700 Pratt

Avenue in the Bronx.

10.      At some point in the late afternoon of September 6, 2017, **RICHARDS**'s landlord,

Glenmore Carey, called 911 and requested a wellness check of his tenant, **RICHARDS**.

11.      Mr. Carey called 911 after not being able to contact **RICHARDS** for several days.

12.      Two NYPD police officers, **FLEMING** and **MURPHY**, arrived at **RICHARDS**'s

residence. Mr. Carey let **FLEMING** and **MURPHY** into the building containing **RICHARDS**'s

apartment.

13.      Mr. Carey then allowed the officers into **RICHARDS**'s apartment which was located

on the third floor.

14.      **RICHARDS**'s apartment consisted of a living space that at the time was shared by

**RICHARDS** and one other individual, and two separate bedrooms with doors that could be

locked from the inside.

15.      When the officers entered **RICHARDS**'s apartment the door to **RICHARDS**'s

bedroom door was closed and locked from the inside.

16.      **FLEMING**, **MURPHY**, and/or Mr. Carey knocked several times on **RICHARDS**'s

bedroom door and received no response but could hear the air-conditioner running inside the

bedroom.

17.      **FLEMING** and **MURPHY**, with the assistance and approval of Mr. Carey, forcibly

gained entry to Mr. Richards's bedroom.

18.      **FLEMING** and **MURPHY** gained entry to **RICHARDS**'s bedroom, and saw

**RICHARDS** standing silent and motionless in the far corner of his bedroom with the lights off

and his hands at his side.

1

19.   **RICHARDS**'s bed was positioned between **RICHARDS** and Officers **FLEMING** and **MURPHY**.

20.   One of the officers immediately began shouting at **RICHARDS** to show his hands and to drop what one of the officers stated was a knife.

21.   While shouting commands at **RICHARDS**, **FLEMING** and **MURPHY** directed the light from their flashlights in **RICHARDS**'s face.

22.   **FLEMING** and **MURPHY** alternated between asking **RICHARDS** his name and shouting commands at **RICHARDS** to show his hands and drop the knife.

23.   **FLEMING** and **MURPHY** shouted at **RICHARDS** for approximately two minutes. **RICHARDS** remained unresponsive and motionless.

24.   **FLEMING** and **MURPHY** stood several feet back from the entrance of **RICHARDS**'s bedroom. **RICHARDS** remained motionless and silent with his arms by his sides. **FLEMING** and **MURPHY** drew their guns and pointed them at **RICHARDS**.

25.   **FLEMING** and **MURPHY** continued to shine their flashlights at **RICHARDS**'s face and shout commands.

26.   At this point in the encounter, it was apparent, or should have been apparent, to **FLEMING** and **MURPHY** that Mr. Richards was experiencing a mental health crisis and/or was emotionally disturbed.

27.   Shortly after **FLEMING** and **MURPHY** unholstered and pointed their weapons at **RICHARDS**, Mr. Carey, who was present during the entire encounter, also began shouting commands at **RICHARDS**.

28. Neither **FLEMING** nor **MURPHY** ever asked Mr. Carey to stop shouting or leave the apartment during the encounter. **FLEMING** and **MURPHY** permitted Mr. Carey to continue screaming at **RICHARDS**.

29. One of the officers then asked **RICHARDS** what he had in his "other" hand.

30. One of the officers began shouting commands at **RICHARDS** in an increasingly loud and agitated manner, including the use of profanity.

31. Mr. Carey then placed a call to one of **RICHARDS**'s friends and put the friend on speaker phone so that **RICHARDS** could hear him.

32. One of the officers then threw the cellphone with **RICHARDS**'s friend on the line into **RICHARDS**'s bedroom.

33. **RICHARDS**'s friend instructs **RICHARDS** to "put the knife down."

34. At one point, **MURPHY**, **FLEMING**, and the friend on speaker phone were all shouting at **RICHARDS**.

35. After about three minutes into the encounter, **MURPHY** and **FLEMING** behaved in an increasingly agitated manner and repeatedly shouted at **RICHARDS** to "put the fucking knife down" and told **RICHARDS**'s friend on speakerphone that **RICHARDS** "is not fucking listening."

36. The officers continued to yell at **RICHARDS** and point their guns and flashlights at him for approximately four minutes.

37. During this time, **RICHARDS** continued to stand silent and motionless in the far corner of the bedroom.

38. **FLEMING** then called his sergeant and informed him that he had a "guy with a knife that does not want to put it down" and the he was going to have the person "Tased."

3

39.     Approximately seven minutes into the encounter, **FLEMING** used his radio to request "one unit with a Taser."

40.     Upon information and belief, two officers with Tasers from the Emergency Services Unit ("ESU"), **RAMOS** and **OLIVEROS**, were dispatched to **RICHARDS**'s apartment.

41.     While awaiting the arrival of ESU officers, **FLEMING** and **MURPHY** continued to yell profanity-laden commands at **RICHARDS** while incorrectly referring to **RICHARDS** as "Ricardo."

42.     **FLEMING** and **MURPHY** continued to point their handguns at **RICHARDS** and shine their flashlights in **RICHARDS** face while **RICHARDS** remained motionless and silent in the corner of his bedroom.

43.     One of the officers threatened **RICHARDS** that he was "running out of time" and needed to put the knife down.

44.     Approximately 13 minutes into the encounter, one of the officers stated that he believed **RICHARDS** is holding a gun in one of his hands.

45.     **FLEMING** asked **RICHARDS** if the gun is real, and stated, "I don't want to shoot you if you've got a fake gun in your hand, you hear me? But I will shoot you if that's a real gun."

46.     Shortly thereafter, **RAMOS** and **OLIVEROS** from the ESU arrived at **RICHARDS**'s building.

47.     By the time the ESU officers arrived in **RICHARDS**'s apartment, **FLEMING** and **MURPHY** were standing in the doorway to **RICHARDS**'s bedroom with their guns raised and pointed at **RICHARDS**.

48.     Immediately upon **RAMOS** and **OLIVEROS** entering **RICHARDS**'s apartment, **RAMOS** asked **FLEMING** and **MURPHY** if they wanted to "take [**RICHARDS**] down?"

4

49.     One of the officers responded "yeah" and "hit him."

50.     **RAMOS** then raised his Taser and pointed it at **RICHARDS**.

51.     A total of approximately 15 minutes elapsed from the moment **FLEMING** and

**MURPHY** first encountered **RICHARDS** until one of the officers directed **RAMOS** to use a

Taser on **RICHARDS**.

52.     During the 15 minutes prior to **RAMOS** being directed to use a Taser on

**RICHARDS**, **RICHARDS** was standing motionless and silent in the corner of his bedroom.

53.     The Taser barbs struck **RICHARDS** in the chest and groin area but did not pierce his

skin.

54.     Immediately after **RAMOS** fired his Taser both **FLEMING** and **MURPHY** opened

fire with their semiautomatic handguns.

55.     **FLEMING** and **MURPHY** shot in the direction of **RICHARDS** 16 times with their

guns, striking **RICHARDS** in the front of his body seven times.

56.     **RICHARDS** eventually died due to the gunshot wounds inflicted by **FLEMING** and

**MURPHY**.

57.     A knife and toy gun were allegedly recovered from **RICHARDS**'s apartment after the

shooting.

58.     At the time and place of the occurrence, upon information and belief, the defendant

officers placed **RICHARDS** in fear of his life and assaulted and battered **RICHARDS** using a

Taser and semiautomatic firearms, murdering **RICHARDS** in his own apartment.

59.     Upon information and belief, the Taser and firearms used by the defendant officers

were issued to them by the NYPD.

60.     All of the conditions precedent to the commencement of the within action against **THE CITY OF NEW YORK** have been complied with, in that: (1) on May 14, 2018, within ninety (90) days of **STEPHENS** being appointed as administrator of the **ESTATE OF MIGUEL ANTONIO RICHARDS**, a Notice of Claim was timely served on **THE CITY OF NEW YORK**; (2) at least thirty (30) days have elapsed since the service of the Notice of Claim, and adjustment or payment of the claims have been neglected or refused; and (3) this action was commenced within one year and ninety days of the accrual of the causes of action herein stated.

61.     As a direct and proximate result of defendants' actions, the deceased, **RICHARDS**, suffered traumatic injuries, pain, mental anguish, and death.

## FIRST CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

### Violation of Civil Rights Pursuant to
### 42 U.S.C. § 1983: Excessive Force

62.     Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

63.     Upon information and belief, in the course of their contact with **RICHARDS**, the individual defendants deliberately and intentionally Tased **RICHARDS**.

64.     Upon information and belief, **RICHARDS** posed no immediate threat to the safety of the individual defendants or any other person.

65.     Upon information and belief, in the course of their contact with **RICHARDS**, the individual defendants deliberately and intentionally shot **RICHARDS** using live ammunition.

66.     Defendants' use of force, including deadly force, was excessive and unreasonable under the circumstances. Lethal force against **RICHARDS** was not justified. Force less than lethal force could have been used to safely extricate **RICHARDS** from the bedroom.

67.     By their actions, the defendants' deprived **RICHARDS** of his clearly-established rights, guaranteed under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the

6

United States, not to be deprived of his liberty without due process of law, to be free from the excessive and unreasonable use of force by persons acting under color of law, and to be free from summary punishment.

68.     The acts of the individual defendants were motivated by evil motive or intent and/or were done in reckless or callous indifference to **RICHARDS** federally protected rights. Accordingly, punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

**SECOND CAUSE OF ACTION**
**AGAINST MUNICIPAL DEFENDANT**
**Violation of Civil Rights**
**Pursuant to 42 U.S.C. §1983: *Monell* Claim**

69.     Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

***Additional Factual Allegations Relating Solely to Municipal Liability***

70.     Municipal defendant **THE CITY OF NEW YORK** has failed to train its officers in the proper use of deadly force.

71.     In addition, **THE CITY OF NEW YORK** has adopted an unwritten policy and practice within the NYPD and other city agencies that allows officers to apply deadly force in circumstances where it is not objectively reasonable.

72.     The aforementioned (a) failure to train and (b) unwritten policy permitting unnecessary deadly force each directly caused the death of **RICHARDS**, thus violating his federal constitutional rights as set forth above.

73.     Law enforcement professionals around the country have instituted special training and protocols relating to confrontations with emotionally disturbed persons ("EDPs"). These originate in the so-called "Memphis Model," which was a policy put in place in Memphis,

Tennessee after a deadly police shooting there in 1987. Under the Memphis Model, a specially trained Crisis Intervention Team ("CIT"), rather than an Emergency Services or SWAT team, responds to calls requesting medical intervention for emotionally disturbed individuals such as the one at issue here. The CIT consists of officers with 40 to 80 hours of training in responding to EDP calls. CIT officers are trained in proper techniques for de-escalating a potentially violent situation without the use of force. For example, CIT officers are taught that shouting at an EDP, surrounding, or threatening him is almost always counterproductive and can, as here, lead to deadly consequences.

74.     Memphis has seen a dramatic decrease in injuries and violence from EDP encounters as a result of its new procedures. Similar procedures have been put in place by police departments in more than 2,000 communities in over 40 states and have been recommended or commended by Amnesty International, the National Alliance on Mental Illness, the U.S. Department of Justice, and the International Association of Chiefs of Police.

75.     Nonetheless, as of the time of the incident at hand, **THE CITY OF NEW YORK** has refused to adopt a similar model despite the long-term, demonstrated reduction in the risk of violence.

76.     At the time of the incident, **THE CITY OF NEW YORK** did not provide adequate training to its officers regarding how to de-escalate an encounter with an emotionally disturbed person.

77.     **THE CITY OF NEW YORK** has a policy and practice of sending police, rather than mental health or healthcare professionals, to respond to 911 reports of EDPs.

78.     The officers involved in the incident leading to the death of **RICHARDS** had not received CIT-type training.

79.     In addition, **THE CITY OF NEW YORK** has adopted a municipal custom and practice that effectively permits or even encourages its officers to use deadly force when such force is objectively unreasonable and unnecessary. Evidence of the existence of this custom is **THE CITY OF NEW YORK**'s effective failure to adequately investigate use-of-force incidents, its nearly universal indemnification of officers involved in deadly incidents, and its tolerance of the so-called "Blue Wall of Silence" that exists to prevent police officers from informing on or testifying against one another. Officers operate in a climate of impunity, knowing that charges are almost never substantiated against police who shoot civilians.  For example, a study by the New York Civil Liberties Union found that of all cases of serious misconduct that were *substantiated* by the Civilian Complaint Review Board between 1998 and 2004, only about one-third led to discipline of the officers involved. *See* NYCLU, *Mission Failure: Civilian Review of Policing in New York City 1998-2004* at 19-28 (describing how police department disciplinary process effectively condones misconduct), *available at* http://www.nyclu.org/files/publications/nyclu_pub_mission_failure.pdf.

80.     **THE CITY OF NEW YORK**'s failure to properly train its officers in the appropriate use of deadly force and in techniques to de-escalate confrontations with emotionally disturbed persons has led to unnecessary civilian deaths in numerous cases over the past several years. The details of only a few of these cases follow by way of example:

a.      In July 2017, Dwayne Jeune was shot and killed by NYPD officers responding to the scene. Jeune had a history of mental illness and NYPD officers stated that he was holding a knife on this occasion. The responding officers first used a Taser on Jeune then fired five shots, killing him.

b.      In October 2016, Deborah Danner was shot and killed by NYPD officers inside of her apartment. Danner was known to the NYPD to suffer from mental illness and would occasionally have loud outbursts that required the NYPD to respond. On this occasion the officer saw her holding scissors and ordered her to drop them. After she dropped the scissors, the officers followed her into her bedroom where they claim she picked up a bat. The officer then shot her causing her death. Her estate filed suit in the Southern District of New York. *See Danner v. City of New York*, 18-civ-332 (NRB).

c.      In September 2012, Mohamed Bah was shot and killed by New York City police in his Morningside Heights apartment. Bah's mother had called for an ambulance for her son, but police officers arrived and insisted on confronting Bah despite his refusal and his mother's objections. After determining that Bah was an emotionally disturbed person, officers with police shields, Tasers, and other weapons surrounded the apartment and forced open Bah's front door. Police then proceeded to Tase Bah, fire a bean bag at him, and shoot him with at least eight bullets in the head, arms, and torso, causing his death. Following a trial in the Southern District of New York, a jury determined that although Bah had a knife in his hand at the time of the shooting, the officer had acted with excessive force in shooting Bah and found in Bah's favor.  *See Oumou Bah v. City of New York*, Case No. 13-civ-6690(PKC) (S.D.N.Y.).

d.      In April 2009, Mauricio Jaquez was shot and killed by the New York City police in his Bronx apartment. Mr. Jaquez's wife had sought medical assistance for Mr. Jaquez, who was having a mental health crisis, by calling 911.  ESU was eventually called to Mr. Jaquez's apartment to deal with Mr. Jaquez who was ranting and raving about seeing demons and people trying to kill or hurt him. Mr. Jaquez's wife pleaded with

the officers to not hurt her husband and told the officers that Mr. Jaquez was mentally ill and having an episode. The officers fired upon Mr. Jaquez, who was holding a knife but not posing an immediate threat to anyone, with Tasers and rubber bullet, with one officer eventually shooting Mr. Jaquez in the back of the head while Mr. Jaquez laid incapacitated on the floor of his kitchen. Mr. Jaquez's estate filed suit in the Southern District of New York. *See The Estate of Mauricio Jaquez v. The City of New York*, 10-civ-2881 (KBF)

  e. In November 2007, Khiel Coppin, 18, was shot to death by New York City police just outside of an apartment building in Bedford-Stuyvesant in Brooklyn.  He was an emotionally disturbed person. The evening of the incident, Coppin's mother had called 911 after a failed attempt to get assistance for her son from the psychiatric unit at Interfaith Medical Hospital earlier that same day. Police officers from the 79th Precinct arrived at the scene and ultimately fired 20 bullets at Coppin, who was holding a hairbrush under his shirt and pointing it at the officers. Coppin was pronounced dead at the hospital.

  f. David Kostovski, an emotionally disturbed 29-year-old man, was shot with 10 bullets and killed only a few blocks from his home at 421 Autumn Avenue in Brooklyn in 2007 by police from the 75th Precinct who claimed he lunged at them with a broken bottle. David Kostovski and Khiel Coppin were both killed by police in the same week.

81. The City's failure to provide for adequate training with respect to de-escalation and to mandate the involvement of mental health professionals has caused unnecessary violence and deaths, as described above, in encounters between police and EDPs.

82.     In 2008, in the wake of several lethal encounters between the NYPD and EDPs, the New York City Council called on the New York City Police Department to improve its procedures for handling emotionally disturbed persons. *See* N.Y. City Council Res. 1249-2008, attached as Exhibit A. Specifically, the City Council noted that the New York City Department of Health and Mental Hygiene ("DOH") utilized 23 mobile crises outreach teams, interdisciplinary units of mental health professionals, that should be coordinated with the NYPD when responding to EDPs, and calling upon the NYPD to "continually reevaluate their protocols and response to field incidence concerning the apprehension of, restraint of, and use of lethal force against emotionally disturbed persons."

83.     It was not until 2015, that the NYPD began CIT training on a limited basis.

84.     Nearly a decade after the City Council's resolution, a January 2017 report compiled by the Department of Investigation's ("DOI") Office of the Inspector General for the New York City Police Department ("OIG-NYPD") (available at https://www1.nyc.gov/ assets/doi/reports/pdf/2017/2017-01-19-OIGNYPDCIT-Report.pdf) found "several fundamental programmatic and training flaws in NYPD's CIT initiative." Among the flaws, the NYPD was not deploying CIT-trained officers to necessary encounters and had no plan for directing CIT-trained officers to such situations. The OIG-NYPD report also noted that the NYPD had also failed to update the patrol guide with CIT principles. As a result, even general CIT principles were not available to patrol officers, and the few officers that were given CIT training were given training in direct contravention of the NYPD patrol guide without any guidance on reconciling the two.

*Cause of Action for Municipal Liability*

85.     Municipal defendant **THE CITY OF NEW YORK** has adopted and unreasonably continued policies, procedures, practices or customs within the NYPD that allow, among other things, the application of deadly force in circumstances where it is not objectively reasonable.

86.     **THE CITY OF NEW YORK** failed to train its officers in the proper method of responding an emotionally disturbed person in crisis.

87.     Any training given to officers as to how to respond to an emotionally disturbed person in crisis was significantly below national standards and/or contrary to other stated policies in the NYPD patrol guide and other sources.

88.     **THE CITY OF NEW YORK** failed to adopt policies through the NYPD patrol guide or widespread training to respond to an emotionally disturbed person in crisis. Specifically, the proper methods of de-escalation were not taught to the individual officers.

89.     Because of the lack of proper training, the individual officers failed to de-escalate the encounter, and, in fact, escalated the encounter, through screaming, threatening, and using force, until it became a fatal encounter.

90.     **THE CITY OF NEW YORK**, through the NYPD, owed a duty of care to its citizens, including **RICHARDS,** to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to Plaintiff or to those in a like situation would probably result from the foregoing conduct.

91.     **THE CITY OF NEW YORK** has been on notice for decades (1) that proper training for responding to EDPs is necessary; (2) that effective techniques, procedures and

1

policies exist and were not being utilized by the NYPD; and (3) the failure to implement those techniques, procedures and policies contributed to deaths of their citizens.

92.     At all relevant times, the individual officers and **THE CITY OF NEW YORK** were in an employee-employer relationship.

93.     **THE CITY OF NEW YORK** knew or should have known through the exercise of reasonable diligence that the individual defendants were likely to engage in the conduct which caused **RICHARDS**'s injury and death prior to this occurrence.

94.     **THE CITY OF NEW YORK**'s negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused each of the injuries of **RICHARDS**.

95.     As a direct and proximate result of this unlawful conduct, **RICHARDS** sustained the damages above alleged.

96.     Had **THE CITY OF NEW YORK** properly implemented CIT training throughout the NYPD, **MIGUEL ANTONIO RICHARDS** would be alive and receiving the treatment he needed.


<u>**THIRD CAUSE OF ACTION**</u>
<u>**AGAINST ALL DEFENDANTS**</u>
**New York State Law Tort: Wrongful Death**

97.     Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

98.     At the time and place of the occurrence, **RICHARDS** was shot multiple times by gun, causing his death.

99.     The defendants acted in a wrongful and negligent manner and in disregard for the rights of **RICHARDS**, in using deadly force that was unreasonable under the circumstances.

100.   **THE CITY OF NEW YORK** was negligent in the training and supervision of the officers.

101.   As a result of the wrongful and negligent actions of the defendants, **RICHARDS** was killed.

102.   At all relevant times, the individual defendants were employees, agents, and/or servants of **THE CITY OF NEW YORK**; their wrongful and negligent acts were committed within the scope of their employment; and the conduct was generally foreseeable by **THE CITY OF NEW YORK** and an incident of the employment.  As such, **THE CITY OF NEW YORK** is responsible for the conduct of the individual defendants under the doctrine of *respondeat superior*.

### FOURTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
**New York State Law Tort: Assault and Battery**

103.   Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

104.   At the time and place of the occurrence, **RICHARDS** was placed in imminent apprehension of harmful bodily contact and death.

105.   The defendants intentionally made bodily contact with **RICHARDS** without his consent by use of a Taser and live ammunition.

106.   Such contact was harmful, causing **RICHARDS** severe pain, injury, and ultimately death.

107.   The intentional contact constituted greater force than was reasonable to effect **RICHARDS** apprehension.

3

108.    At all relevant times, the individual defendants were employees, agents, and/or servants of **THE CITY OF NEW YORK**; their intentional acts were committed within the scope of their employment; and the conduct was generally foreseeable by **THE CITY OF NEW YORK** and an incident of the employment.  As such, **THE CITY OF NEW YORK** is responsible for the conduct of the individual defendants under the doctrine of *respondeat superior*.

109.    As a direct and proximate result of the intentional acts of the defendants, **RICHARDS** suffered both physical and mental injuries and is entitled to relief.

### FIFTH CAUSE OF ACTION
### AGAINST MUNICIPAL DEFENDANT
**New York State Law Tort: Negligent Screening,
Hiring, Retention, Training, and Supervision**

110.    Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

111.    The aforementioned (a) failure to train and (b) unwritten policy permitting unnecessary deadly force each directly caused the death of **RICHARDS**, thus violating his federal constitutional rights as set forth above.

112.    **THE CITY OF NEW YORK** failed to properly train and supervise officers to use CIT techniques or similar methods to preserve the lives of individuals suffering from emotional and mental crises.

113.    Had the individual defendants been properly trained and supervised by **THE CITY OF NEW YORK**, **RICHARDS** would have survived the encounter.

4

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request the following relief:

1.     An award of compensatory damages against all defendants, jointly and severally, in an amount according to proof at trial;

2.     An award of punitive damages against the defendants sued in their individual capacities, in an amount to be proven at trial;

3.     The award of any and all other damages allowed by law according to the proof to be determined at the time of trial;

4.     Pre-judgment interest on all economic losses;

5.     Attorney's fees and costs of litigation;

6.     A trial by jury on all issues so triable; and

7.     Such further relief as the Court deems just and proper.

Dated: New York, New York
           December 4, 2018

Respectfully submitted,

Daniel A. McGuinness
Law Offices of Daniel A. McGuinness
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 679-1990

/s/

Zachary Margulis-Ohnuma
Law Office of Zachary Margulis-Ohnuma
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 685-0999

# EXHIBIT A



# The New York City Council

City Hall
New York, NY  10007

## Legislation Details (With Text)

| | | | | |
|---|---|---|---|---|
| **File #:** | Res 1249-2008 | **Version:** A | **Name:** | Continually reevaluate protocols and response to field incidents concerning the apprehension of, restraint of, and use of lethal force against emotionally disturbed persons. |
| **Type:** | Resolution | | **Status:** | Filed |
| | | | **In control:** | Committee on Public Safety |
| **On agenda:** | 2/13/2008 | | | |
| **Enactment date:** | | | **Enactment #:** | |
| **Title:** | Resolution calling on the Mayor, the New York City Police Department, and the New York City Department of Health and Mental Hygiene to continually reevaluate their protocols and response to field incidents concerning the apprehension of, restraint of, and use of lethal force against emotionally disturbed persons. | | | |
| **Sponsors:** | Inez E. Dickens, Albert Vann, Gale A. Brewer, Simcha Felder, Lewis A. Fidler, Letitia James, G. Oliver Koppell, John C. Liu, Rosie Mendez, James Sanders, Jr., Larry B. Seabrook, Kendall Stewart, Thomas White, Jr., Sara M. Gonzalez, Darlene Mealy, Charles Barron, Helen D. Foster, Robert Jackson, Annabel Palma, David I. Weprin | | | |
| **Indexes:** | | | | |
| **Attachments:** | 1. Res. No. 1249 - 2/13/08, 2. Committee Report 2/28/08, 3. Hearing Transcript 2/28/08, 4. Hearing Testimony 2/28/08 | | | |

| Date | Ver. | Action By | Action | Result |
|---|---|---|---|---|
| 2/13/2008 | * | City Council | Introduced by Council | |
| 2/13/2008 | * | City Council | Referred to Comm by Council | |
| 2/28/2008 | * | Committee on Public Safety | Hearing Held by Committee | |
| 2/28/2008 | * | Committee on Public Safety | Laid Over by Committee | |
| 2/28/2008 | * | Committee on Mental Health, Developmental Disability, Alcoholism, Substance Abuse and Disability Services | Hearing Held by Committee | |
| 2/28/2008 | * | Committee on Mental Health, Developmental Disability, Alcoholism, Substance Abuse and Disability Services | Laid Over by Committee | |
| 12/31/2009 | A | City Council | Filed (End of Session) | |

Proposed Res. No. 1249-A

Resolution calling on the Mayor, the New York City Police Department, and the New York City Department of Health and Mental Hygiene to continually reevaluate their protocols and response to field incidents concerning the apprehension of, restraint of, and use of lethal force against emotionally disturbed persons.

By Council Members Dickens, Vann, Brewer, Felder, Fidler, James, Koppell, Liu, Mendez, Sanders Jr., Seabrook, Stewart, White Jr., Gonzalez, Mealy, Barron, Foster, Jackson, Palma, and Weprin

Whereas, People with severe mental illnesses are four times more likely to be killed by police in justifiable homicide than the general public, as was the case in New York City in 1999 when nearly one-third of those killed in police shootings were mentally impaired; and

Whereas; In 1999, the New York City Police Department ("NYPD") responded to an average of 175 complaints concerning emotionally disturbed persons ("EDPs") every day; and

Whereas, According to the NYPD, police officers receive only 14.5 hours of training on how to appropriately interact with emotionally disturbed persons; and

Whereas, According to the 2007 NYPD Patrol Guide, physical force will only be used against EDPs when necessary to restrain them until they can be placed in a hospital or detention center, and deadly force will only be used when absolutely necessary to protect the life of others present; and

Whereas, The 2007 Patrol Guide further states that an officer must not take into custody an armed or violent EDP without the order from a supervisor, or unless the EDP presents an immediate threat to him/herself or others; and

Whereas, In November 2007, Khiel Coppin, an emotionally disturbed resident of Brooklyn, was shot ten times by police officers after brandishing a hairbrush that officers mistook for a gun; and

Whereas, Also in November 2007, David Kostovski, an emotionally disturbed man in Brooklyn, was fatally shot by police officers after waving a broken bottle at them and refusing to follow orders; and

Whereas, In 1999, Gideon Busch, a mentally ill resident of Borough Park, was shot 15 times by police officers despite the fact that he was armed with just a hammer; and

Whereas, In the aftermath of the death of Mr. Coppin, it was reported that the NYPD was considering measures to improve its procedures with respect to the apprehension of EDPs, including improved protocols by 911 dispatchers to assess subjects' mental dispositions and greater communication between local precincts and mental health workers; and

Whereas, While it is commendable that the NYPD would consider taking proactive steps to improve its

**File #:** Res 1249-2008, **Version:** A

policies with respect to the apprehension and restraint of EDPs, its reforms are too often made in the aftermath of tragic incidents; and

Whereas, According to a 2004 New York City Department of Health and Mental Hygiene ("DOH")-conducted survey, 7.5 percent of New York City residents suffered from a major depressive disorder and 3.5 percent suffered from a generalized anxiety disorder in the previous twelve months; and

Whereas, In cases of mental distress, the DOH utilizes 23 mobile crisis outreach teams, an interdisciplinary unit of mental health professionals that have the authority to evaluate an EDP and transport him/her to a hospital if they determine that the individual presents a threat to him/herself or others; and

Whereas, If a person experiencing a psychological crisis is unwilling to be transported to a psychiatric emergency room, a mobile crisis outreach team can solicit the assistance of the police in the transport of the affected person to the mental health facility; and

Whereas, Mobile crisis outreach teams have up to 24 hours to respond to cases that are classified as urgent, which inevitably results in the NYPD becoming the first party to respond to an emergency situation involving an EDP; and

Whereas, It is imperative that the NYPD elevate the level of its dialogue with the DOH so as to increase the sharing of relevant information relating to the medical history of EDPs experiencing a mental crisis; and

Whereas, It is equally important that the DOH dramatically shorten the response time of its mobile crisis outreach teams; and

Whereas, An improvement in the interaction between the NYPD, EDPs, and other involved parties requires a complete and thorough investigation of policies and procedures in this area; now, therefore, be it

Resolved, That the Council of the City of New York calls on the Mayor, the New York City Police Department, and the New York City Department of Health and Mental Hygiene to continually reevaluate their protocols and response to field incidents concerning the apprehension of, restraint of, and use of lethal force against emotionally disturbed persons.

DMB

powered by Legistar™

**File #:** Res 1249-2008, **Version:** A

2/26/08
LS# 4394