UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

THE ESTATE OF MIGUEL ANTONIO RICHARDS,

                      Plaintiff,

          - against -

THE CITY OF NEW YORK, POLICE OFFICER ("PO")
JESUS RAMOS, PO MARK FLEMING, PO REDMOND
MURPHY, and PO MARCOS OLIVEROS, individually
and in their official capacities,

                     Defendants.

------------------------------------------------------------------------X

**PROPOSED STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 AND RULE III(A) OF THE COURT'S INDIVIDUAL PRACTICES AND RULES**

18 Civ. 11287 (MKV)

Defendants The City of New York, Officer Jesus Ramos, Officer Mark Fleming, Officer Redmond Murphy, and Officer Marco Oliveros, by their attorney, James E. Johnson, Corporation Counsel of the City of New York, submit this statement pursuant to Local Civil Rule 56.1 and the Rule III(A) of the Court's Individual Practices and Rules, to set forth the material facts as to which they contend there is no genuine issue to be tried:[1]

**I.      The Parties**

      1.      On September 6, 2017, Miguel Antonio Richards (the "decedent") resided at 3700 Pratt Avenue, Bronx, New York 10466 (the "location"). (Amended Complaint ("Am. Complt."), ¶ 9).

---

[1] Defendants reserve the right to amend or correct this Proposed 56.1 Statement prior to filing their motion under Rule 56. Further, defendants adopt the facts set forth herein only for purposes of the Motion for Summary Judgment and reserve the right to present different and/or conflicting facts at any trial in this matter. See Vasconcellos v. City of New York, 12 Civ. 8445 (CM) (HBP), 2015 U.S. Dist. LEXIS 121572, at *4 (S.D.N.Y. Sept. 9, 2015) (Local Civil Rule 56.1 "means a party can 'admit' facts that it intends to dispute at trial without suffering any prejudice – the 'admission' …neither binds the party going forward if the motion is denied nor can it be admitted in evidence at trial.").

2.      On September 6, 2017, defendants Fleming, Murphy, Ramos, and Oliveros were employees of the City of New York, and members of the New York City Police Department ("NYPD").  (Answer to Amended Complaint, dated August 22, 2020 ("Ans. to Am. Complt."), ¶ 7).

3.      On September 6, 2017, defendants Officers Fleming, Murphy, Ramos, and Oliveros were all assigned as patrol officers in the 47th Precinct.  (Relevant Portions of Transcript of Deposition of Mark Fleming ("Fleming Tr."), Relevant Portions of Transcript of Deposition of Redmond Murphy ("Murphy Tr."); Relevant Portions of Transcript of Deposition of Jesus Ramos ("Ramos Tr."); Relevant Portions of Transcript of Deposition of Marco Oliveros ("Oliveros Tr."))

4.      On September 6, 2017, Officers Fleming and Murphy were working together, assigned to Sector "C" ("Charlie") of the 47th Precinct. (Oliveros Tr., 28:23-25).

5.      On September 6, 2017, Officers Ramos and Oliveros were working together, assigned to Sector "A" ("Adam") of the 47th Precinct. (Ramos Tr., 27:12-16; Oliveros Tr., 26:22-23; Relevant Memo Book Entries of Marco Oliveros ("Oliveros Memobook"), D4604-4607).

## II.    Background

6.      On September 6, 2017, at approximately 16:03 hours,[2] the landlord of 3700 Pratt Avenue, Glenmore Carey, called 911 and requested a wellness check on a tenant at the location who he had not seen in some time.  (NYPD Intergraph Computer Aided Dispatch System Event Chronology ("ICAD"), D1014-1025.; Audio Statement of Glenmore Carey ("Carey Audio Stmt."), D1455; Written Statement of Glenmore Carey ("Carey Written Stmt."), D234-236; 911 Call of Glenmore Carey ("911 Call"), D1459).

---

[2] For consistency, and ease of reference, all times are stated in 24-hour time.

7.     On September 6, 2017, Mr. Carey reported in his 911 call that he had not seen his tenant, and that the tenant's family had knocked on the tenant's door and gotten no response. (911 Call, D1459).

8.     The tenant in question was the decedent, Miguel Antonio Richards. (Carey Audio Stmt., D1455; Carey Written Stmt., D234-236).

9.     On September 6, 2017, the wellness check at the location was assigned to Officers Fleming and Murphy, (Murphy Tr., 34:21-35:19).

10.    On September 6, 2017, prior to arriving at the location, Officer Murphy spoke to Glenmore Carey by phone.  Carey stated that he had not seen Richards in a long time, that he did not know whether Richards had any mental health history, that Richards smoked a lot of marijuana, and that there was not any odor emanating from the tenant's bedroom.  (Murphy Tr, 43:5-44:13; Fleming Tr., 34:4-35:14).

11.    On September 6, 2017, Officers Fleming and Murphy arrived at the location at approximately 17:25 hours.  (ICAD, D1014-1025, p. 1).

12.    On September 6, 2017, upon arriving at the location, Officer Fleming spoke with Mr. Carey, who, in sum and substance, repeated what he had previously told Murphy on the phone.  (Fleming Tr., 36:18-37:12).

13.    On September 6, 2017, Officers Fleming and Murphy were in regular NYPD uniform, consisting of dark blue pants and shirts, with badges displayed on their chests, and wearing utility belts.   (Relevant Body-Worn Camera Footage of Mark Fleming ("Fleming BWC"), D1485, *passim*; Relevant Body-Worn Camera Footage of Redmond Murphy ("Murphy BWC"), D1485, *passim*).

14.    On September 6, 2017, Officers Murphy and Fleming were equipped with

operable body-worn cameras.  (Fleming BWC, D1485; Murphy BWC, D1485).

### III.     Officers Fleming and Murphy Encounter Richards

15.     Mr. Carey, along with an acquaintance, led Officers Fleming and Murphy into the apartment which contained Richards' bedroom.  (Fleming Tr. at 37:21-38:16; Carey Audio Stmt.; Carey Written Stmt.)

16.     Officers Fleming and Murphy approached Richards' bedroom door, and found it to be locked.  (Fleming Tr. at 38:21 – 39:4, Faddis Decl., Ex. C; Carey Audio Stmt., D1455; Carey Written Stmt., D234-236, p. 1).

17.     Officers Fleming and Murphy knocked on the door and received no response. (Fleming Tr., 39:4-5; Murphy Tr., 54:2-5).

18.     Officers Fleming and Murphy then attempted to gain more information from Carey, who indicated that Richards' family had also unsuccessfully attempted to contact him. (Fleming Tr., 39:7-14).

19.     At approximately 17:45 hours, Mr. Carey decided to force open the door and Mr. Carey's acquaintance opened door with a screwdriver.  (Fleming Tr. at 42:5-43:16; Murphy Tr. at 56:4-57:2; Fleming BWC, D1485, 00:00-00:12; Carey Written Stmt., D234-326, p. 1).

20.     When Fleming and Murphy first observed Richards, he was standing motionless near the foot of a bed in the bedroom wearing dark sunglasses, armed with a knife in his left hand.  (Fleming BWC at 00:20, Faddis Decl., Ex. D; Murphy Tr. at 57:25-58:2, 60:14-61:7, 64:9-16, Faddis Decl., Ex. B; Fleming Tr. at 45:2-10, Faddis Decl., Ex. C.)

21.     Richards was gripping the knife around the handle with the blade protruding from the bottom of his left fist and his left arm at his side. (Fleming BWC, D1485, 00:20-1:12).

22.     Richards' right hand was not visible when Officers Fleming and Murphy first

observed him. (Fleming BWC, D1485, *passim*; Fleming BWC Tr., D1150-1184, *passim;* Fleming Tr., 45:6-10; Murphy Tr. 60:24-61:3).

23.    After observing Richards in the bedroom, Officers Fleming and Murphy both activated their body-worn cameras to begin recording. (Fleming BWC, D1485; Fleming Tr., 50:7-13; Murphy BWC, D1485; Murphy Tr., 61:21-25).

24.    Officers Fleming and Murphy drew their firearms and took cover behind the frame of the door way to Richards' bedroom. (Fleming Tr., 55:17-56:10; Murphy Tr., 61:4-9).

25.    Several minutes after Fleming and Murphy first observed Richards, he moved his right arm further away, seeming to hide his right hand. (Fleming Tr., 48:12-49:13; Fleming BWC at 06:17).

26.    Mr. Carey believed that Richards would have injured him if the police had not been present when the bedroom door was opened. (Carey Audio Stmt., D1455, 8:15-8:30).

27.    At some point, Mr. Carey called a friend, Ricardo Cohen, who knew Richards, to also come to the location. (Cohen Written Stmt., D242-247).

28.    Mr. Cohen arrived at the location after the door to the bedroom had been opened. (Cohen Written Stmt., D242-257).

**IV.    Attempts to Disarm Richards Voluntarily**

29.    Based upon their observations of Richards, including his demeanor, their inability to see his right hand, and the knife, a deadly weapon, in his left hand, Officers Fleming and Murphy perceived that Richards might be a threat to himself or others. (Fleming Tr., 50:14-51:4; Murphy Tr., 63:21-64:16).

30.    Officers Fleming and Murphy did not believe that they could safely leave Richards, based on his demeanor and possession of at least one weapon, and possibly a second.

(Fleming Tr., 61:14-62:2, 139:2-12; Murphy Tr., 65:8-16).

31.     Officers Fleming and Murphy thought it was possible, based on their observations, that Richards was concealing another weapon, possibly a firearm, in his right hand. (Fleming Tr., 64:23-65:23; Fleming BWC, D1485, 1:34-36; Fleming BWC Tr., D1150-1184, 3:15-16).

32.     Officers Fleming and Murphy repeatedly instructed Richards to drop the knife and reveal the contents of his right hand.  (Fleming BWC, D1485, *passim*; Fleming BWC Tr., D1150-1184, *passim*; Murphy BWC, D1485, *passim*; Murphy BWC Tr., D1054-1086, *passim*, Fleming Tr., 65:2-23).

33.     In total, Officers Fleming and Murphy instructed Richards to put the knife down a total of approximately 50 times. (Fleming BWC, D1485, *passim*; Fleming BWC Tr., D1150-1184, *passim*).

34.     Officers Fleming and Murphy also instructed Richards to reveal the contents of his right hand numerous times. (Fleming BWC, D1485, *passim*; Fleming BWC Tr., D1150-1184, *passim*).

35.     Mr. Carey and Mr. Cohen also asked Richards to put the knife down. (Fleming BWC, D1485, *passim*; Fleming BWC Tr., D1150-1184, *passim*; Carey Written Stmt., D234-236; Cohen Written Stmt., D242-247).

36.     Mr. Cohen also contacted a relative of Richards, Peter Mitchell, by phone, to allow him to speak with Richards.  After the call was initiated, Officer Fleming slid the phone into Richards' bedroom, after which Mr. Mitchell also pleaded with Richards to drop the knife. (Fleming BWC, D1485, 03:25; Fleming Tr., 72:15-73:5; Cohen Written Stmt., D242-247; Mitchell Written Stmt., D237-241).

37. Richards never responded verbally to the repeated attempts at communication. (Fleming BWC, D1485, *passim*; Murphy BWC, D1485, *passim*).

38. At no point did Richards relinquish down the knife. (Fleming BWC, D1485, *passim*; Murphy BWC, D1485, *passim*).

39. At no point did Richards respond to the requests of Officers Fleming or Murphy to reveal the contents of his right hand. (Fleming BWC, *passim*; Murphy BWC, *passim*).

**V.    Request for Less Lethal Force Option**

40. Based on the threat Richards' refusal to comply with the instructions of Officers Fleming and Murphy, Officer Fleming determined that attempts at communication were ineffective and that a Taser should be used to involuntarily disarm Richards. (Fleming Tr., 66:21-76:7).

41. At approximately 17:50:53, Officer Fleming told Officer Murphy that he was going to request a supervisor to respond to the location. (Fleming BWC, D1485, 5:07; Fleming BWC Tr., D1150-1184, 9:15-16).

42. Officer Fleming then communicated with Sgt. Howard Roth, one of the patrol supervisors for the 47th Precinct that day, via police radio, and requested Sgt. Roth respond to the location. (Fleming BWC, D1485, 5:07-5:30; Fleming BWC Tr., D1150-1184, 9:22-10:7; ; ICAD).

43. At approximately 17:51:53, Officer Fleming called Officer Harris Jean, who was Sgt. Roth's driver, or "operator," for that day via cell phone, asked to speak to Sgt. Roth (Jean Tr., 14:4-15:8) and then stated, "we got a guy with a knife in his hand, he doesn't want to put it down—and we need him tased." (Fleming BWC, D1485, 6:05-15; Fleming BWC Tr., D1150-1184, 10:18-24)

44. At approximately 17:52:39, Sgt. Roth requested the NYPD dispatcher  to direct

another unit from the 47 Precinct to respond to the location and also mark him as responding. (Fleming BWC, D1485, 6:52-7:07; Fleming BWC Tr., D1150-1184, 12:4-21; ICAD, D1014-1025).

45.     At approximately 17:54, the NYPD dispatcher changed the type of job to "54E1," "Ambulance Case," which automatically routed the job to emergency medical services ("EMS"). (ICAD, D1014-1025, pp. 1-2).

46.     At approximately 17:54:53, an EMS unit was dispatched to the location, with an expected time of arrival ("ETA") of 18:05. (ICAD, D1014-1025, p. 2).

47.     At approximately 17:53:06, Officer Fleming told the dispatcher, "we just need one unit with a Taser.  We don't need a whole bunch of guys coming over here." (Fleming BWC, D1485, 7:20-21; Fleming BWC Tr., D1150-1184, 13:3-5).

48.     At approximately 17:53:41, the NYPD dispatcher requested confirmation as to whether the situation involved an emotionally disturbed person ("EDP") and Officer Fleming responded in the affirmative. (Fleming BWC, D1485, 7:54-58; Fleming BWC Tr., D1150-1184, 13:10-24).

49.     Officers Ramos and Oliveros heard the request for a Taser and responded to the location. (Ramos Tr., 21:22L22:3).

50.     At approximately 17:59:50, Officers Fleming and Murphy were approached from behind by two additional officers, ESU Det. Hartnett and Officer O'Rourke, at which time Richards moved slightly, making an apparent firearm in his right hand visible to Officer Murphy, who announced that Richards had a knife and a gun.  (Murphy BWC, D1485, 12:50-56; Fleming BWC, D1485, 14:03-14:10; Harnett Tr., 54:7-23; Fleming Tr., D1485, 67:13-68:9).

51.     At approximately 17:59:58, Det. Hartnett and Officer O'Rourke left the apartment

to "suit up."  (Fleming BWC, D1485, 14:10; Fleming BWC Tr. D1150-1184, 23:6-7)

52.     At that point, Officer Fleming was also able to see the apparent firearm in Richards' right hand. (Fleming Tr., 70:8-18, 75:11-23).

53.     At approximately 18:00:03 hours, Officer Murphy described the apparent firearm to Officer Fleming as silver, and stated that he did not know if it was a toy or not.  (Fleming BWC, D1485, 14:17; Fleming BWC Tr. D1150-1184, 23:10-12).

## VI.   Attempt to Use Less Lethal Force

54.     At approximately 18:00:49 hours, Officer Ramos entered the apartment, followed by his partner Officer Oliveros. (Ramos BWC, D1485, 1:06; Oliveros BWC, 1:15).

55.     Officer Ramos was equipped with a Taser. (Ramos Tr., *passim*). .

56.     Officer Ramos observed that both Officers Fleming and Murphy were taking cover behind the door frame of Richards' bedroom with their firearms drawn. (Ramos Tr., 55:12-23).

57.     Officer Ramos also observed that Richards was holding a knife in his left hand. (Ramos Tr., 31:20-23).

58.     At approximately 18:00:57, Officer Ramos approached Officers Fleming and Murphy and asked, "Do you want to take him down now?" meaning to use his Taser on Richards. (Fleming BWC, D1485; Fleming BWC Tr. D1150-1184).

59.     At approximately 18:00:57, Officers Fleming and Murphy both told Officer Ramos to use his Taser on Richards at that time. (Fleming BWC, D1485; Fleming BWC Tr. D1150-1184).

60.     At that time, Officer Oliveros was positioned behind Officers Fleming, Murphy, and Ramos. (Oliveros BWC, 00:20).

61.     At approximately, 18:01:00, Officer Ramos stepped toward the bedroom, while

raising his Taser, preparing to discharge it at Richards. (Ramos BWC, 1:16-1:17; Oliveros BWC, 00:22-24).

62.     As Officer Ramos stepped toward the doorway, Richards raised his right hand in the direction of Officer Ramos and the other officers, holding an object with a laser on top. (Ramos BWC, 1:18-1:19; Ramos Tr., 88:22-91:14; Fleming Tr., 77:21-78:3).

63.     Officer Ramos jumped backward slightly when Richards raised his arm, and then moved toward him again when Richards lowered his arm. (Ramos BWC, 1:19-20; Oliveros BWC, 00:22-24).

64.     As Officer Ramos crossed into the bedroom, again raising his Taser, Richards raised his arm holding and object in a pistol grip and Officer Ramos saw a laser move toward him from Richards, observed the laser reflect off of his badge on his chest, and believed that Richards was pointing a gun at him. (Ramos Tr., 93:10-15, 95:22-96:4, 97:22-98:20).

65.     Officer Fleming also saw Richards lift the apparent firearm in his right hand, with a laser dot on the top of it, and point it at Officer Ramos, and so discharged his firearm at Richards. (Fleming Tr., 80:2-8).

66.     After the first gunshot, Officer Ramos began to fall toward the bedroom door, opened to the left side of the door frame. (Fleming Tr., 81:14-19, Ramos Tr., 100:18-24).

67.     As Officer Ramos fell, he discharged his Taser.  (Fleming Tr., 81:14-19).

68.     After Officer Ramos began to fall, Officer Murphy could also see Richards pointing was appeared to be a silver handgun in the officer's direction, and discharged his firearm. (Murphy Tr.)

69.     Officers Fleming and Murphy stopped firing when they perceived that Richards was no longer pointing was appeared to be a firearm at anyone. (Fleming Tr., 80:25-81:10, 85:3-

12).

70.     Officers Fleming and Murphy discharged their firearms over a total of approximately five seconds. (Ramos BWC, 1:12-1:17).

71.     Officer Murphy fired nine rounds, leaving seven rounds unexpended in his weapon. (Murphy Tr.; NYPD Property Voucher, D834-835).

72.     Officer Fleming fired seven rounds, leaving nine rounds unexpended in his weapon. (Fleming Tr.; NYPD Property Voucher, D828-829).

**VII.     Securing Richards and the Crime Scene**

73.     At approximately 18:01:12, immediately after the shooting, Officer Ramos exited the bedroom.  (Ramos BWC, 1:30).

74.     At approximately 18:01:20 hours, Officers Fleming, Murphy, and Oliveros entered the bedroom. (Fleming BWC, 15:30; Ramos BWC, 1:37-1:45).

75.     When Officers Fleming and Murphy entered the room, Richards was lying prone on the floor between the foot of the bed and the wall, with his head closer to the dresser and his right arm extended almost to the edge of the dresser. (Fleming BWC, 15:32).

76.     When Officers Fleming and Murphy entered the bedroom, Richards was still moving his arms and head. (Fleming BWC, 15:30-16:05; Fleming Tr., 88:10-16).

77.     When officers entered the room, Richards was still holding the knife in his left hand. (Fleming BWC, 15:32-37; Fleming Tr.).

78.     Officer Fleming stepped to Richards and kicked the knife out of his left hand. (Fleming BWC, 15:40-45; Fleming Tr., 88:10-16).

79.     The officers attempted to handcuff Richards, in accordance with NYPD practice. (Fleming Tr., 88:19-89:3).

80.     Officer Oliveros put on disposable gloves and handcuffed Richards.   (Fleming BWC, 16:20-16:40; Oliveros Tr.)

81.     After Richards was handcuffed, Officer Fleming attempted to locate the apparent firearm that Richards had been holding. (Fleming BWC, 16:40; Fleming Tr., 89:22-90:9).

82.     At approximately 18:02, Det. Hartnett and Officer O'Rourke returned to the bedroom with their medical bag. (Fleming BWC, 16:50-16:55).

83.     As members of ESU, both Det. Hartnett and Officer O'Rourke were certified emergency medical technicians ("EMTs"). (O'Rourke Tr., 13:2-9).

84.     Upon their return, Det. Hartnett and Officer O'Rourke began attending to Richards' injuries. (O'Rourke Tr., 29:25-30:16).

85.     While Det. Hartnett and Officer O'Rourke were working on Richards, Officer Fleming continued to search for the apparent firearm. (Fleming BWC, 16:55-18:30).

86.     At approximately 18:04, Officer Fleming looked under the dresser and located the apparent firearm. (Fleming BWC, 18:30; Fleming Tr., 91:23-92:21).

87.     When Officer Fleming located the apparent firearm under the dresser, he stated, "Oh, there we go," (Fleming BWC, 18:30; Fleming BWC Tr., 31:24), and then noted, "maybe it was like a toy or something." (Fleming BWC, 18:30-33; Fleming BWC Tr., 32:2-6).

88.     Officer Fleming then dragged the apparent firearm out from under the dresser with his foot. (Fleming BWC, 18:33-19:02; Fleming Tr., 93:15-19)..

89.     After dragging the apparent firearm out from under the dresser, Officer Fleming illuminated the object with his flashlight and attempted to record its location with his body-worn camera. (Fleming BWC, 19:02; Fleming Tr., 195:4-23).

90.     At that point,, Officer Fleming left the bedroom. (Fleming BWC, 19:02-20:06).

## VIII.     Medical Response and Autopsy

91.      Emergency medical services arrived on the scene at approximately 18:05 hours. (ICAD).

92.      Richards was pronounced dead at approximately 18:11 hours.

93.      The Office of the Chief Medical Examiner performed an autopsy of Richards' body on September 7, 2017.  (Autopsy Report,  D1246-1259., p. 1).

94.      The OCME concluded that Richards' cause of death was a gunshot wound of the torso. (Autopsy Report, D1246-1259, p. 2).

95.      Richards sustained seven gunshot injuries, including one penetrating shot to the torso, two perforating shots to the torso, one perforating shot to the left wrist, one penetrating wound to the right hip, and two graze wounds. (Id., pp. 4-7).

96.      During the autopsy, Taser barbs were also removed from the clothing at Richards' right chest and left thigh. (Id., p. 10).

## IX.     Crime Scene Response

97.      At approximately 18:30 hours, the NYPD Crime Scene Unit ("CSU") responded to the location.  (CSU Case/Run Information Sheet ("CSU Info. Sheet"), D4835)

98.      CSU photographed the imitation firearm beside the dresser inside Richards' bedroom. (Photo "A" of Imitation Firearm, D445).

99.      CSU photographed the knife inside Richards' bedroom. (Photo of Knife, D443).

100.     CSU photographed the laser function in use on the imitation firearm. (Photo "B" of Imitation Firearm, D473).

101.     CSU recovered and vouchered the imitation pistol and knife from the scene. (NYPD Property Voucher No. 2000689803, D841-842).

102.    CSU measured and diagrammed Richards' apartment.   (Crime Scene Diagram

("CSU Diagram"), D1314).


Dated:        New York, New York
              December 28, 2020
                                    JAMES E. JOHNSON
                                    Corporation Counsel of the
                                    City of New York
                                    *Attorney for Defendants*
                                    100 Church Street
                                    New York, New York 10007
                                    (212) 356-2486
                                    By: _____/s/_____
                                          Hannah V. Faddis
                                          *Senior Counsel*


TO:    **VIA ECF and Email**
       Zachary Margulis-Ohnuma, Esq., zach@zmolaw.com
       Daniel A. McGuiness, Esq., dan@legalmcg.com
       Victoria N. Medley, Esq., vm@zmolaw.com
       Benjamin Notterman, Esq., bn@zmolaw.com
       *Attorneys for Plaintiff*

Docket No. 18 Civ. 11287 (MKV)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ESTATE OF MIGUEL ANTONIO RICHARDS,

Plaintiff,

- against -

THE CITY OF NEW YORK, POLICE OFFICER ("PO") JESUS RAMOS, PO
MARK FLEMING, PO REDMOND MURPHY, and PO MARCOS
OLIVEROS, individually and in their official capacities,

Defendants.

**PROPOSED STATEMENT OF MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1**

**JAMES E. JOHNSON**
Corporation Counsel of the City of New York
*Attorney for Defendants City of New York, Fleming, Murphy, Ramos, and
Oliveros*
100 Church Street
New York, New York 10007

Of Counsel:   Hannah V. Faddis
Tel:  (212) 356-2486

*Due and timely service is hereby admitted.*

*New York, N.Y.   ......................................................., 202......*

*...................................................................... Esq.*

*Attorney for...........................................................................*

15