UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE ESTATE OF MIGUEL RICHARDS,

Plaintiff,

- against -

THE CITY OF NEW YORK, ET AL.,

Defendants.

18 CV. 11287 (MKV)

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

ZMO LAW PLLC
260 Madison Avenue, 17th Fl.
New York, NY 10016
(212) 685-0999

LAW OFFICES OF DANIEL A. MCGUINNESS PC
260 Madison Avenue, 17th Fl.
New York, NY 10016
(212) 685-0999
*ATTORNEYS FOR DEFENDANT ESTATE OF MIGUEL RICHARDS*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

FACTS ............................................................................................................. 2

LEGAL STANDARD.......................................................................................... 2

ARGUMENT .................................................................................................... 5

   I.   A REASONABLE JURY COULD FIND THAT
       DEFENDANTS USED EXCESSIVE FORCE
       AGAINST MIGUEL.................................................................................... 5

       A.   Using Lethal Force Against Miguel Was
           Objectively Unreasonable................................................................. 6

       B.   Shooting Miguel 15 More Times Was
           Objectively Unreasonable............................................................... 14

       C.   Tasing Miguel was objectively unreasonable ................................. 15

       D.   Handcuffing Miguel While He Lay
           Incapacitated and Dying Was Objectively
           Unreasonable.................................................................................. 17

  II.  DEFENDANTS ARE NOT ENTITLED TO
       QUALIFIED IMMUNITY FOR THEIR USES OF
       FORCE.................................................................................................... 18

       A.   Defendants Fleming and Murphy are not
           Entitled to Qualified Immunity for the Use of
           Deadly Force................................................................................... 19

       B.   Defendants Fleming and Murphy should not be
           granted Qualified Immunity for Continuing to
           Shoot Miguel after he was Incapacitated and
           Falling to the Ground. .................................................................... 22

       C.   Defendant Ramos is not Entitled to Qualified
           Immunity for Tasing Miguel........................................................... 23

       D.   Defendant Oliveros is not Entitled to Qualified
           Immunity for Handcuffing Miguel ................................................. 23

III.  A REASONABLE JURY COULD FIND THAT
      DEFENDANTS WERE DELIBERATELY
      INDIFFERENT TO MIGUEL'S MEDICAL
      NEEDS ............................................................................................................ 24

IV.   DEFENDANTS FAILED TO INTERVENE TO
      PREVENT THE VIOLATION OF MIGUEL'S
      CONSTITUTIONAL RIGHTS ........................................................................... 26

V.    DEFENDANTS' MOTION FOR SUMMARY
      JUDGMENT FOR *MONELL* LIABILITY SHOULD
      BE DENIED ...................................................................................................... 28

VI.   THE COURT SHOULD NOT DISMISS
      PLAINTIFF'S STATE LAW CLAIMS .............................................................. 33

      A.   Plaintiff's Assault and Battery Claim Does Not
           Fail As A Matter of Law ......................................................................... 33

      B.   Plaintiff's Wrongful Death Claim Does Not Fail
           as a Matter of Law .................................................................................. 33

CONCLUSION ................................................................................................................ 35

## **INTRODUCTION**

Defendant police officers and the City of New York correctly concede that there is no dispute that they Tasered, shot, and handcuffed Miguel Richards in his bedroom in the Bronx on September 6, 2017, causing him to die. But, as the Court has correctly recognized, virtually everything else important in this case is hotly disputed by the parties based on video evidence, crime scene forensics, and self-serving, contradictory statements by the defendant police officers. The one person who could give an account of the incident from Mr. Richards's point of view—Mr. Richards himself—is dead as a direct result of Defendants' conduct. As explained below, there is ample evidence from which a jury could conclude that no reasonable officer could have believed that Mr. Richards was pointing a gun at anyone when the police opened fire with their Taser and firearms. There is ample evidence that the officers' handcuffing of Mr. Richards after he fell to the ground was unnecessary and constituted excessive force. There is ample evidence that the officers' delay in providing medical care as Mr. Richards lay bleeding after the shooting constituted deliberate indifference to a serious medical need of person in their custody. In their motion, the defendants point to nothing more than self-serving, contradictory testimony and ambiguities in the videos. We submit that the video evidence, analyzed in conjunction with the defendants' ever-changing statements, in fact *is* clear: the officers at best did not see a gun pointed at them when they opened fire and, at worst, planted a toy gun at the scene in order to justify their bad shooting after the fact. Accordingly, whether or not the defendants in this case violated the Constitution when they killed Mr. Richards presents numerous questions of material fact and summary judgment should be DENIED.

## FACTS

On September 6, 2017, Officers Mark Fleming and Redmond Murphy were assigned to conduct a "wellness check" at 3700 Pratt Avenue in the Bronx. *See* Plaintiff's 56.1 Statement ¶ 139. The officers stopped at a bank and pizza restaurant before responding. *Id*. at ¶ 139. Once they finally arrived, seventy-nine minutes later, they were greeted by the landlord of the building who told them that he had called because one of his tenants, Miguel Richards, had not been seen for a period of time. *Id*. at ¶ 12.

The officers encouraged the landlord to force open Mr. Richards's bedroom door. *Id*. at ¶ 20. The officers then entered Mr. Richards's room with the landlord and discovered Mr. Richards standing motionless in the corner of the dark room. *Id*. at ¶ 21. Mr. Richards made no threatening moves or statements but was holding a knife by his side. *Id*. at ¶ 23 and ¶ 143. The officers retreated to the doorway and pointed their firearms at Mr. Richards, who remained silent and motionless in the far corner of the room. *Id*. at ¶ 26.

For approximately fifteen minutes, the officers yelled commands and pointed their guns at Mr. Richards, despite the facts that he was clearly an emotionally disturbed person ("EDP") confined in his own bedroom and that he made no threats or attempts to flee. *Id*. at ¶ ¶ 150 - 151. During this time, the officers took a number of actions in contravention to NYPD policies: Officer Fleming blocked his body-warn camera, obscuring the only clear vantage point into Miguel's bedroom; the officers decided to have Mr. Richards tased without a supervisor's approval; they told dispatch not to send the Emergency Services Unit ("ESU"), who are specially trained to handle such situations; and they remained within close proximity to Mr. Richards, even though they were able to retreat and Mr. Richards was contained in his bedroom. *Id*. at ¶ ¶ 146, 147, 154.

Eventually, Officer Jesus Ramos and his partner, Officer Marcos Oliveros, arrived at the scene. *Id.* at ¶ 66. Officer Ramos was armed with a Taser electro-conductive weapon. *Id.* at ¶ 67. At the direction of Officers Fleming and Murphy, Officer Ramos moved in to tase Mr. Richards. *Id.* at ¶ 72.[1] As Officer Ramos moved across the threshold into the bedroom with his only the Taser in his hands, Mr. Richards raised his right hand. *Id.* at ¶ 75. The officers flinched backwards. *Id.* at ¶ 76. After seeing nothing in Mr. Richards's hand, Ramos re-entered the room with his Taser. *Id.* at ¶ 76. Officer Fleming fired a shot. *Id.* at ¶ 85. Officer Ramos then fell to the ground in response to Officer's Fleming's shot. *Id.* at ¶ 80. Officers Fleming and Murphy fired 15 additional shots at Mr. Richards, including at least one shot that was fired downward when Mr. Richards was already falling or on the floor. *Id.* at ¶ 93, ¶ 95, and ¶ 96.

After the shooting, the Officers walked all the way into the bedroom and saw Mr. Richards bleeding to death on the floor. *Id.* at ¶ 104. Officer Fleming then stomped on Mr. Richards's limp hand, purportedly to dislodge the knife, even though Mr. Richards was clearly incapacitated. *Id.* at ¶ 108. Officer Oliveros handcuffed Mr. Richards, who was dying and essentially motionless. *Id.* at ¶ 109. Afterwards, a number of other officers responded to the scene, including Officer John McLoughlin. *Id.* at ¶ 186.

Officer McLoughlin was the only officer at the 47th Precinct who had been involved in a police shooting death of a civilian within the past ten years. *Id.* at ¶ 187. After peering into the bedroom, Officer McLoughlin exited the apartment building. *Id.* at ¶ 190. Once in front of the building, Officer McLoughlin spoke to someone in a hooded

---

[1] Officer Ramos did not assess the totality of the circumstances as directed by the NYPD Patrol Guide. *Id.* at ¶ 171.

sweatshirt, who appeared to hand him something. *Id.* at ¶ 192. Meanwhile, inside the apartment, Officer Murphy asked Officer Fleming, "Where is it? Where is it? Where is he?" *Id.* at ¶ 191.

Officer McLoughlin re-entered the apartment and approached Officer Fleming, who had exited the bedroom. *Id.* at ¶ 195. Officer McLoughlin appeared to hand Officer Fleming an object, and then turned to Officer Murphy and made a cut motion by moving his hand along his throat. *Id.* at ¶ 196 and ¶ 197. Officer Fleming turned around and appeared to look down at an object in his hands. *Id.* at ¶ 198. He then re-entered the bedroom, stepped over Mr. Richards's body, went over to the wall next to the dresser, momentarily pointed his body camera directly at the wall, and pointed his camera down, showing the imitation firearm in a location it previously was not present. *Id.* at ¶ 199 and ¶ 200. Officer Fleming exited the bedroom immediately thereafter. *Id.* at ¶ 202. Officer Fleming later testified falsely in an internal police investigation that he did not move the imitation firearm. *Id.* at ¶ 204. Mr. Richards was pronounced dead at 18:05 hours. *Id.* at ¶ 123.

## **LEGAL STANDARD**

Summary judgment may be granted only where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a court resolves all ambiguities and draws all reasonable inferences in favor of the non-moving party. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v.*

*Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004); *Dasrath v. City of New York*, No. 15-cv-766 (AMD), 2018 WL 10501877, at *5 (E.D.N.Y. Sept. 25, 2018) (denying summary judgment where deadly police shooting was partly captured on surveillance camera and noting that "[l]awsuits involving encounters between citizens and police officers are, by their very nature, almost entirely dependent on the facts."). The Second Circuit has specifically cautioned against relying on officer testimony when the use of force results in death, because "the witness most likely to contradict the police officer's story . . . is unable to testify[]" and "the court may not simply accept what may be a self-serving account by the police officer[s]," but rather "must also consider circumstantial evidence that, if believed, would tend to discredit the police officer[s'] story[.]" *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003); *accord, e.g.*, *Public Administrator v. City of New York*, No. 06 Civ. 7099, 2009 WL 498976, at *6, 10 (S.D.N.Y. Feb. 24, 2009).

## ARGUMENT

**I.    A Reasonable Jury Could Find that Defendants Used Excessive Force Against Miguel**

A reasonable jury could find that the use of lethal and non-lethal force against Miguel was objectively unreasonable and therefore excessive. To assess reasonableness, courts consider: "[i] the severity of the crime at issue, [ii] whether the suspect poses an immediate threat to the safety of the officers or others, and [iii] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Pelayo v. Port Auth.*, 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 386 (1989)). The reasonableness inquiry focuses on "the officer's knowledge of circumstances immediately prior to and at the moment" of a shooting, *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996), but may incorporate the "sequence of events leading to the shooting." *Stevens*

*v. Metro. Transp. Auth. Police Dep't*, 293 F. Supp. 2d 415, 421 (S.D.N.Y. 2003). In this case, only the second *Graham* factor is in issue—it is beyond dispute that no crime had been committed or alleged and that Miguel was neither actively resisting arrest or attempting to evade arrest.

### A.   Using Lethal Force Against Miguel Was Objectively Unreasonable

In cases that involve deadly force, the "operative question" is whether a reasonable officer would have believed his or her life was in danger. *Daniel v. Rivera*, No. 14-CV-00259 (PKC), 2016 WL 5947289, at *2 (S.D.N.Y. Oct. 13, 2016) (emphasis added) (citing *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003)). Drawing all reasonable inferences in Plaintiff's favor, a reasonable officer would not have perceived Miguel as a deadly threat because (1) Miguel did not possess a toy gun at any time during the encounter; (2) even if Miguel was holding a 3.5-inch plastic toy gun, a reasonable officer would not have mistaken it for an actual firearm; (3) Miguel was not pointing his arm at the officers immediately prior to or at the moment of the shooting; (4) the officers' statements and actions prior to the shooting—particularly sending Officer Ramos, with no gun drawn, into the room to confront Miguel—suggest they did not believe Miguel had a gun; and (5) the "sequence of events leading to [Miguel's] shooting" suggests that Miguel posed no danger to the officers. *See Stevens*, 293 F. Supp. 2d at 421. Further, even if Miguel did point a toy gun at the officers immediately prior to or at the moment he was shot, the shooting was objectively unreasonable because Fleming and Murphy needlessly created the need to "immediately begin firing." *See Cox v. Vill. of Pleasantville*, 271 F. Supp. 3d 591, 618 (S.D.N.Y. Sept. 26, 2017).

First, as set forth in Plaintiff's Rule 56.1 Counter Statement, Plaintiff disputes that Miguel ever possessed the 3.5-inch toy gun that Defendants claim they located in Miguel's bedroom following the shooting. Further, Fleming and Murphy had their firearms drawn, while Miguel was contained, holding only a small knife, standing motionless in the corner. Accordingly, a reasonable officer would not have perceived Miguel as a deadly threat, and the decision to shoot him was objectively unreasonable. *See, e.g.*, *O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003) ("It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.").

Second, assuming Miguel *was* holding a 3.5-inch-long plastic toy gun, a reasonable jury could determine that it was unreasonable to mistake the toy as a real firearm. *See Lopez v. Gelhaus*, 871 F.3d 998, 1009 (9th Cir. 2009) (affirming denial of summary judgment in shooting of a plaintiff wielding "a plastic gun designed to replicate an AK-47," where the defendant-officer believed the gun was real but a civilian witness said. "the gun look[ed] fake"); *Nance v. Sammis*, No. 3:07-CV-00119 SCM, 2009 WL 308606, at *12 (E.D. Ark. Feb. 5, 2009), *aff'd*, 586 F.3d 604 (8th Cir. 2009) ("[T]here are genuine issues of material fact as to whether Farrow held a toy gun in his hand that could be mistaken for a real gun . . ."). *Cf. Pelzer v. City of Philadelphia*, No. 07-CV-0038, 2011 WL 93054, at *6 (E.D. Pa. Jan. 11, 2011) ("To determine whether an officer's use of force was reasonable where the officer testifies he saw an object he believed was a weapon, but later learned was not a weapon, a jury must consider whether a reasonable officer could have mistaken the item in question—here, a cellular phone—for a weapon.").

Third, the record shows that Miguel was *not* pointing his arm at the officers when he was shot. Camera footage shows that Miguel raised his arm five seconds *before* the shooting took place, and Officer Fleming testified that Miguel immediately lowered his arm. *See* Fleming Tr., 77:21 - 81:10, Faddis Decl., Ex. C; Ramos BWC 18:00:57 - 18:01:11, Faddis Decl., Ex. J. Fleming, Murphy, and Ramos each told the NYPD's Force Investigation Division ("FID") that Miguel only raised his arm once.[2] Thus, it is reasonable to infer that Miguel momentarily raised his arm five seconds before the shooting—as captured on the body camera footage—then lowered his arm and was fired upon five seconds later. Under these circumstances, it was objectively unreasonable to perceive Miguel as a deadly threat "immediately prior to or at the moment of" the shooting; indeed, Murphy *did not* open fire until a full second after Fleming. *See* Murphy BWC 18:01:00 - 18:01:07, Faddis Decl., Ex. I; Murphy Tr., 110:7 - 111:5, Faddis Decl., Ex. D. Moreover, the officers' testimony that Miguel "bladed" his body and raised an apparent firearm does not resolve the factual question of whether a reasonable officer would have perceived Miguel as an imminent deadly threat at the moment of the shooting. *See Daniel v. Rivera*, No. 14-cv-00259 (KPC), 2016 WL 5947289, at *3 (S.D.N.Y. Oct. 13, 2016) (denying summary judgment on excessive force claims despite the defendant's contention that video evidence "unequivocally show[ed] that immediately before each time he discharged his

---

[2] Officer Fleming testified that Miguel raised his hand twice, but his testimony should not be credited, as Fleming admitted to telling a completely different story to both the FID. and the Bronx District Attorney's Office. Fleming Tr. 83:16-22, Faddis Decl., Ex. C. Specifically, Fleming told the FID. and prosecutors that he shot Miguel because Ramos had already discharged his taser but the taser was ineffective, *id.*, yet body-worn camera footage shows conclusively that Fleming discharged his weapon *prior to* Ramos discharging the taser and falling. For his part, Ramos testified that he "hit the deck" in response to Fleming's gunshot—not because of something that Miguel did.

weapon," plaintiff "'bladed' his body, which made it appear as if [the plaintiff] was about to fire his imitation handgun.").

Critically, had Fleming not covered his body-worn camera, there would be no dispute about what, if anything, Miguel was holding in his right hand or about whether Miguel raised his arm for a second time immediately prior to or at the moment of the shooting. *Cf. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (defining spoliation as "the destruction or significant alteration of evidence" and sanctioning the responsible party with an adverse inference). Several minutes into the encounter with Miguel, Fleming used his glove to block his camera, negating the only vantage point that would have captured Miguel during the five seconds before he was shot. *See* Fleming BWC 17:53:18 - 18:01:08, Faddis Decl., Ex. H. Even though Plaintiff is entitled to all reasonable inferences on this motion, Defendants ask the Court to draw a critical inference in *their* favor, and in so doing reward officer Fleming for violating an NYPD policy designed to "encourage lawful . . . interactions between the public and the police" and to "provide important evidence in criminal and civil proceedings."[3] The Court should not draw that

---

[3] According to the NYPD's website:

> The purpose of body-worn cameras is to record enforcement, investigative and other encounters between the police and the public. They provide a contemporaneous, objective record of these encounters, facilitate review of events by supervisors, foster accountability, and encourage lawful and respectful interactions between the public and the police. The use of body-worn cameras has shown that cameras may help de-escalate potentially volatile encounters. The cameras may also provide important evidence in criminal and civil proceedings as well as resolving civilian complaints.

> https://www1.nyc.gov/site/nypd/about/about-nypd/equipment-tech/body-worn-cameras.page.

inference, particularly as Defendants' credibility is at issue and Miguel is not here to tell his side of the story. *See Dasrath v. City of New York*, No. 15-cv-766 (AMD), 2018 WL 10501877 at *3, n. 8 (E.D.N.Y. Sept. 25, 2018) ("The videos . . . do not capture the entire encounter . . . Thus, the appropriate course of action is still to permit the jury an opportunity to resolve the competing versions of events, *in conjunction with the video*, through the ordinary fact-finding processes . . ..") (emphasis in original) (quotations and citations omitted). *See also O'Bert*, 331 F.3d at 37 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)) ("[G]iven the difficult problem posed by a suit for the use of deadly force, in which "the witness most likely to contradict [the police officer's] story—the person shot dead—is unable to testify[,] .... the court may not simply accept what may be a self-serving account by the police officer.").

Fourth, the officers' statements and actions prior to the shooting "provide strong circumstantial evidence that the officers knew [Miguel] remained unarmed." *See O'Bert*, 331 F.3d at 39. Seconds prior to the shooting, Fleming and Murphy directed Ramos, with no firearm drawn, to enter the bedroom to confront Miguel. *See* Murphy BWC 18:00:55 - 18:01:02; Faddis Decl., Ex. I. A reasonable jury could find that Fleming and Murphy would not have sent an unarmed officer into a small, confined space to confront an emotionally disturbed person if the officers actually believed that person had a gun. As the Second Circuit explained in *O'Bert*, a rational factfinder could infer that the officers did not actually believe that Miguel posed a deadly threat:

> [I]t is undisputed that Fagerholm walked to within a few feet of O'Bert and put away his own gun. That conduct would have been foolhardy if the officers had any reason to believe O'Bert had a gun in his hand, because Fagerholm could easily have been shot or grabbed as a hostage. A rational factfinder could easily infer that Fagerholm's holstering his gun after placing himself within O'Bert's reach belies Vargo's claim that the officers believed that O'Bert could be armed.

*Id.* at 39 (affirming denial of summary judgment on excessive force claim).

At their depositions, Murphy and Fleming could not explain why they permitted Ramos to enter the bedroom unarmed if they thought Miguel had a gun. Murphy testified that he and Fleming wanted the encounter to "be over," a rationale that fails to justify using deadly force. *See* Murphy Tr. 104:13-22, Faddis Decl., Ex. D. *See Negron v. City of New York*, 976 F. Supp. 2d 360, 369 (E.D.N.Y. 2013) (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir.2001)) ("Even a legitimate [d]esire to resolve quickly a potentially dangerous situation is not the type of government interest that, standing alone, justifies the use of force that may cause serious injury."). Nor do Murphy's comments prior to the shooting, that "he might have a gun" and "I don't know if it's a toy or not," resolve whether a reasonable officer would have perceived Miguel as an imminent risk of deadly harm. *See* Murphy BWC 18:00:00 - 18:00:07 and 18:00:50 - 18:00:58, Faddis Decl., Ex. I. *See Nance v. Sammis*, No. 3:07-CV-00119 (SCM), 2009 WL 308606, at *21 (E.D. Ark. Feb. 5, 2009), *aff'd*, 586 F.3d 604 (8th Cir. 2009) (denying summary judgment in a case involving an imitation gun where, "[s]econds prior to the shooting, an officer appears to state that Gabriel 'had that gun,' while another shouts to 'put that down!'").

Fifth, the "sequence of events leading to [Miguel's] shooting" suggests that using deadly force was unjustified. *Stevens v. MTA Police Dep't*, 293 F. Supp. 2d 415, 421 (S.D.N.Y. 2010). *See Negron v. City of New York*, 976 F. Supp. 2d 360, 367 (E.D.N.Y.

2013) (denying summary judgment because "there were viable alternatives available to the police that could have avoided or at least minimized the risk to officers," such as "retreat[ing] from harm's way" or "wait[ing] for the arrival of the air bag that had been requested and was likely only a few minutes away."). ███████████████████

████████████████████████████████████████████████████████

████████████.[4] Miguel was not suspected of a crime and was not fleeing or "actively resisting" arrest. *See Graham*, 490 U.S. at 386. Before activating their body-worn cameras, Fleming, Murphy and Miguel's landlord broke into Miguel's bedroom; without realizing anybody else was inside, they walked within feet of Miguel, yet Miguel did not lunge at them with a knife or "fire" the object that the officers allegedly believed was a firearm. *See* Plaintiff's 56.1 Statement at ¶ 143. From that moment forward, a reasonable officer would have believed that Miguel did not intend to harm anybody, and nothing over the ensuing fifteen minutes would have reasonably altered that conclusion, as Miguel remained silent and still, apparently terrified by the guns trained on his torso and the officers screaming at him. See FID. Audio Statement of Officer Murphy, 32:00 - 34:00, McGuinness Decl., Ex. H.

Finally, even if Miguel *was* pointing a toy gun at the officers at the moment of the shooting, the use of lethal force against Miguel was nevertheless objectively unreasonable. Although the officer in *Salim* was not liable for "creat[ing] a situation in which the use of deadly force became necessary[,]" 93 F.3d at 92, that holding does not govern situations in which officers create the need to "immediately begin firing." *Cox v. Vill. of Pleasantville*,

───────────────

███████████████████████████████████████████████████
███████████████████████████████████████████████████

271 F. Supp. 3d 591, 618 (S.D.N.Y., Sept. 26, 2017). In *Cox*, the court denied summary judgment for an officer who placed himself in the path of a moving car and, 1.3 seconds later, shot into the car to prevent getting hit by it. The court explained why *Salim* does not apply under such circumstances:

> Defendants cite a line of cases examining federal claims for excessive force holding that an officer's "actions leading up to the shooting are irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force," because "[t]he reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996) . . . From this, Defendants argue that whether Hess himself created a situation in which deadly force was required is irrelevant. But the cases cited do not stand for this broad proposition . . . the claim in *Salim* was that the officer had caused the deadly situation by "failing to carry a radio or call for back-up, and also for failing to disengage when ... other children entered the fray." 93 F.3d at 92. The circumstances there were thus far different from those present here. Under Defendants' interpretation of the law, a police officer would be justified in standing on the side of a busy highway, stepping in front of speeding cars, and firing into the windshields under the guise of self-defense. Such a conclusion is both beyond the scope of *Salim* and unreasonable . . .

*Id.* at 617-18.

If Fleming and Murphy actually believed that Miguel had just pointed a live firearm at them, sending Ramos into the small bedroom to tase Miguel—then firing when Miguel raised his arm again—is not a justifiable shooting under *Salim*, just as the officer in *Cox* was not justified for jumping in front of a car and immediately firing shots in "self-defense."[5]

---

[5] In fact, the shooting here would be even less reasonable because, unlike the plaintiff in *Cox*, Miguel was contained and not attempting to flee.

**B.**      **Shooting Miguel 15 More Times Was Objectively Unreasonable**

Even if Fleming and Murphy were justified in opening fire, the use of force became excessive during the barrage of 15 additional shots, at least one of which was fired downward at Miguel's final resting place on the floor. *Dasrath*, 2018 WL 10501877, at *6 (denying summary judgment because "even if the decedent posed an imminent threat at the moment of the shooting, he was severely wounded after the first shot and falling to the ground."). Courts have denied summary judgment where there is evidence that officers continued to fire after their target was falling or lying on the ground. *See, e.g.*, *id*. at *4 (noting a "medical examiner report of the downward trajectories of the bullet wounds, which might suggest that the decedent was falling forward after the first shot."); *Bah v. City of New York*, No. 13-CV-6690 (PKC), 2017 WL 435823, at *5 (S.D.N.Y. Jan. 31, 2017) (denying summary judgment because of material issue of fact as to whether the final shot that killed the decedent was fired while he was lying wounded on the ground). *See generally, Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 295 (S.D.N.Y. 2014) ("[T]he fact that an initial use of force . . . was justified does not mean that all subsequent uses of ... force were similarly justified," even in a "rapidly unfolding" situation where only seconds separated the initial and subsequent uses of force) (citations omitted).

In *Dasrath*, an officer fired an initial shot at a large man who was charging at him with a kitchen knife. The officer "paused for one or two seconds to see if [the decedent] stopped," then fired four more shots because, according to the officer, "the decedent 'didn't break stride after the first shot'. . . [and] continued to advance." *Id*. at *2, 4. But the plaintiff argued that the decedent was "severely wounded after the first shot and falling to the ground," and the court ruled that "a jury could reasonably conclude that the decedent, at

14

some point, was no longer a threat to [the officer], and that the officer's decision to continue shooting at the decedent constituted excessive force." *Id*. at *6.

Evidence of overkill is stronger in this case than in *Dasrath*. Murphy and Fleming waited for about one second after Fleming's initial shot before unleashing a barrage of 15 additional bullets. An analysis by crime-scene investigators revealed that at least one of the bullets was fired at a downward trajectory toward Miguel's final resting place on the floor of his bedroom. Officer Ramos's body-worn camera confirms that the officers were still firing as Miguel was falling to the ground. *See* Ramos BWC, 18:01:08 - 18:01:11, Faddis Decl., Ex. J. Thus, even if the first shot was justified, a jury could reasonably find that the officers' continued use of lethal force became objectively unreasonable.

### C.    Tasing Miguel was objectively unreasonable

A reasonable jury could conclude that tasing Miguel was objectively unreasonable because Miguel posed no immediate threat, was not "actively resisting" arrest or attempting to flee, and was not suspected of committing a crime. *See, e.g.*, *Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 295 (S.D.N.Y. 2014) (holding that it was "clearly established . . . that in effectuating a lawful arrest, an officer used excessive force by firing a taser in stun mode against an individual not suspected of a crime and who no longer actively resisted arrest").

"A taser unquestionably seizes the victim in an abrupt and violent manner, and causes an intrusion into the interests ... protected by the Fourth Amendment [that is] quite severe." *Negron v. City of New York*, 976 F.Supp.2d 360, 367 (E.D.N.Y. 2013) (quotations and citations omitted). "Desire to resolve quickly a potentially dangerous situation is not the type of government interest that, standing alone, justifies the use of force that may cause serious injury." *Id.* at 369 (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th

Cir.2001)). Hence, using a taser is excessive force if "there were viable alternatives available to the police that could have avoided or at least minimized the risk to officers." *Id*.

Miguel was standing still in the corner of his bedroom when Ramos approached and pointed the taser at him. The officers decided to tase Miguel not for their own safety, but because they wanted to "take him down" so that the encounter would "be over." *See* Murphy Tr., 104:20, Faddis Decl., Ex. D. As a matter of law, this reasoning cannot justify using a taser. *See Negron*, 976 F.Supp.2d at 369. Like the plaintiff in *Negron*, Miguel was "trapped in a small area" and was "only conceivably dangerous to those in the immediate vicinity; the officers in reach could have retreated from harm's way," *id.*, just as Fleming and Murphy in fact did when they initially entered the room and found themselves within striking distance of Miguel. *See* FID. Audio Statement of Officer Fleming, 8:00 - 10:30, Faddis Decl., Ex. L; Fleming Tr., 45:2-22, Faddis Decl., Ex. C; FID. Audio Statement of Officer Murphy, 8:00 - 10:00, McGuinness, Decl., Ex. H; Murphy Tr., 57:15 - 59:24, Faddis Decl., Ex. D. The officers knew that specially trained ESU officers were already on the scene and would return within seconds or minutes with equipment likely to diffuse the situation without serious injury to Miguel or the officers. *See* Murphy BWC 18:59:45 - 18:00:00, Faddis Decl., Ex. I. *See id.* ("The police might also have waited for the arrival of the air bag that had been requested and was likely only a few minutes away.").

Defendants argue that Ramos saw a red laser reflect off his badge, which Defendants claim is supported by an image in which Miguel appears to have his arm raised and a laser dot on his upper torso. Yet, it was at this very moment that Ramos pointed *his* taser—which projected a red laser dot in the direction it is aimed—directly at Miguel's

chest. *See* Oliveros BWC 18:00:56 - 18:01:02, Faddis Decl., Ex. K; Ramos BWC 18:00:56

- 18:01:04, Faddis Decl., Ex. J. Thus, this sequence raises a number of genuine issues of

material fact, including whether Ramos actually saw a red laser dot reflect off his badge

and whether any such laser dot originated from his own taser as opposed to something in

Miguel's hand.

### D. Handcuffing Miguel While He Lay Incapacitated and Dying Was Objectively Unreasonable

Finally, it was objectively unreasonable for Defendant Oliveros to lean on Miguel's

back with his knee and handcuff him while he lay bleeding on the floor. See Fleming BWC

18:02:20, Faddis Decl., Ex. H; Oliveros Tr. 45:3 - 47:17, Faddis Decl., Ex. F; Santana

BWC 18:02:10 - 18:02:25, McGuinness Decl., Ex. E. *See Alvarez v. City of New York*, No.

11 Civ. 5464 (AT), 2015 WL 1499161, at *8 (S.D.N.Y. Mar. 30, 2015) (holding that a

reasonable jury could find excessive force against an officer who handcuffed a gunshot

victim who lay "incapacitated and bleeding on the ground"). *See generally Weather v. City

of Mount Vernon*, No. 08 Civ. 192, 2011 WL 1046165, at *9 (S.D.N.Y. Mar. 22, 2011),

*aff'd*, 474 Fed. Appx. 821 (2d Cir. 2012) ("Under the law, police are not permitted to use

any degree of force in all instances-in some circumstances, no use of force is reasonable

because none is required.").

In *Alvarez*, the Court denied summary judgment because the officer who cuffed the

gunshot victim "testified that he did not see the [arrestee's gun] until after he handcuffed

[him]." *Id*. at 19 (emphasis in original). The instant case presents the same operative facts.

Defendant Oliveros testified that when he handcuffed Miguel, Miguel was already

incapacitated, and that prior to the handcuffing, Oliveros saw no weapon that could pose a

threat to the officers. *See* Oliveros Tr. 45:3 - 46:5, Faddis Decl., Ex. F. Defendants'

17

assertion that "Richards was still moving and holding a knife in his left hand" is, at best, misleading. Video shows that, after the shooting, the knife was resting in Miguel's motionless left hand while Miguel's right arm twitched slightly. As Oliveros took out the handcuffs, Miguel's torso was motionless, his right arm was not moving, and his left arm was pinned to the ground by Fleming's shoe. *See* Fleming BWC, 18:02:15 - 18:02:27, Faddis Decl., Ex. H; Oliveros BWC 18:02:00 - 18:02:35, Faddis Decl., Ex. K. A reasonable officer would have recognized that Miguel was gravely injured and posed no threat to the group of armed officers surrounding him, and that no force of any kind was reasonable or necessary.

## II.   Defendants are Not Entitled to Qualified Immunity for Their Uses of Force

The defendants may not benefit from qualified immunity on this motion because the facts, taken in a light most favorable to Plaintiff, show violations of constitutional rights that were clearly established at the time of Miguel's death.

"Summary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant 'show[s] that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law.'" *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (citations omitted). *See Hemphill v. Schott*, 141 F.3d 412, 417-18 (2d Cir. 1998) (overturning summary judgment based on qualified immunity where a factual dispute remained as to whether the arrestee posed a threat to the officer and whether the arrestee raised his hands in the air when commanded.); *Alvarez v. City of New York*, No. 11 CIV. 5464 AT, 2015 WL 1499161, at *6 (S.D.N.Y. Mar. 30, 2015) (citing *Thomas v. Roach*,

165 F.3d 137, 144 (2d Cir. 1999) ("The Second Circuit has consistently held that summary judgment is inappropriate where, as here, the determination of whether a constitutional violation occurred 'turns on which of two conflicting stories best captures what happened on the street.'") *See generally Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances[,] so long as officers had 'fair warning' that their conduct was unconstitutional.") (citations omitted).

### A. Defendants Fleming and Murphy are not Entitled to Qualified Immunity for the Use of Deadly Force

On September 6, 2017, when Miguel was killed, it was clearly established that the Fourth Amendment forbids using deadly force absent a reasonable belief that the suspect poses a deadly threat. *See*, *e.g.*, *O'Bert*, 331 F.3d at 36 (citing *Tennessee v. Garner*, 471 U.S.1, 3, 11 (1985)). Because a reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could find that a reasonable officer would not have perceived Miguel as an imminent deadly threat, *supra*, Defendants Fleming and Murphy are not entitled to qualified immunity.

In the context of deadly police shootings, courts do not grant summary judgment based on qualified immunity if there is a genuine issue of material fact as to whether a reasonable officer would have perceived the decedent as posing a significant threat of death or physical harm. *See, e.g.*, *Daniel v. Rivera*, No. 2016 WL 5947289, at *3 (S.D.N.Y. Oct. 13, 2016) (denying qualified immunity because there was a genuine issue of material fact as to whether an officer reasonably believed that a fleeing suspect, armed with a toy gun and "blading" his body, "was preparing to fire upon him or his fellow officers."); *Cowan*,

352 F.3d at 764.  As the Second Circuit explained in *Cowan*, when the reasonableness of the shooting remains at issue, there is no basis for extending qualified immunity:

> Breen would be entitled to qualified immunity if he reasonably believed at the moment he fired at Cooper that she posed a significant threat of death or serious physical harm to him or others. But this question——whether it was reasonable for Breen to believe that his life or person was in danger——is the very question upon which we have found there are genuine issues of material fact. Because in this case genuine, material, factual disputes overlap both the excessive force and qualified immunity issues, summary judgment must be denied.

*Cowan*, 352 F.3d at 764.

To bolster their qualified immunity argument, Defendants overstate the factual similarities between this case and *Kisela v. Hughes*, 138 S. Ct. 1148 (2018). In *Kisela*, the officer arrived on scene and was immediately confronted with "a woman [Hughes] who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down [the police]." *Id*. at 1153. As the officer arrived, Hughes quickly approached the bystander, Chadwick, with a large kitchen knife. A chain-link fence separated the officer from Hughes and Chadwick, limiting the officer's tactical options. *Id*. at 1151. The officer had "mere seconds to assess the potential danger" to Chadwick; Hughes approached "within a few feet" of Chadwick, so the officer, without alternative means of intervening, fired four shots to prevent a potentially fatal knife attack. *Id*. at 1153.

In stark contrast, for roughly fifteen minutes, Fleming and Murphy observed Miguel standing motionless in the corner of his own bedroom, threatening nobody, before the officers fired 16 shots at him. Miguel was trapped in a small space and there were no civilians "within striking distance" when the shooting occurred. *See* Fleming BWC *passim*,

Faddis Decl., Ex. H; Murphy BWC *passim*, Faddis Decl., Ex. I. In fact, when Fleming, Murphy and Miguel's landlord *were* within striking distance, Miguel did not lunge or move toward them, indicating Miguel did not intend to harm anybody. See FID. Audio Statement of Officer Fleming 8:00 - 10:30, Faddis Decl., Ex. L; Fleming Tr. 43:14-25 and 45:2-22, Faddis Decl., Ex. C; FID. Audio Statement of Officer Murphy 8:00 - 10:00, McGuinness Decl., Ex. H; Murphy Tr. 57:15 - 59:24, Faddis Decl., Ex. D. Thus, whereas Miguel was trying to *avoid.* physical confrontation and was contained by officers in a small space, the plaintiff in *Kisela* was bearing down on an unarmed civilian with a large kitchen knife and was shielded from officers by a metal fence.

Further, the Court in *Kisela* determined that all analogous cases within the Ninth Circuit, where *Kisela* originated, supported granting qualified immunity under the specific facts of that case. 138 S. Ct. at 1153-54. Here, by contrast, if the officers did not reasonably perceive that Miguel presented an imminent threat, then this is an "obvious case" in which *Garner* and *Graham* are themselves sufficient to put Fleming and Murphy on notice that their conduct was unlawful. *Kisela*, 138 S. Ct. at 1153. Thus, in *Daniel*, where the plaintiff "bladed" his body "in order to fire what appeared to be a handgun" (but what was actually a toy gun), Judge Castel declined to grant qualified immunity to officers at summary judgment. *See Daniel*, 2016 WL 5947289, at *3 ("[T]he Supreme Court has held that a police officer could not use deadly force to stop a fleeing suspect who 'poses no immediate threat to the officer and no threat to others.' Genuine issues of material fact regarding the reasonableness of Officer Rivera's use of deadly force are disputed and preclude summary judgment at this stage.") (citing *Garner*, 471 U.S. at 11). *See also Lopez v. Gelhaus*, 871 F.3d 998, 1009 (9th Cir. 2009) (declining to apply qualified immunity in the shooting of

plaintiff with "a plastic gun designed to replicate an AK-47," which officers claimed the decedent "was raising and turning toward us.").

> **B.**     **Defendants Fleming and Murphy should not be granted Qualified Immunity for Continuing to Shoot Miguel after he was Incapacitated and Falling to the Ground.**

Even if qualified immunity shielded the initial decision to fire at Miguel, it does not shield the subsequent barrage of gunfire by Defendants Fleming and Murphy. In September 2017, clearly established law prohibited officers from continuing to shoot a person who no longer posed a threat to officers—regardless of whether the initial use of force was justified. *See, e.g.*, *O'Bert*, 331 F.3d at 39-40; *Bah v. City of New York*, No. 13-cv-6690 (PKC) 2017 WL 435823, at 5* (S.D.N.Y. Jan. 31, 2017); *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 437-38 (S.D.N.Y. 2015). In *Bah*, the plaintiff alleged that an officer fired a final shot while the decedent was grievously wounded and no longer posed a threat. The court, citing to the Second Circuit's decision in *O'Bert*, denied summary judgment because, "[i]f proven, this would violate a clearly established right." 2017 WL 435823, at *5 (citing *O'Bert*, 331 F.3d at 29, 39-40). *See also Alvarez*, 2015 WL 1499161, at *6 (rejecting a qualified immunity defense at summary judgment where parties disagreed over "whether the police continued to shoot Plaintiff after he fell to the ground."). Similarly, based on the holdings in *O'Bert* and *Bah*, the court in *Dasrath* declined to apply qualified immunity because, according to the plaintiff, "[the decedent] was severely wounded after the first shot and falling to the ground." 2018 WL 10501877, at *7 ("If the jury finds that Officer Guzman continued to shoot the decedent when he was incapacitated and no longer a threat, then the officer's actions would violate the clearly established right in *O'Bert*.").

**C.    Defendant Ramos is not Entitled to Qualified Immunity for Tasing Miguel**

In October 2017, it was "clearly established . . . [that] an officer used excessive force by firing a taser in stun mode against an individual not suspected of a crime and who no longer actively resisted arrest." *Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 296, 297 (S.D.N.Y. Aug. 21, 2014) (surveying case law and concluding that "the contours of the constitutional right at issue here were indeed clearly established by March 2010."). *See Jones v. Treubig*, 963 F.3d 214, 227 (2d Cir. 2020) ("[I]t was clearly established before April 2015 that officers may not use a taser against a . . . non-threatening suspect.) (citations and quotations omitted).

Here, it is undisputed that when Miguel was tased, he was not suspected of a crime and he was not actively resisting arrest. Further, there are genuine issues of material fact as to whether a reasonable officer would have perceived Miguel as a threat at the time he was tased. Accordingly, Defendant Ramos is not entitled to qualified immunity for tasing Miguel.

**D.    Defendant Oliveros is not Entitled to Qualified Immunity for Handcuffing Miguel**

Defendant Oliveros used excessive force by handcuffing Miguel while he lay incapacitated and bleeding to death. *See* Oliveros Tr. 45:3 - 47:17, Faddis Decl., Ex. F. *Alvarez*, 2015 WL 1499161, at *6. Without question, a reasonable jury could find that a reasonable officer would not have considered Miguel a threat when the handcuffing occurred. *Supra*. In October 2017, clearly established law forbade using any type of force—including with handcuffs—on a person who was shot by the police and who did not pose a threat to police officers. *See, e.g.*, *id.* (citing *Cowan*, 352 F.3d at 764); *see also*

*Ketcham v. City of Mt. Vernon*, 2021 WL 1165401 (2d Cir. March 29, 2021) (denying summary judgment where arrestee was handcuffed: "With respect to the handcuffing, the question is ... whether an officer reasonably should have known during handcuffing that his use of force was excessive").

### III.   A Reasonable Jury Could find that Defendants were Deliberately Indifferent to Miguel's Medical Needs

Defendants violated Miguel's constitutional right to receive medical attention when, instead of performing first aId. on Miguel, the officers spent one minute and 13 seconds searching for a gun that did not exist.

"The Due Process Clause ... require[s] the responsible government or governmental agency to provide medical care to persons ... who have been injured while being apprehended by the police." *Garcia*, 43 F. Supp. 3d at 300. An official violates due process when (1) the plaintiff sustains a "sufficiently serious" deprivation and (2) the defendant "knows of and disregards an excessive risk to [detainee's] health or safety." *See, e.g.*, *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Here, there is no question that Miguel's injuries amounted to a "sufficiently serious" deprivation.     Defendants disregarded Miguel's life-threatening gunshot wounds because they declined to render first aId. despite knowing that Miguel would quickly die if someone did not control his bleeding. *Cf. Ocasio v. City of Canandaigua*, No. 18-CV-6712L, 2021 WL 115509, at *4-5 (W.D.N.Y. Jan. 13, 2021) (declining to dismiss due process claim where an officer shot the decedent and "callously failed to immediately summon or render medical aId. as she lay dying").

Defendants appear to take the position that a delay does not become "significant" unless hours or days have elapsed. Memorandum of Law in Support of Defendants' Motion

for Summary Judgment ("Br.") at 20-21. In fact, what amounts to an "significant delay" depends on the severity of the injury and the "particular risk of harm" resulting from the delay. *See Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003). *See also Valderrama v. Rousseau*, 780 F.3d 1108, 1122 (11th Cir. 2015) ("delays even of only a 'few minutes' in seeking care for life-threatening injuries can constitute deliberate indifference.") (citations omitted). Indeed, with respect to heavy bleeding, Defendants were trained that a "responder may only have seconds to save a victim's life." *See* Hartnett Tr. 68:25 - 70:14, Faddis Decl., Ex. G; NYPD Belt Trauma Training Kit Materials (produced as D001854), McGuinness Decl., Ex. H.

Moreover, courts have held that officers satisfy the subjective element of deliberate indifference when they "act[] with apparent self-interest" rather than tend to an injured arrestee. *See id.*, at 1122-23 ("[W]ere the jury to find that Sergeant Smith delayed seeking care . . . so that she and Detective Rousseau could craft a story to justify the shooting, then our prior case law clearly establishes that delay caused for this reason constitutes deliberate indifference"); *Scozzari v. Miedzianowski*, 454 F. App'x 455, 466 (6th Cir. 2012) ("Officers were aware of Scozzari's precarious medical condition but nevertheless engaged in activities unnecessary to their duties," such as "arrang[ing] [weapons] around Scozzari's body after the fact" and "call[ing] on the occupants of nearby cabins to view Scozzari's body and observe the weapons he purportedly brandished during the standoff.").

Here, instead of attempting to slow Miguel's uncontrolled bleeding, Defendants stomped on Miguel's hand, handcuffed him, and purported to search for a weapon that could justify their use of deadly force. See Fleming BWC 18:01:15 - 18:04:20, Faddis Decl., Ex. H; Fleming Tr. 88:10-18, Faddis Decl., Ex. C; Murphy BWC 18:01:15 -

18:04:20, Faddis Decl., Ex. I; Oliveros Tr. 45:3, Faddis Decl., Ex. F. Based on their training, Defendants knew that one minute and 13 seconds could mean the difference between life and death for Miguel. A reasonable jury could find that Defendants acted with deliberate indifference to Miguel's medical needs by declining to stem Miguel's bleeding—as they were trained to do—and instead letting Miguel bleed out on his bedroom floor until ESU arrived.

Finally, defendants state incorrectly that a plaintiff at summary judgment must provide "medical evidence that the alleged delay caused or exacerbated the decedent's injuries." Br. at 22. For this proposition, defendants cite *Johnson v. City of New York*, No. 12 Civ. 8265 (LAK), 2014 WL 5393181 at *6 (S.D.N.Y. Oct. 21, 2014), in which the plaintiff alleged he suffered a broken ankle for which treatment was delayed for four and a half hours, and *Simpson v. Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 444 (S.D.N.Y. 2016), where the plaintiff suffered a hyperextended leg, for which treatment (in the form of a wheelchair) was delayed for three hours. These cases do not require Plaintiff, at summary judgment, to provide medical evidence that delaying treatment for gunshot wounds exacerbated Miguel's injuries or led to his death.

## IV.   Defendants Failed to Intervene to Prevent the Violation of Miguel's Constitutional Rights

Defendants argue that the Court should grant summary judgment on Plaintiff's failure to intervene claim because no underlying constitutional violation occurred and because the officers had no "realistic opportunity to intervene." As discussed *supra*, however, a reasonable jury could find that Miguel did not pose a threat to the officers and that any use of force against him was excessive. Further, a reasonable jury could find that

Defendants had ample opportunity to intervene to prevent violations of Miguel's constitutional rights.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know [] that excessive force is being used," and the officer "had a realistic opportunity to intervene to prevent the harm from occurring." *Id*. (citations omitted). "[T]he question [of] whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016) (rejecting the use of a "bright-line rule" regarding what length of time provides "a realistic opportunity"). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson*, 17 F.3d at 557.

A reasonable jury could find that each individual defendant "had an opportunity to intervene" to prevent other officers from violating Miguel's constitutional rights. *Figueroa*, 825 at 107. In particular, Fleming and Murphy had at least 15 minutes to prevent the other from using unjustifiable deadly force against Miguel. Once Ramos arrived, he, too, had approximately fourteen seconds to communicate with Murphy and Fleming, and Ramos testified that when he entered the room to tase Miguel he did not believe Miguel had a

firearm. *See* Ramos BWC 18:00:51 - 18:01:05, Faddis Decl., Ex. J; Ramos Tr. 79:13-20 and 86:14-22, Faddis Decl., Ex. E. Finally, Defendants' assertion that "Fleming and Murphy discharged their firearms concurrently" is misleading, since the first shot—fired by Fleming—was followed by a noticeable pause, before the officers began emptying their clips at Miguel. See Fleming Tr. 80:2-8, Faddis Decl., Ex. C; Murphy BWC 18:00:58 - 18:01:08, Faddis Decl., Ex. I; Murphy Tr. 111:3-5, Faddis Decl., Ex. D. *Cf. Hicks v. Craw*, 405 F. Supp. 3d 374, 385 (N.D.N.Y. 2019) (denying summary judgment where plaintiff alleged officers "played different roles in the alleged excessive force"). Thus, even putting aside the 15 minutes leading up to the shooting, a reasonable jury could find that the pause after Fleming's initial shot gave Murphy a realistic opportunity to intervene, and that a reasonable officer in Murphy's situation would have directed Fleming to cease fire rather open fire himself     .

Finally, the individual defendants each had an opportunity to intervene to ensure that Miguel received the medical aId. that the Constitution guaranteed him. *Supra*.

## V.   Defendants' Motion for Summary Judgment for *Monell* Liability Should be Denied

As a preliminary matter, Plaintiff did not consent to adjudicating the merits of the *Monell* claim at summary judgment. *See* Court's Individual's Rule 4(a)(i) (pre-motion submissions must "summariz[e] the *grounds* for the proposed motion, and whether the motion is on consent of all parties.") (emphasis added). In their pre-motion letter, Defendants stated that they would seek dismissal of the *Monell* claim "because [plaintiff] will not be able to establish any underlying constitutional violation."[6] ECF No. 71 at 5.

---

[6] While Plaintiff understands that pre-motion letters are schematic, Defendants' letter is misleading. ECF No. 71 at 5. It provides that Defendants would be entitled to summary

Instead, Defendants have moved for summary judgment on fundamentally different grounds, arguing at length that Plaintiff's Amended Complaint is "insufficiently pled and [that] the evidence adduced thus far makes clear there is no set of facts on which the claim asserted [] could succeed." ECF No. 84, at 33, n. 4. This leg of Defendants' motion is premature, as no *Monell* discovery has been conducted. *See* ECF No. 33 (bifurcating *Monell* discovery). Nevertheless, the Amended Complaint sufficiently states a claim for municipal liability, and the evidence discovered during this litigation supports Plaintiff's allegation that the NYPD has adopted municipal customs and practices of failing to train officers to safely address emotionally disturbed people and failing to discipline officers who use excessive force against emotionally disturbed people. ECF No. 22 at 12.

Past decisions in this District have declined to dismiss *Monell* claims that are virtually identical to the one set forth in the Amended Complaint. In *Felix v. City of New York*, which involved the fatal shooting of an unarmed emotionally disturbed man, the plaintiffs sufficiently alleged that the NYPD failed to train and supervise officers on how to properly engage emotionally disturbed persons. 344 F. Supp. 3d 644, 659 (S.D.N.Y. 2018) (citing *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 393 (S.D.N.Y. 2013)) ("[C]ourts in this district have found inadequate training with respect to individuals with mental illness to sufficiently state a claim for failure to train or supervise."). Relying primarily on the same 2017 OIG Report cited in Plaintiff's Amended Complaint, the court in *Felix* explained that "NYPD officers regularly responded to individuals with mental

---

judgment of the *Monell* claim if the Court finds no underlying constitutional violation, a point about which there could be no disagreement. Defendants in fact argue that, regardless of individual liability, the *Monell* claim should be dismissed without the benefit of discovery.

illness in the field," that "there is some history of employees mishandling such situations," that "adequate training opportunities, including [Crisis Intervention Team], would make these situations easier for police officers to manage," and "a specific training deficiency— the failure to incorporate CIT or similar training practices[.]" *Id.* at 660 (citing OIG Report at 1-3).[7] Hence, the plaintiff satisfied the elements of municipal liability outlined by the Supreme Court in *City of Canton*, 489 U.S. at 390, n. 10. *See Felix*, 344 F. Supp. 3d at 660 (quoting *Chamberlain*, 986 F. Supp. 2d at 393)

Contrary to this Court's precedent, Defendants argue that the Amended Complaint fails to establish a pattern of misconduct because it cites "only" six deadly shootings of emotionally disturbed persons occurring over a 10-year period.[8] Br. at 25, 29. In *Chamberlain*, the court did not require references to *any* prior incidents because, with respect to encounters with emotionally disturbed persons, "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under [Section] 1983 without proof of a pre-existing pattern of violations." *Chamberlain*, 986 F. Supp. 2d at 391 (citing *Connick v. Thompson* 131 S. Ct. 1350, 1361 (2011)).  In *Felix*, the plaintiffs cited eight lawsuits and "two other instances in the press" that occurred over 30 years, proportionally fewer than the six cases over 10 years Plaintiff cites in the Amended Complaint. 344 F. Supp. 3d at 661. Moreover, rather than viewing the cited cases in isolation, the Court must consider them alongside the 2017 OIG Report and the NYCLU

---

[7] The 2017 OIG Report further provides that NYPD's policy on mental health encounters, in place at the time of Miguel's death, fall short of national best practices in seven out of eight categories. OIG Report at 18. Paragraph 112 of the Amended complaint incorporates these flaws by reference. ECF No. 22, at 17.

[8] The Amended Complaint provides an illustrative, not exhaustive, list of recent incidents. ECF No. 12, at 13-14.

Report also cited in the Amended Complaint. ECF No. 22 at 12, 15-16. *See Felix*, 344 F. Supp. 3d at 662. ("As other courts confronted with a pattern of lawsuits *and* corroborating reports have found, the Court concludes that Plaintiffs have adequately pled deliberately indifferent emotionally disturbed persons training policies.") (emphasis in original).

Next, Defendants argue that five of the cases cited in the Amended Complaint did not end in a verdict against the City. Yet, "there is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise or failure to train." *Felix*, 344 F. Supp. 3d at 662. Defendants also argue that the cases cited in the Amended Complaint involve allegations that are not sufficiently similar to form a pattern of misconduct, in that "not all of these incidents, including Richards, began as calls for EDPs." Br. at 37.  Of course, the common thread among these cases is the unnecessary killing of emotionally disturbed persons by NYPD officers, not whether the incidents "began as calls for EDPs." *See Felix*, 344 F.Supp.3d at 662 ("Even if the precise factual circumstances of these cases vary, ranging from eviction enforcement to emergency response situations[,] Plaintiffs' allegation that the cases illustrate NYPD officers' repeated failures to respond to emotionally disturbed persons is at least a plausible one."). Moreover, Defendants' assertion that "Richards had no reported history of mental illness" overlooks that Miguel was an "emotionally disturbed person" at the time of his shooting and that the individual Defendants were aware of this fact when they used excessive force against Miguel.[9]

---

[9] Defendants also misconstrue the Amended Complaint to predicate municipal liability on the City's failure to adopt "a particular training program," the Memphis Model. ECF No. 84 at 39. The Amended Complaint alleges, not that the NYPD's failure to adopt the Memphis Model is a *per se* constitutional violation, but that the NYPD's failure to adopt and implement "a similar model" is evidence of policymakers' deliberate indifference. *Id.*

Finally, even without *Monell* discovery, this litigation has produced compelling evidence that, at the time of Miguel's death, the City maintained a policy of failing to train and discipline officers who needlessly shoot emotionally disturbed persons. ███████

███████████████████████████████████████████████████ ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

at 11, 15. In other words, the City's decision not to adopt a model similar to the Memphis Model "reflect[s] a deliberate choice among various alternatives, rather than negligence or bureaucratic inaction." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007).

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

**VI.    The Court Should Not Dismiss Plaintiff's State Law Claims**

Defendants argue that the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims and that, regardless, the state law claims fail as a matter of law. First, as already discussed, *supra*, Defendants are not entitled to summary judgment on the federal claims, so there is no jurisdictional cause to dismiss the state law claims. Second, Defendants are incorrect that Plaintiff's claims for assault and battery and wrongful death fail as a matter of law.[11]

### A.    Plaintiff's Assault and Battery Claim Does Not Fail As A Matter of Law

"[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical." *Shaheed v. City of New York*, 287 F. Supp. 3d 438, 452 (S.D.N.Y. 2018) (citing *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991)). For the reasons set forth in Point I, *supra*, the Court should not grant Defendants' summary judgment on Plaintiff's claim for assault and battery, as the Defendants' use of force was objectively unreasonable.

### B.    Plaintiff's Wrongful Death Claim Does Not Fail as a Matter of Law

"Under New York law the elements of a cause of action for wrongful death are: (1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered

---

[11] With respect to Plaintiff's claim for negligent hiring, training, and retention, Plaintiff does not oppose the Defendants' motion for summary judgment.

pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." *Melvin v. Cty. of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, at *22 (S.D.N.Y. Mar. 29, 2016) (citations and quotations omitted).

Defendants argue that Plaintiff's wrongful death claim fails because Plaintiff cannot establish wrongful conduct or pecuniary loss suffered by a surviving distribute. First, with all reasonable inferences drawn in Plaintiff's favor, a reasonable jury could find that Defendants' unreasonable conduct caused Miguel's death. Second, Miguel died intestate and is survived by his parents, Barbara and Belvett Richards (whom Defendants deposed during this litigation), as well as two siblings. *See Melvin v. Cty. of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, at *22 (S.D.N.Y. Mar. 29, 2016) ("[A] distributee is a person entitled to take or share in the property of a decedent under the statutes governing descent and distribution.") (citations omitted). Accordingly, at trial, Plaintiff will readily establish pecuniary loss suffered by the surviving distributees.

## **CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment should

be DENIED.

Dated:  April 6, 2021
        New York, NY


                        Respectfully submitted,

                        ZMO LAW PLLC


                        By:        /s/
                           _____
                           Zachary Margulis-Ohnuma
                           Benjamin Notterman
                           260 Madison Avenue, 17th Fl.
                           New York, NY 10016
                           (212) 685-0999


                        LAW OFFICES OF DANIEL A. MCGUINNESS, PC


                        By:   _____
                           Daniel A. McGuinness
                           260 Madison Avenue, 17th Fl.
                           New York, NY 10016
                           (212) 679-1990