UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

THE ESTATE OF MIGUEL ANTONIO RICHARDS,

                              Plaintiff,

                -against-

THE CITY OF NEW YORK, POLICE OFFICER ("PO")
JESUS RAMOS, PO MARK FLEMING, PO
REDMOND MURPHY, and PO MARCOS OLIVEROS,
individually and in their official capacities,

                              Defendants.

-------------------------------------------------------------------x

**DEFENDANTS' REPLY TO PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS**

18 Civ. 11287 (MKV)

Defendants The City of New York, Officer Jesus Ramos, Officer Mark Fleming, Officer Redmond Murphy, and Officer Marco Oliveros, by their attorney, James E. Johnson, Corporation Counsel of the City of New York, submit this statement pursuant to Local Civil Rule 56.1, in response to plaintiff's counter-statement of material facts:[1]

**I.      The Parties**

     1.       On September 6, 2017, Miguel Antonio Richards (the "decedent") resided at 3700 Pratt Avenue, Bronx, New York 10466 (the "location"). (Amended Complaint ("Am. Complt."), annexed as Exhibit ("Ex.") "A" to the Declaration of Hannah V. Faddis, dated March 5, 2021 ("Faddis Decl."), ¶ 9).

         **Admitted.**

---

[1]  Defendants adopt the facts set forth herein only for purposes of the Motion for Summary Judgment and reserve the right to present different and/or conflicting facts at any trial in this matter.  See Vasconcellos v. City of New York, 12 Civ. 8445 (CM) (HBP), 2015 U.S. Dist. LEXIS 121572, at *4 (S.D.N.Y. Sept. 9, 2015) (Local Civil Rule 56.1 "means a party can 'admit' facts that it intends to dispute at trial without suffering any prejudice – the 'admission' …neither binds the party going forward if the motion is denied nor can it be admitted in evidence at trial.")

2.      On September 6, 2017, defendants Fleming, Murphy, Ramos, and Oliveros were employees of the City of New York, and members of the New York City Police Department ("NYPD").  (Answer to Amended Complaint, dated August 22, 2020 ("Ans. to Am. Complt."), annexed as Ex. "B" to the Faddis Decl., ¶ 7).

**Admitted.**

3.      On September 6, 2017, defendants Officers Fleming, Murphy, Ramos, and Oliveros were assigned as patrol officers in the 47th Precinct. (Transcript of Deposition of Redmond Murphy ("Murphy Tr."), 17:3-19:22, annexed to the Faddis Decl. as Ex. D; Transcript of Deposition of Marco Oliveros ("Oliveros Tr."), 9:12-16, 26:22-23, annexed to the Faddis Decl. as Ex. F).

**Admitted.**

4.      On September 6, 2017, Officers Fleming and Murphy were working together, assigned to Sector "C" ("Charlie") of the 47th Precinct. (Murphy Tr., 19:15-22, Faddis Decl., Ex. D; Oliveros Tr., 28:23-25, Faddis Decl., Ex. F).

**Admitted.**

5.      On September 6, 2017, Officers Ramos and Oliveros were working together, assigned to Sector "A" ("Adam") of the 47th Precinct. (Transcript of Deposition of Jesus Ramos ("Ramos Tr."), 27:12-16, annexed to the Faddis Decl. as Ex. E; Oliveros Tr., 26:22-23, Faddis Decl., Ex. F).

**Admitted.**

## II.     Background

6.      On September 6, 2017, at approximately 16:03 hours,[2] the owner of 3700 Pratt Avenue (the "Premises"), Glenmore Carey, called 911 and requested a wellness check on a tenant at the Premises who he had not seen in some time. (NYPD Intergraph Computer Aided Dispatch ("ICAD") System Event Chronology ("ICAD"), D1015, annexed to the Faddis Decl. as Ex. Q; Written Statement of Glenmore Carey ("Carey Written Stmt."), D235, annexed to the Faddis Decl. as Ex. N; 911 Call of Glenmore Carey ("911 Call"), annexed to the Faddis Decl. as Ex. M).

**Admitted.**

7.      On September 6, 2017, Mr. Carey reported in his 911 call that he had not seen his tenant, and that the tenant's family had knocked on the tenant's door and gotten no response. (911 Call, Faddis Decl., Ex. H).

**Admitted.**

8.      The tenant in question was the decedent, Miguel Antonio Richards. (Carey Written Stmt. at D235, Faddis Decl., Ex. G).

**Admitted.**

9.      On September 6, 2017, the wellness check at the Premises was assigned to Officers Fleming and Murphy. (Murphy Tr. at 34:21-35:19, Faddis Decl., Ex. A).

**Admitted. Plaintiff adds that the wellness check was assigned to Officers Fleming and Murphy at 16:06:53 of this date. ICAD, D01015, Faddis Decl., Ex. Q.**

---

[2] For consistency, and ease of reference, all times are stated in 24-hour time.

**Defendants' Reply:** Defendants deny the materiality of the additional facts alleged by plaintiff, but admit the substance of the allegations.[3]

10.     On September 6, 2017, prior to arriving at the Premises, Officer Murphy spoke to Mr. Carey by phone.  Carey stated to Officer Murphy that he had not seen Richards in a long time, that he did not know whether Richards had any mental health history, that Richards smoked a lot of marijuana, and that there was not any odor emanating from the tenant's bedroom.  (Murphy Tr., 43:5-44:13, Faddis Decl., Ex. D; Transcript of Deposition of Mark Fleming ("Fleming Tr."), 34:4-35:14, annexed to the Faddis Decl. as Ex. C).

        **Admitted.**

11.     On September 6, 2017, Officers Fleming and Murphy arrived at the location at approximately 17:25 hours. (ICAD, D1015, Faddis Decl., Ex. Q).

        **Admitted.**

12.     On September 6, 2017, upon arriving at the location, Officer Fleming spoke with Mr. Carey, who, in sum and substance, repeated what he had previously told Officer Murphy on the phone about Richards. (Fleming Tr. at 36:18-37:12, Faddis Decl., Ex. C).

        **Admitted.**

13.     On September 6, 2017, Officers Fleming and Murphy were in regular NYPD uniform, consisting of dark blue pants and shirts, with badges displayed on their chests, and wearing utility belts. (Relevant Body-Worn Camera Footage of Mark Fleming ("Fleming BWC"), *passim*, annexed to the Faddis Decl. as Ex. H; Relevant Body-Worn

---

[3] Plaintiff's responses to defendants' factual allegations appear in bold text; defendants' responses appear in underlined text.

Camera Footage of Redmond Murphy ("Murphy BWC"), *passim*, annexed to the Faddis Decl. as Ex. I).

> **Admitted.**

14. On September 6, 2017, Officers Murphy and Fleming were equipped with operable body-worn cameras. (Fleming BWC, Faddis Decl., Ex. H; Murphy BWC, Faddis Decl., Ex. I).

> **Admitted.**

15. On September 6, 2017, Officers Fleming and Murphy were equipped with body-worn cameras which employed a thirty-second standby buffer, which preserved thirty seconds of video without audio immediately prior to the activation of the camera. (Fleming Tr., 54:4-15, Faddis Decl., Ex. C).

> **Admitted.**

### III. Officers Fleming and Murphy Encounter Richards

16. Mr. Carey, along with another civilian, led Officers Fleming and Murphy into the apartment which contained Richards' bedroom. (Fleming Tr., 37:21-38:16, Faddis Decl., Ex. H; Carey Written Stmt., D235, Faddis Decl., Ex. N).

> **Admitted.**

17. Officers Fleming and Murphy approached Richards' bedroom door, and found it to be locked. (Fleming Tr., 38:21-39:4, Faddis Decl., Ex. H; Carey Written Stmt. at D235, Faddis Decl., Ex. N).

> **Admitted.**

18. Officers Fleming and Murphy knocked on the door and received no response. (Fleming Tr., 39:4-5, Faddis Decl., Ex. H; Murphy Tr., 54:2-5, Faddis Decl., Ex. I).

**Admitted.**

19.     Officers Fleming and Murphy then attempted to gain more information from Mr. Carey, who indicated that Richards' family had also unsuccessfully attempted to contact him. (Fleming Tr., 39:7-14, Faddis Decl., Ex. H; see also Carey Written Stmt., D235, Faddis Decl., Ex. N).

**Admitted.**

20.     At approximately 17:45 hours, Mr. Carey decided to force open the door and the other civilian opened door with a screwdriver. (Fleming Tr., 42:5-43:16, Faddis Decl., Ex. C; Murphy Tr., 56:4-57:2, Faddis Decl., Ex. D; Fleming BWC, 00:00-00:12,[4] Faddis Decl., Ex. H; Carey Written Stmt., D235, Faddis Decl., Ex. N).

**Denied. The officers directed Mr. Carey to force the door open. See Murphy Tr. 55:21-23, Faddis Decl., Ex. D.**

**Defendants' Reply:** Defendants deny the allegations on the grounds that they are not supported by the evidence cited.  Officer Murphy did not testify that the officers directed Mr. Carey to open the door, but rather that Mr. Carey decided to open the door.  Because plaintiff has failed to controvert this fact with citations to relevant, admissible evidence, it should be deemed admitted.

21.     When the bedroom door opened, Officers Fleming and Murphy observed Richards, standing near the foot of a bed, wearing dark sunglasses, armed with a knife in his left hand. (Fleming BWC, 00:20, Faddis Decl., Ex. H; Murphy Tr., 57:25-58:2, 60:14-61:7, 64:9-16, Faddis Decl., Ex. D; Fleming Tr., 45:2-10, Faddis Decl., Ex. C.)

---

[4] Defendants' citations to video evidence include time stamps which correlate to the runtime of the videos; plaintiff's citations include time stamps which refer to the visual date and time stamp imprinted on the video, the time of day.

**Admitted.**

22.    When Fleming and Murphy first observed Richards, his right hand was not visible to them. (Fleming BWC, 00:20-1:12, Faddis Decl., Ex. H; Transcript of Fleming BWC ("Fleming BWC Tr.") annexed to the Faddis Decl. as Exhibit H-1, at 2:1-3:16; Fleming Tr., 45:6-10, Faddis Decl., Ex. C; Murphy Tr., 60:24-61:3, Faddis Decl., Ex. D).

**Denied. The body-worn camera footage shows that Richards's right hand may have been visible when the officers first opened the door. Murphy BWC 17:48:09, Faddis Decl., Ex. I.**

**Defendants' Reply:**  Defendants deny the allegations on the grounds that they are not supported by the evidence cited.  Officers Fleming and Murphy both testified that they could not see Mr. Richards' right hand, which is corroborated by their repeated, contemporaneous requests to Mr. Richards to show them his right hand.  Further, the body-worn camera footage confirms that the view of Mr. Richards' right hand was obstructed by the bag on Richards' bed.  Whether it appears from body-worn camera footage that Richards' right hand "may" have been visible to the angle of the camera is not relevant to what the defendants actually observed.  Because plaintiff has failed to controvert this fact with admissible evidence, it should be deemed admitted.

23.    When Fleming and Murphy first observed Richards, he was gripping the knife around the handle with the blade protruding from the bottom of his left fist and his left arm at his side. (Fleming BWC, 00:20-1:12, Faddis Decl., Ex. H; Relevant Still Images From the Bodyworn Camera Footage of Officer Fleming "Fleming BWC Stills"), at "Fleming 1," annexed to the Faddis Decl. as Exhibit H-2; see Figure 1, "Fleming 1" annotated, *infra*).

**Admitted.**

**Figure 1**[5]



Knife in left hand

Fleming 1

24.     When the door was opened, Mr. Carey observed a knife in Richards' left hand and that he was "holding something in his right [hand] which [they] could not see." (Carey Written Stmt., D235, Faddis Decl., Ex. N).

**Admitted as to Mr. Carey's statements; denied insofar as whether Richards did in fact have anything in his right hand. Mr. Carey's statements support the fact that he did not see anything in Richards's hand.**

**Defendants' Reply:** Mr. Carey's written statement does not support plaintiff's response.  Mr. Carey stated that Richards was holding something in his right hand.  (*See* Carey Written Stmt., D235, Faddis Decl., Ex. N).  Because plaintiff has failed to controvert this fact with admissible evidence, it should be deemed admitted.

---

[5] For clarity, defendants have <u>underlined</u> the labels for each figure included as part of their statement of material facts.

25.     After observing Richards in the bedroom, Officers Fleming and Murphy both activated their body-worn cameras to begin recording. (Fleming BWC, Faddis Decl., Ex. H; Fleming Tr., 50:7-13, Faddis Decl., Ex. C; Murphy BWC, Faddis Decl., Ex. I; Murphy Tr., 61:21-25, Faddis Decl., Ex. D).

**Admitted.**

26.     Officers Fleming and Murphy drew their firearms and stood at the sides of the doorway to Richards' bedroom. (Fleming Tr., 55:17-56:10, Faddis Decl., Ex. C; Murphy Tr. at 61:4-9, Faddis Decl., Ex. D).

**Admitted.**

27.     At some point while Fleming and Murphy were in the apartment, Mr. Carey called a friend, Ricardo Cohen, who knew Richards, to also come to the location. (Written Statement of Ricardo Cohen ("Cohen Written Stmt."), D244-246, annexed to the Faddis Decl. as Ex. O).

**Admitted.**

28.     Mr. Cohen arrived at the location after the door to the bedroom had been opened. (Cohen Written Stmt., D244-246, Faddis Decl., Ex. O).

**Admitted.**

**IV.     Attempts to Disarm Richards Voluntarily**

29.     Officers Fleming and Murphy concluded, based on their observations, that Richards was concealing something, possibly a firearm, in his right hand. (Fleming Tr., 64:23-65:23, Faddis Decl., Ex. C; Murphy Tr., 80:16-23, Faddis Decl., Ex. D; Fleming BWC, 1:34-36, Faddis Decl., Ex. H; Fleming BWC Tr., 3:15-16, Faddis Decl., Ex. H-1).

**Denied as to whether Officers Fleming and Murphy reasonably believed that Richards had a firearm in his right hand. After Officer Murphy claimed to see a gun**

in Richards's hand, he remarked that he doesn't "know if it's a toy or not." Further, upon hearing these statements from Officer Murphy, Officer Fleming asked Richards whether the gun was real. Officer Murphy also stated to Officer Ramos that Richards "might have a gun." These comments indicate that Officers Fleming and Murphy had plenty of doubt as to whether Richards actually had a gun. In fact, these comments suggest that Officers Fleming and Murphy thought it was possible that Richards did not have a gun. Lastly, the fact that Officers Fleming and Murphy directed Officer Ramos to tase Richards from close distance after Richards had raised his arm and pointed a possible firearm at them, when Officer Ramos had no gear to protect himself from a possible firearm, strongly suggests that the Officers did not, in fact, believe that Richards had a firearm. If the Officers thought that Richards had a firearm when he raised his arm, they surely would not have allowed Officer Ramos to approach Richards a second time without protection. Murphy BWC 18:00:00 – 18:01:06, Faddis Decl., Ex. I; Ramos BWC 18:00:50 – 18:01:06, Faddis Decl., Ex. J.

**Defendants' Reply:**   Plaintiff cites no evidence to dispute this fact. Rather, plaintiff argues that it was unreasonable for Officers Fleming and Murphy to believe that Richards was possibly concealing a firearm in his right hand. This argument does not controvert the facts alleged, which are corroborated by contemporaneous video and audio—showing that Richards' right hand was hidden from the defendants and that both officers were concerned that he was concealing a firearm.   Because plaintiff's response rests on argument rather than fact, plaintiff has failed to controvert this fact with citation to relevant, admissible evidence and this fact must be deemed admitted.

30.     Officers Fleming and Murphy concluded Richards might be a threat to himself or others, based upon their observations of Richards, including his demeanor, their inability to see his right hand, and the deadly weapon—the knife—in his left hand. (Fleming Tr., 50:14-51:4, Faddis Decl., Ex. C; Murphy Tr., 63:21-64:16, Faddis Decl., Ex. D).

**Denied. This paragraph contains disjunctive, subjective assertions. It is denied insofar as the knife did not pose a "deadly" or immediate threat to the officers, who had their guns drawn and were taking cover behind a wall. Fleming BWC *passim*; Faddis Decl., Ex. H; Murphy BWC *passim*, Faddis Decl., Ex. I; Murphy Tr. 101:14-102:2, Faddis Decl., Ex. D. Fleming and Murphy did not perceive that Richards posed a threat to himself with the knife; and there were no civilians in the bedroom to whom Richards could have posed a threat. Fleming BWC *passim*, Faddis Decl., Ex. H; Murphy BWC *passim*, Faddis Decl., Ex. I.**

Defendants' Reply: The evidence cited by plaintiff—the entire body-worn camera footage and Officer Murphy's testimony that the officers took cover from the sides of the door—does not controvert the officers' conclusion that Richards posed a threat to himself or others.  The defendants' conclusion is corroborated by their contemporaneous actions—including repeatedly asking Richards to disarm himself, providing him a phone to speak with a "family member" to encourage him to disarm himself, requesting a supervisor respond to the scene immediately, and requesting an officer equipped with less lethal force, the taser.  Because plaintiff's response is not supported by relevant, admissible evidence, this fact should be deemed admitted.

31.     Officers Fleming and Murphy concluded that they could not safely leave Richards alone, based on his demeanor and possession of at least one weapon, and

possibly a second. (Fleming Tr., 61:14-62:2, 139:2-12, Faddis Decl., Ex. C; Murphy Tr., 65:8-16, Faddis Decl., Ex. D).

**Denied. The officers could have safely retreated or closed the door. Furthermore, approximately one and a half minutes after opening Richards's bedroom door, Officer Murphy asked Officer Fleming whether they should shut the door and have someone come over with a taser. This suggests that Officer Murphy believed they could safely leave Richards in his closed bedroom while they waited for help to arrive. Fleming BWC 17:47:13 – 17:47:25, Faddis Decl., Ex. H.**

**Defendants' Reply:** Plaintiff cites no evidence to support her denial of this fact, but rather argues about the reasonableness of the officers' conclusion that they could not safely leave Richards alone.  The fact that Officer Murphy asked Officer Fleming whether they should shut the door at the outset of the encounter does not controvert his ultimate conclusion that they could not safely leave Richards alone.  Plaintiff's unsupported assertion that the officers "could have safely retreated or closed the door" is both irrelevant and unsupported by any admissible evidence.  Indeed, not a single party or non-party police officer testified that it would have been reasonable for the officers to close the door when they was suspected that Richards was armed with a firearm.  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it should be deemed admitted.

32.     Officers Fleming and Murphy instructed Richards to put the knife down approximately 50 times over a period of approximately 15 minutes. (Fleming BWC, 00:00-14:45, Faddis Decl., Ex. H; Fleming BWC Tr., 2:1-23:23, Faddis Decl., Ex. H-1; Murphy BWC, 00:00-13:30, Faddis Decl., Ex. I; Transcript of Bodyworn Camera Footage

of Officer Murphy ("Murphy BWC Tr."), 2:2-21:24, Faddis Decl., Ex. I-1; Fleming Tr., 65:2-23, Faddis Decl., Ex. C).

**Admitted, but Plaintiff objects to the use of the word "instructed." The officers screamed commands at Richards and threatened to kill him. Murphy BWC 17:48:20-32, Faddis Decl., Ex. I; Murphy BWC 17:52:04-41, Faddis Decl., Ex. I.**

**Defendants' Reply:** Defendants object to plaintiff's subjective characterization of the evidence and respectfully refer the Court to the evidence cited. Plaintiff has failed to controvert this fact with a citation to relevant, admissible evidence and it should be deemed admitted.

33.    Officers Fleming and Murphy repeatedly instructed Richards to reveal the contents of his right hand. (Fleming BWC, 00:00-14:45, Faddis Decl., Ex. H; Fleming BWC Tr., 2:1-23:23, Faddis Decl., Ex. H-1; Murphy BWC, 00:00-13:30, Faddis Decl., Ex. I; Murphy BWC Tr., 2:2-21:24, Faddis Decl., Ex. I-1; Fleming Tr., 65:2-23, Faddis Decl., Ex. C).

**Admitted, but Plaintiff objects to the use of the word "instructed." The officers screamed commands at Richards and threatened to kill him. Murphy BWC 17:52:04-41, Faddis Decl., Ex. I; Murphy BWC 17:55:43-59, Faddis Decl., Ex. I.**

**Defendants' Reply:** Defendants object to plaintiff's subjective characterization of the evidence and respectfully refer the Court to the evidence cited. Plaintiff has failed to controvert this fact with a citation to relevant, admissible evidence and it should be deemed admitted.

34.    The civilians present also asked Richards to put the knife down. (Fleming BWC, 00:00-14:45, Faddis Decl., Ex. H; Fleming BWC Tr., 2:7-22:8, Faddis Decl., Ex.

H-1; Carey Written Stmt., D235, Faddis Decl., Ex. N; Cohen Written Stmt., D244-246, Faddis Decl., Ex. O).

**Admitted, but Plaintiff objects to the use of the word "asked." The civilians screamed commands at Richards and warned that the officers would kill him if he did not comply. Fleming BWC,** *passim,* **Faddis Decl., Ex. H.**

> <u>**Defendants' Reply:**</u> <u>Defendants object to plaintiff's subjective characterization of the evidence and respectfully refer the Court to the evidence cited. Plaintiff has failed to controvert this fact with a citation to relevant, admissible evidence and it should be deemed admitted.</u>

35.   Mr. Cohen contacted someone he described as a relative of Richards, Peter Mitchell, by phone, and gave the phone to Officer Fleming to allow Mr. Mitchell to speak with Richards. (Fleming BWC, 03:25, Faddis Decl., Ex. H; Fleming Tr., 72:15-73:5, Faddis Decl., Ex. C; Cohen Written Stmt., D244-246, Faddis Decl., Ex. O; Written Statement of Peter Mitchell ("Mitchell Written Stmt."), D238-240, annexed to the Faddis Decl. as Ex. P).

**Admitted, but Mr. Mitchell is not, in fact, a relative of Richards.**

36.   Approximately four minutes after the bedroom door was opened, Officer Fleming slid Mr. Cohen's phone into Richards' bedroom. (Fleming BWC at 03:25, Faddis Decl., Ex. J; Fleming Tr., 72:15-73:5, Faddis Decl., Ex. I; Cohen Written Stmt., D244-246, Faddis Decl., Ex. M; Mitchell Written Stmt., D238-240, Faddis Decl., Ex. P).

**Admitted.**

37.   After the phone was placed into Richards' room, Mr. Mitchell also pleaded with Richards to drop the knife via speakerphone. (Fleming BWC, 03:25, Faddis Decl., Ex. H; Fleming BWC Tr., 7:4-10:12, Faddis Decl., Ex. H-1; Fleming Tr., 72:15-73:5,

Faddis Decl., Ex. C; Cohen Written Stmt., D244-246, Faddis Decl., Ex. O; Mitchell Written Stmt., D238-240, Faddis Decl., Ex. P).

> **Admitted.**

38.    Approximately one minute after placing the phone in Richards' room, Officer Fleming moved into the bedroom and kicked the phone closer to Richards, telling Richards to pick up the phone and speak to Mr. Mitchell. (Fleming BWC, 4:30-33, Faddis Decl., Ex. H; Fleming BWC Tr., 9:21-22, Faddis Decl., H-1).

> **Admitted.**

39.    Richards never responded verbally to the repeated attempts at communication by Officers Fleming and Murphy, or the civilians present. (Fleming BWC, 00:00-14:45, Faddis Decl., Ex. H; Murphy BWC, 00:00-13:30, Faddis Decl., Ex. I).

> **Admitted.**

40.    At no point did Richards relinquish the knife. (Fleming BWC, 00:00-14:45, Faddis Decl., Ex. H; Murphy BWC, 00:00-13:30, Faddis Decl., Ex. I).

> **Admitted, except that Richards did relinquish the knife when Officer Fleming stomped on his left hand as he bled to death on the floor. Fleming Tr., 88:10-18, Faddis Decl., Ex. C.**

> **Defendants' Reply:** The evidence cited does not support plaintiff's response. The evidence shows that Officer Fleming had to forcibly take the knife from Richards. Because plaintiff has failed to controvert this fact with citation to admissible, relevant evidence, it should be deemed admitted.

41.    At no point did Richards respond to the requests of Officers Fleming or Murphy to reveal the contents of his right hand. (Fleming BWC, 00:00-14:45, Faddis Decl., Ex. I; Murphy BWC, 00:00-13:30, Faddis Decl., Ex. H; Fleming BWC Stills,

"Fleming 2," Faddis Decl., H-2 (depicting Richards' hiding his right hand behind his back)).

**Denied, as Richards did reveal his right hand, which was empty, to the officers when Officer Ramos first approached him with the taser only seconds before he was shot. Ramos BWC 18:00:50 - 18:01:03, Faddis Decl., Ex. J. Admitted that Richards did not display his empty right hand until this part of the encounter.**

<u>**Defendants' Reply:**</u> <u>The evidence plaintiff cites fails to controvert the fact alleged—that Richards never *responded* to the officers' requests to show or tell them what he held in his right hand.  Defendants do not dispute that Richards did ultimately reveal the imitation pistol to the defendants. (*See* ¶¶ 75-98, *supra*).  Because Plaintiff has failed to controvert this fact with citation to admissible, relevant evidence, it should be deemed admitted.</u>

**Figure 2**



42.     Several times while Officers Fleming and Murphy were attempting to communicate with Richards, Richards looked down at his right hand. (Fleming BWC, 1:03, 1:15, 2:20, 2:36, Faddis Decl., Ex. H).

**Denied as to where Richards was looking.**

**Defendants' Reply:**  Plaintiff's response is not supported by any citation to evidence.  Moreover, the evidence cited by defendants clearly shows Richards looking down at his right hand.  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it should be deemed admitted.

43.     At approximately 17:52 hours, Officer Fleming saw Richards move his right arm further away, hiding it behind his back. (Fleming Tr., 48:12-49:13, Faddis Decl., Ex. C; Fleming BWC, 06:15-20, Faddis Decl., Ex. H; Fleming BWC Stills, "Fleming 2," Faddis Decl., Ex. H-2; see Figure 2, "Fleming 2" annotated, *supra*).

**Denied that Richards was intentionally "hiding" his hand.**

**Defendants' Reply:** Plaintiff does not deny that Richards hid his right hand behind his back, but rather argues as to the intentionality of Richards' action, which is not relevant to the officers' observations.  Moreover, plaintiff's response is not supported by any citation to evidence.  Officer Fleming testified, and his body-worn camera footage corroborates, that Richards moved his right hand further away from the officers.  (*See* Fleming Tr., 48:12-49:13, Faddis Decl., Ex. C; Fleming BWC at 6:17, Faddis Decl., Ex. H).  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it should be deemed admitted.

44.     At some point during the incident, Carey saw Richards "making some shakey moves with the right hand [and] left and went down stairs to the first floor." (Carey Written Stmt. at D235, Faddis Decl., Ex. N).

**Admitted to the extent that Carey wrote that statement but denied that Richards made any "shakey moves" as that is not what is seen on the video.**

> **Defendants' Reply:** Plaintiff's response is not supported by any citation to evidence. Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it should be deemed admitted.

**V. Request for Less Lethal Force Option**

45. Based on Richards' refusal to comply with the instructions of Officers Fleming and Murphy, Officer Fleming decided to request a Taser in case they needed to involuntarily disarm Richards. (Fleming Tr., 66:21-76:7, Faddis Decl., Ex. C).

**Admitted insofar as Fleming requested a unit with a taser to respond to the location. Murphy BWC 17:51:54-17:52:00, Faddis Decl., Ex. I.**

> **Defendants' Reply:** Plaintiff does not deny this fact, and thus it should be deemed admitted in its entirety. To the extent plaintiff purports to limit her admission, she has failed to controvert this fact with citation to relevant, admissible evidence, and it should be deemed admitted.

46. At approximately 17:50 hours, Officer Fleming told Officer Murphy that he was going to request a supervisor to respond to the location. (Fleming BWC, 5:07, Faddis Decl., Ex. H; Fleming BWC Tr., 9:15-16, Faddis Decl., Ex. H-1).

**Admitted.**

47. At approximately 17:51 hours, Officer Fleming then communicated with Sgt. Howard Roth, one of the patrol supervisors for the 47th Precinct that day, via radio, and requested Sgt. Roth respond to the location. (Fleming BWC, at 5:07-5:30, Faddis Decl., Ex. H; Fleming BWC Tr., 9:22-10:7, Faddis Decl., Ex. H-1)

**Admitted.**

48.     At approximately 17:51 hours, Officer Fleming called Officer Harris Jean, who was Sgt. Roth's driver, or "operator," for that day via cell phone, asked to speak to Sgt. Roth, and then stated, "[F]ly over here.  We got a guy with a knife in his hand, he doesn't want to put it down…and we need him tased." (Fleming BWC, 6:05-15, Faddis Decl., Ex. H; Fleming BWC Tr., 10:18-24, Faddis Decl., Ex. H-1).

    **Admitted.**

49.     At approximately 17:52 hours, Sgt. Roth requested the NYPD dispatcher to direct another unit from the 47th Precinct to respond to the location and also mark him as responding. (Fleming BWC, 6:52-7:07, Faddis Decl., Ex. H; Fleming BWC Tr., 12:4-21, Faddis Decl., Ex. H-1).

    **Admitted.**

50.     At approximately 17:54 hours, the NYPD dispatcher changed the type of job to "54E1," "Ambulance Case," routing the job to emergency medical services ("EMS"). (ICAD, D1015, Faddis Decl., Ex. Q).

    **Admitted.**

51.     At approximately 17:54 hours, an EMS unit was dispatched to the location, with an expected time of arrival ("ETA") of 18:05. (ICAD, D1016, Faddis Decl., Ex. Q; FDNY Prehospital Care Report Summary ("FDNY PCR"), D5098, annexed to the Faddis Decl. as Ex. U).

    **Admitted.**

52.     At approximately 17:53 hours, Officer Fleming told the NYPD dispatcher via police radio, "We just need one unit with a Taser.  We don't need a whole bunch of guys coming over here." (Fleming BWC, 7:20-21, Faddis Decl., Ex. H; Fleming BWC Tr., 13:3-5, Faddis Decl., Ex. H-1).

**Admitted.**

53.     At approximately 17:53 hours, the NYPD dispatcher requested confirmation as to whether the situation involved an emotionally disturbed person ("EDP") and Officer Fleming responded in the affirmative. (Fleming BWC, 7:54-58, Faddis Decl., Ex. H; Fleming BWC Tr., 13:10-24, Faddis Decl., Ex. H-1).

**Admitted.**

54.     Officers Ramos and Oliveros heard the request for a Taser over police radio and responded to the location. (Ramos Tr., 21:22-22:3, Faddis Decl., Ex. E).

**Admitted.**

55.     At approximately 17:59 hours, Officers Fleming and Murphy were approached from behind by two additional officers, members of the Emergency Services Unit ("ESU") Det. Hartnett and Officer O'Rourke. (Murphy BWC, 12:52, Faddis Decl., Ex. I; Murphy BWC Tr., 20:19, Faddis Decl., Ex. I-1; Deposition Transcript of Det. Hartnett, 14:3-5; 54:7-55, annexed to the Faddis Decl. as Ex. G ).

**Admitted.**

56.     When Det. Hartnett and Officer O'Rourke approached the bedroom, Richards moved slightly. (Fleming Tr., 67:15-68:22, Faddis Decl., Ex. C).

**Denied. There is no body camera footage that supports this assertion, and Officer Fleming's self-serving statements should not be credited.**

**Defendants' Reply:** Plaintiff cites no evidence to support her denial of this fact. Rather, plaintiff argues that the Court should not credit Officer Fleming's "self-serving statement." Officer Fleming's testimony is corroborated by Officer Murphy's testimony, and his contemporaneous statement that he saw a silver gun in Richards' hand when ESU first approached the room. (*See* ¶ 57, *infra*). Because plaintiff has failed to

controvert this fact with citation to relevant, admissible evidence, and because plaintiff's response rests on argument rather than fact, it should be deemed admitted.

57.     When Richards moved, Officer Murphy observed an apparent firearm in his right hand. (Murphy Tr., 78:25-79:4, Faddis Decl., Ex. D; Murphy BWC, 12:50-56, Faddis Decl., Ex. I).

**Denied. Officer Murphy claimed to observe an apparent firearm; he did not in fact observe an apparent firearm.**

**Defendants' Reply:** Plaintiff cites no evidence to support her denial of this fact. Moreover, the fact that Richards' was holding an apparent firearm cannot be disputed in good faith. (*See* ¶ 98, *infra*). Further, Officer Murphy's testimony is corroborated by his contemporaneous statement that he saw a silver gun in Richards' hand when ESU first approached the room. Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it should be deemed admitted.

58.     After observing the apparent firearm, Officer Murphy announced, "He's got a knife and a -- and a gun. He has a gun in his --" (Murphy BWC, 12:50-56, Faddis Decl., Ex. I; Murphy BWC Tr., 20:24-25, Faddis Decl., Ex. I-1; Fleming BWC, 14:03-14:10, Faddis Decl., Ex. J; Fleming Tr., 67:13-68:9, Faddis Decl., Ex. C; Transcript of Deposition of Det. Hartnett ("Hartnett Tr."), 54:7-23, annexed to the Faddis Decl. as Ex. G).

**Admitted as to Officer Murphy's statements; denied as to whether he actually observed an apparent firearm.**

**Defendants' Reply:** Plaintiff cites no evidence to support her denial of this fact. Moreover, the fact that Richards' was holding an apparent firearm cannot be disputed in good faith. (*See* ¶ 98, *infra*). In further response to plaintiff's denial,

defendants respectfully refer the Court to ¶ 57, *supra*.  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it should be deemed admitted.

59.     At approximately 17:59 hours, upon hearing that Richards had an apparent firearm, Det. Hartnett and Officer O'Rourke left the apartment, stating, "we're going to suit up." (Fleming BWC, 14:10, Faddis Decl., Ex. H; Fleming BWC Tr. at 23:6-7, Faddis Decl., Ex. I-1).

**Admitted.**

60.     After Det. Hartnett and Officer O'Rourke exited the apartment, Officer Fleming saw the apparent firearm in Richards' right hand. (Fleming Tr., 70:8-18, 75:11-23, Faddis Decl., Ex. C).

**Denied. Fleming did not actually see an apparent firearm in Richards's hand because there was not one there. See ¶¶ 139-213, infra.**

**Officer Fleming never says or other otherwise indicates that he sees Richards holding a gun. *See* Fleming BWC *passim*, Faddis Decl., Ex. H.**

**Fleming stated that he was able to see Richards's hand after ESU left and Ramos entered the apartment because Richards had moved approximately two feet to the right. Fleming Tr. 70:11 – 71:17, Faddis Decl., Ex. C. However, a comparison of the body camera footage shows that Richards did not move from his original position. Fleming BWC 17:46:30-40, Faddis Decl. Ex. H; Ramos BWC 18:00:59 - 18:01:02, Faddis Decl., Ex. J.**

**Defendants' Reply:** The evidence cited does not support plaintiff's response.  The fact that Richards' was holding an apparent firearm cannot be disputed in good faith.  (*See* ¶ 98, *infra*.)  Plaintiff's assertion that Fleming "never says or otherwise

indicates that he sees Richards holding a gun" is false, as Fleming repeatedly instructed Richards to drop the apparent firearm.  (*See* ¶ 64, *infra.*)  Defendants also note that, after the shooting, Fleming stated, "He had something in his hand. It was like a laser pointer he was pointing at us. I didn't know if it was a gun or not." (*See* Fleming BWC, 18:06, Faddis Decl., Ex. H.)  Moreover, plaintiff's assertion that Richards never moved from his original position is false.  That is, Ramos' body-worn camera footage clearly shows Richards shifting his position at least twice, first at approximately 1:12, and again as Richards' raised his right hand toward the officers. (*See* Ramos BWC, 1:12, Faddis Decl., Ex. J.)  Either of those instances are consistent with Fleming's testimony that Richards moved his body such that his right hand was visible to Fleming.  While plaintiff bases her denial on Fleming's estimation that Richards moved approximately two feet, Fleming actually testified that it was difficult to approximate the distance by which Richards moved and that it was "*maybe*" two feet.  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it should be deemed admitted.

61.     At approximately 18:00 hours, Officer Murphy described the apparent firearm to Officer Fleming as silver, and stated that he did not know if it was a toy or not. (Fleming BWC, 14:17, Faddis Decl., Ex. H; Fleming BWC Tr., 23:10-12, Faddis Decl., Ex. H-1).

          **Admitted.**

62.     Officer Fleming asked Richards if he was holding a real gun. (Fleming BWC Tr., 23:12-13, Faddis Decl., Ex. H-1; Murphy BWC, 13:06-13:07, Faddis Decl., Ex. I).

          **Admitted.**

63.     Richards did not respond to Officer Fleming. (Murphy BWC, 13:05-13:30, Faddis Decl., Ex. I).

**Admitted.**

64.     Thereafter, Officer Fleming told Richards to drop the gun an additional four times. (Fleming BWC Tr., 23:8-23, Faddis Decl., Ex. H-1).

**Admitted.**

65.     At no time did Richards respond to Officer Fleming's instructions to drop the gun. (Murphy BWC 13:05-13:30, Faddis Decl., Ex. I).

**Admitted.**

**VI.     Attempt to Use Less Lethal Force**

66.     At approximately 18:00 hours, Officer Ramos entered the apartment, followed by Officer Oliveros. (Relevant Body-Worn Camera Footage of Jesus Ramos ("Ramos BWC"), 1:06, annexed to the Faddis Decl. as Ex. J; Relevant Body-Worn Camera Footage of Marco Oliveros ("Oliveros BWC"), 1:15, annexed to the Faddis Decl. as Ex. K).

**Admitted.**

67.     Officer Ramos was equipped with a Taser. (Ramos Tr., 27:17-28:12, Faddis Decl., Ex. E).

**Admitted.**

68. Officer Ramos saw Officers Fleming and Murphy at the door frame of Richards' bedroom with their firearms drawn. (Ramos Tr., 55:12-23, Faddis Decl., Ex. E).

**Admitted.**

69.     Officer Ramos saw that Richards was holding a knife in his left hand. (Ramos Tr., 31:20-23, Faddis Decl., Ex. E).

    **Admitted.**

70.     Officer Oliveros saw that Richards was holding a knife in his left hand and hiding his right hand. (Oliveros Tr., 58:20-10, Faddis Decl., Ex. F).

    **Admitted.**

71.     At approximately 18:00 hours, Officer Ramos approached Officers Fleming and Murphy and asked, "Do you want to take him down now?" meaning to use his Taser on Richards. (Fleming BWC, 15:06, Faddis Decl., Ex. H; Fleming BWC Tr., 21:5-6, Faddis Decl., Ex. H-1).

    **Admitted.**

72.     At approximately 18:00 hours, Officers Fleming and Murphy both told Officer Ramos to use his Taser on Richards at that time. (Fleming BWC, 15:07-15:13, Faddis Decl., Ex. H; Fleming BWC Tr., 24:7-13, Faddis Decl., Ex. H-1).

    **Admitted.**

73.     At that time, Officer Oliveros was standing behind Officers Fleming, Murphy, and Ramos. (Oliveros BWC, 00:20, Faddis Decl., Ex. K).

    **Admitted.**

74.     At approximately, 18:01 hours, Officer Ramos approached the bedroom, while raising his Taser. (Ramos BWC, 1:16-1:17, Faddis Decl., Ex. J; Oliveros BWC, 00:22-24, Faddis Decl., Ex. K).

    **Admitted.**

75.     As Officer Ramos stepped toward the doorway, Richards raised his right hand in the direction of Officer Ramos and the other officers, holding an object with an

activated red laser on top. (Ramos BWC 1:18-1:19, Faddis Decl., Ex. K; Ramos BWC
Slow-Motion Excerpt, Faddis Decl., Ex. J-2; Still Images From Officer Ramos' BWC
Footage ("Ramos BWC Stills"), "Ramos 1-5", annexed to the Faddis Decl. as Ex. J-3
(showing Richards raising object in his right hand and a red light emanating from his right
hand); see Figure 3, "Ramos 3" annotated, *infra*).

**Denied. There is no credible evidence that Richards was "holding an object
with an activated red laser on top." The BWC footage cited by Defendants does not
show any object in Richards's hand. Ramos testified that he did not see anything in
Richards's right hand when Richards purportedly raised his arm. Ramos Tr. 92:10-
19, Faddis Decl., Ex. E. Fleming testified that his view at that time was obstructed by
Ramos and did not testify that he saw Richards holding an object with a laser on top
as Ramos entered the bedroom. Fleming Tr. 77:21-78:3, Faddis Decl., Ex. C. The red
light was created by Ramos's Taser, which was equipped with a laser site.**

**First, in his FID interview, Fleming himself stated that as Ramos approached
Richards while raising his taser, he "saw the laser dot on the EDP's chest from
[Ramos's]... taser." Second, in Officer Oliveros's testimony, he admitted that his
BWC footage shows only one red dot, and that the red dot emanates from Officer
Ramos's taser and can be seen moving along the floor, away from Officer Ramos and
towards Richards. FID Audio Statement of Officer Fleming 22:40 - 22:58, (produced
as D001482), Faddis Decl., Ex. L; Oliveros BWC 18:00:56 - 18:01:02, Faddis Decl.,
Ex. K; Oliveros Tr. 63:18 - 74:15, 81:19 - 85:15, 87:5 - 90:14, Faddis Decl., Ex. F;
Ramos Tr. 88:24 - 98:24, 124:4 - 131:22, Faddis Decl., Ex. E.**

**Defendants' Reply:** Defendants object to plaintiff's commentary regarding
the credibility of evidence.  As set forth *infra*, the fact that Richards was holding an

apparent firearm with an activated red laser function is irrefutable.   (*See* ¶ 98, *infra*). Moreover, the body-worn camera footage cited by defendants in support of this allegation irrefutably shows Richards raise his right hand toward the officers, and that there is a red dot emanating from his right hand (*See* Figure 3, ("Ramos 5")).   The same video confirms that Officer Ramos' taser was not pointed at Richards at that moment, and thus the red light on Richards' hand could not have come from the taser. (*Id.*)   Further, plaintiff misconstrues defendants' testimony.   For example, plaintiff asserts that Ramos testified that "he did not see anything in Richards's right hand when Richards purportedly raised his arm."   However, the cited testimony actually states that Officer Ramos did not see Richards' right hand when Richards first raised it in the direction of the officers.   (*See* Ramos Tr., 91:8-10, Faddis Decl., Ex. E ("Again at that point, I didn't see him raise his hand. I just saw a quick movement."))   Further, the cited portions of Officer Oliveros' testimony do not controvert this fact.   Because plaintiff has failed to controvert this fact with relevant, admissible evidence, it should be deemed admitted.

**Figure 3**



Red light from Richards' right hand

Ramos 5

76.     Officer Ramos flinched backward slightly when Richards raised his arm, then moved toward Richards. (Ramos BWC, 1:19-20, Faddis Decl., Ex. J; Oliveros BWC, 00:22-24, Faddis Decl., Ex. K).

        **Admitted.**

77.     As Officer Ramos entered the bedroom, raising his Taser, he saw Richards raise his right hand holding an object in a pistol grip. (Ramos Tr., 95:20-96:8, Faddis Decl., Ex. E).

        **Denied. Miguel's right hand is not visible on any of the officers' body-worn camera footage at the time Ramos re-entered the room. Fleming BWC 18:01:02-10, Faddis Decl., Ex. H; Murphy BWC 18:01:02-10, Faddis Decl., Ex. I; Oliveros BWC 18:01:02-10, Faddis Decl., Ex. K; Ramos BWC 18:01:02-10, Faddis Decl., Ex. J. The only camera angle that would have depicted Miguel at this time was Fleming's body-**

**worn camera, which Fleming had intentionally blocked. Fleming BWC 17:53:20 - 18:01:08, Faddis Decl., Ex. H; Fleming Tr. 167:4-18, Faddis Decl., Ex. C. Therefore, the officer's self-serving statements are not supported by evidence and should not be credited.**

**Defendants' Reply:** The fact that Richards' right hand may not have been visible on the officers' body-worn camera footage at the time Ramos re-entered the room does not controvert Ramos' own observations. Moreover, plaintiff's assertion that Fleming "intentionally blocked" his body-worn camera is not supported by the evidence cited. Indeed, plaintiff misrepresents Officer Fleming's testimony on this point, and omits any citation to the portion of Fleming's testimony when he was directly asked whether he intentionally blocked his body-worn camera. (*See* Fleming Tr., 170:6-11, Faddis Decl., Ex. C (Q: You were still blocking your body cam? A: Yes, unintentionally. Q: Unintentionally you say? A: Yes.")) Further, plaintiff's argument that the officers' testimony is self-serving is insufficient to controvert this fact. Lastly, plaintiff's speculation that Officer Fleming's camera would have recorded this moment if his flashlight had not been in the way lacks any foundation. Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and because plaintiff's response rests on argument rather than fact, it should be deemed admitted.

78.    At that moment, Officer Ramos also saw a red laser move toward him from Richards. (Ramos Tr., 95:20-97:16, Faddis Decl., Ex. E).

**Denied. The officer's self-serving statements are not supported by evidence and should not be credited.**

**Defendants' Reply:** Plaintiff cites no evidence to support her denial of this fact. Rather, plaintiff argues that the Court should not credit Officer Ramos' "self-serving

statement."  Officer Ramos' testimony is corroborated by the video evidence showing two lasers inside the bedroom during the incident—one from Richards and one from Officer Ramos' taser.  (*See*, ¶¶ 87, 98, *infra*).   Ramos' testimony is further corroborated by video evidence showing a taser pointed in his direction during the shooting, landing on Officer Murphy's hand. (*See* ¶¶ 87, 98, *infra*).  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and because plaintiff's response rests on argument rather than fact, it should be deemed admitted.

79.    Officer Ramos then observed the red laser reflect off of his badge on his left chest. (Ramos Tr., 98:8-22, Faddis Decl., Ex. E).

**Denied. The officer's self-serving statements are not supported by evidence and should not be credited. Furthermore, Officer Ramos testifies that he was looking at Richards at this point and not down at his own body. Ramos Tr., 95:22 - 97:2, Faddis Decl., Ex. E.**

**Defendants' Reply:** Plaintiff cites no evidence to support her denial of this fact. Further, the evidence cited does not support plaintiff's additional allegation.  Officer Ramos testified that he was trying to take aim with his taser, looking for the laser dot from his taser on the bedroom floor when he saw a red dot coming towards him. (*See* Ramos Tr., 95:22-97:21, Faddis Decl., Ex. E).  Officer Ramos then observed that Richards "pulled up his hand, held like a pistol grip and the red dot coming towards [him.]" (*Id.* at 97:22:98:7).  Additionally, Officer Ramos never testified that he was looking at his own body, but rather that Richards' laser reflected onto the left side of his face. (*See id.* at 98:8-20).  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and because plaintiff's response rests on argument rather than fact, it should be deemed admitted.

80.     Officer Ramos concluded that Richards was pointing a gun at him. (Ramos Tr. at 93:10-15, 95:22-96:4, 97:22-98:20, Faddis Decl., Ex. E).

**Denied. The officer's self-serving statements are not supported by evidence and should not be credited. Officer Ramos testified that he "hit the deck" because he heard Fleming fire, not because he was threatened by a firearm by Richards. Ramos Tr., 100:13 - 101:17, Faddis Decl., Ex. E.**

Defendants' Reply:  The evidence cited does not support plaintiff's denial of this fact.  Yet again, plaintiff misrepresents Officer Ramos' testimony.  Officer Ramos testified that he believed Richards had a gun before hearing any gunshots.  Specifically, he testified, "The way he pulled up his hand, held like a pistol grip and the red dot coming towards me, I thought he had a gun." (Ramos Tr., 98:5-7, Faddis Decl., Ex. E).  As such, plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and it should be deemed admitted.

81.     Officer Oliveros also observed Richards raise an object in the officers' direction and a red dot. (Oliveros Tr., 74:16-75:6, Faddis Decl., Ex. F)

**Denied. Officer Oliveros provided conflicting testimony on this matter. Oliveros initially said that he did not see anything and did not know why the other officers flinched. Oliveros Tr., 62:6-63:17, Faddis Decl., Ex. F. Further, Oliveros claimed to see the red dot coming from Richards before Ramos entered the bedroom. Oliveros Tr., 83:17-85:15, Faddis Decl., Ex. F. Oliveros also testified that he saw Richards raise his arm at the same time as Ramos raised his taser. Oliveros Tr., 74:16 - 75:6, Faddis Decl., Ex. F. Video evidence confirms that the officers flinched at the same time as Ramos raised his taser. Oliveros BWC 18:00:56 - 18:01:01, Faddis**

**Decl., Ex. K. If Oliveros did in fact see Richards raise his arm while Ramos raised his taser, Oliveros would never testify that he did not know why the officers flinched.**

**Officer Oliveros admitted in his testimony, and video evidence proved, that the red dot that Oliveros thought came from Richards was actually coming from Ramos's taser and was moving away from Ramos and toward Richards, not vice versa. Oliveros Tr. 63:18 - 74:15, 81:19 - 85:15, 87:5 - 90:14, Faddis Decl., Ex. F.**

<u>**Defendants' Reply:**</u> The evidence cited does not support plaintiff's response. Defendants object to plaintiff's commentary on the credibility of evidence and to the broad conclusions plaintiff draws from portions of Officer Oliveros' testimony in which he was posed questions about specific stills and discrete moments from his body-worn camera footage that were presented to him by plaintiff's counsel. Officer Oliveros testified that he did not know why the officers initially flinched, *and also* that he saw Richards raise an object with a red dot in the officers' direction. (*See* Oliveros Tr., 62:12-19; 74:20-76:13, Faddis Decl., Ex. F.)   This testimony is not inconsistent, but rather supports the fact that Richards raised the imitation firearm twice—first, just before the officers flinched, and, second, before and while Fleming and Murphy discharged their firearms. Additionally, Oliveros never "admitted…that the red dot that Oliveros thought came from Richards was actually coming from Ramos' taser and was moving away from Ramos and towards Richards, not vice versa," nor does the video evidence show as such. In fact, Officer Oliveros repeatedly testified that the laser dot depicted in photographs presented at his deposition was from Officer Ramos' taser and not the laser he observed pointing back in the officers' direction. Defendants respectfully refer the Court to the evidence cited for an accurate representation of the officer's testimony. Because plaintiff

has failed to controvert this fact with relevant, admissible evidence, it should be deemed admitted.

82.     Officer Oliveros concluded that Richards was pointing a gun in the officers' direction. (Oliveros Tr., 75:7-76:13, Faddis Decl., Ex. F).

**Denied. See response to ¶ 81 supra.**

**Defendants' Reply:**  Plaintiff has failed to support her response with citation to relevant evidence.  Rather, plaintiff only refers to ¶ 81, which does not contain any allegation as to conclusions drawn by Officer Oliveros.  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it must be deemed admitted.

83.     Officer Fleming also saw Richards point the apparent firearm in his right hand, with a laser dot on the top of it, at Officer Ramos. (Fleming Tr., 80:2-8, Faddis Decl., Ex. C).

**Denied. There is no evidence which supports this assertion, so the officer's self-serving statements should not be credited.**

**Defendants' Reply:**  Plaintiff's response is not supported by any relevant, admissible evidence.   Indeed, Officer Fleming's observation is corroborated by the testimony of other officers, the body-worn camera footage of Richards pointing the imitation firearm at the officers, and the indisputable fact that Richards was holding an imitation firearm with an operable laser function during the encounter.  (*See* ¶ 98, *infra*). Further, plaintiff's argument that Officer Fleming's testimony is self-serving is insufficient to controvert this fact.  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and because plaintiff's response rests on argument rather than fact, it should be deemed admitted.

84.     Officer Fleming concluded that Richards was pointing a firearm at Officer Ramos. (Fleming Tr., 80:20-24, Faddis Decl., Ex. C).

**Denied. There is no evidence which supports this assertion, so the officer's self-serving statements should not be credited.**

**Defendants' Reply:**  Plaintiff's response is not supported by any relevant, admissible evidence.  Indeed, Fleming's conclusion is corroborated by the testimony of other officers, the body-worn camera footage of Richards pointing the imitation firearm at the officers, and the indisputable fact that Richards was holding an imitation firearm with an operable laser function during the encounter.  (*See* ¶ 98, *infra*).  Further, plaintiff's argument that Officer Fleming's testimony is self-serving is insufficient to controvert this fact.  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and because plaintiff's response rests on argument rather than fact, it should be deemed admitted.

85.     At approximately 18:01 hours, Officer Fleming discharged his firearm at Richards. (Fleming BWC, 15:16, Faddis Decl., Ex. H; Fleming Tr., 80:2-8, Faddis Decl., Ex. C).

**Admitted.**

86.     After the first gunshot, Officer Ramos began to fall toward the bedroom door, which was opened to the left side of the door frame. (Fleming Tr., 81:14-19, Faddis Decl., Ex. C; Ramos Tr., 100:18-24, Faddis Decl., Ex. E).

**Admitted.**

87.     Richards remained standing upright after the first gunshot, still pointing the apparent firearm in the officers' direction, with the red laser activated. (Ramos BWC,

1:24, Faddis Decl., Ex. J Oliveros BWC, 00:30, Faddis Decl., Ex. K; Oliveros BWC Stills, "Oliveros 1," Faddis Decl., Ex. K-2).

**Denied. While Richards remained standing upright after the first gunshot, the evidence cited does not support the assertion that he was "pointing" anything in the officers' direction, nor is there any credible evidence that he was activating a red laser at the time.**

<u>**Defendants' Reply:**  Plaintiff's response is not supported by any relevant, admissible evidence.  Rather, the evidence cited by defendants corroborates the fact that Richards was pointing the imitation firearm at the officers after the first gunshot.  (*See, e.g.*, Oliveros BWC Stills, "Oliveros 1," Faddis Decl., Ex. K-2, which shows a red laser hitting the side of Officer Murphy's hand, coming from inside of the bedroom.)  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it should be deemed admitted.</u>

88.     As Officer Ramos fell, he discharged his Taser at Richards. (Ramos BWC, 1:25, Faddis Decl., Ex. J; Ramos Tr., 99:3-14, Faddis Decl., Ex. E; Fleming Tr., 81:14-19, Faddis Decl., Ex. C).

**Admitted.**

89.     Officer Ramos pulled the trigger on his Taser one time for a period of 2 seconds. (Taser Details Report ("Taser Report"), D1265, D1298, annexed to the Faddis Decl. as Exhibit T).

**Admitted.**

90.     After Officer Ramos began to fall, Officer Murphy could also see Richards still pointing the apparent firearm in the officers' direction. (Murphy Tr., 112:5-15, Faddis Decl., Ex. D).

**Denied. There is no credible evidence which supports this assertion, so the officer's self-serving statements should not be credited. Murphy also provided testimony that is inconsistent with Defendants' assertion: Murphy also says that he only remembers Richards raising his arm at the officers one time. Murphy Tr., 119:07-122:14, Faddis Decl., Ex. D. The officers' body camera footage shows that Murphy and his fellow officers flinched in response to Richards raising his right arm during Ramos's initial approach, *not* the second approach, which is when Fleming opened fire. Oliveros BWC, 18:00:59 – 18:01:03, Faddis Decl., Ex. K; Ramos BWC, 18:00:59 – 18:01:03, Faddis Decl., Ex. J.**

> **Defendants' Reply:** The evidence cited does not support plaintiff's response. Plaintiff's assertion that "Murphy also says that he only remembers Richards raising his arm at the officers one time" is yet another misrepresentation of the officers' testimony. Indeed, Officer Murphy testified that he remembers Richards: (1) slightly raising his right arm before the officers flinched backward; *and* (2) fully raising his right arm before and as the officers opened fire. (*See* Murphy Tr., 120:6-121:8, Faddis Decl., Ex. D.) Officer Murphy also testified that he saw Richards pointing a silver handgun in the officers' direction as Ramos began to fall. (*See id.* at 112:5-25.) Further, plaintiff's argument that Officer Murphy's testimony is self-serving is insufficient to controvert this fact. Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and because plaintiff's response rests on argument rather than fact, it should be deemed admitted.

91.    Officer Murphy saw Richards pointing the apparent firearm in the officers' direction. (Murphy Tr., 112:5-113:25, Faddis Decl., Ex. D).

**Denied. See response to ¶ 90 supra.**

**Defendants' Reply:** Plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and it should be deemed admitted.  (*See* ¶ 90, *supra*).

92.     Officer Murphy discharged his firearm. (Murphy Tr., 112:5-25, Faddis Decl., Ex. D).

**Admitted.**

93.     Officer Fleming stopped firing when he saw that Richards was no longer pointing the apparent firearm at anyone. (Fleming Tr., 80:25-81:10, 85:3-12, Faddis Decl., Ex. C).

**Denied. There is no credible evidence that Richards was pointing an apparent firearm at the officers at the time he was shot. Furthermore, ballistic evidence shows that the officers continued to shoot at Richards as he fell, which would surely be long after he could possibly be pointing anything at anyone. Crime Scene Unit Photos D004996 – D005018, McGuinness Decl., Ex. A.**

**Also, in the 20th frame of the 18:01:09 timestamp on Ramos's body camera footage, a bullet can be seen flying at Richards as he falls. Ramos BWC 18:01:09, Faddis Decl., Ex. J.**

**Additional shots can be heard as Richards is only inches from hitting the floor. Fleming Tr., 200:14 - 203:22, Faddis Decl., Ex. C. Richards is clearly not pointing anything at anyone, and yet the officers are shooting him as he falls.**

**Defendants' Reply:**  Plaintiff's denial is unsupported by admissible evidence which would controvert Officer Fleming's testimony.  With regard to Richards' possession of the imitation firearm, defendants respectfully refer the Court to ¶ 98, *infra*. Additionally, the CSU photos cited by plaintiff are not "ballistic evidence."  Indeed, the Crime Scene Investigator, Det. Steiner, testified that the photographs taken at the scene

could not establish trajectory of any rounds fired.  (*See* Transcript of Deposition of Matthew Steiner, 42:4-13, annexed to the Reply Declaration of Hannah V. Faddis as Ex. AB).  Finally, even accepting plaintiff's speculation that the mark appearing in Officer Ramos' camera footage at 18:01:09 were a bullet, that photograph alone does not establish its trajectory.  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and because plaintiff's response rests on argument rather than fact, it should be deemed admitted.

**Figure 3a**



94.     Officer Murphy stopped firing when he saw that Richards was no longer pointing the apparent firearm at anyone. (Murphy Tr., 114:16-115:5, Faddis Decl., Ex. D).

**Denied. See response to ¶ 93 supra.**

**Defendants' Reply:** *See* ¶ 93 *supra.*

95.     Officer Murphy fired a total of nine rounds, leaving seven rounds unexpended in his weapon. (Murphy Tr., 115:19-116:10, Faddis Decl., Ex. D; NYPD

Property Voucher of Officer Murphy's Firearm, D834, annexed to the Faddis Decl. as Ex. R).

**Admitted.**

96.     Officer Fleming fired seven rounds, leaving nine rounds unexpended in his weapon. (Fleming Tr., 85:3-5, Faddis Decl., Ex. C; NYPD Property Voucher of Officer Fleming's Firearm, D828, Faddis Decl., Ex. S).

**Admitted.**

97.     Officers Fleming and Murphy discharged their firearms over a total of less than five seconds. (Ramos BWC, 1:12-1:17, Faddis Decl., Ex. J).

**Admitted.**

**Figure 4**



98.    The object Richards held in his right hand was a silver imitation firearm with an operable laser function. (Murphy Tr., 88:16-25, Faddis Decl., Ex. D; Fleming Tr., 80:2-8, Faddis Decl., Ex. C; Ramos BWC Stills, "Ramos 1-5," Faddis Decl., Ex. J-3 (showing an object in Richards' right hand and a red light emanating from his right hand); Murphy BWC, 14:04-14:06; Faddis Decl., Ex. K (showing two distinct red laser dots in the bedroom); Still Images From Officer Murphy's BWC Footage ("Murphy BWC Stills"), "Murphy 2," annexed to the Faddis Decl. as Ex. I-2; see Figure 4, "Murphy 1" annotated, *supra*; Still Images From Officer Oliveros' BWC Footage ("Oliveros BWC Stills"), "Oliveros 1-2," annexed to the Faddis Decl. as Ex. K-2; see Figure 5, "Oliveros 1" annotated (showing a red laser from inside the bedroom hitting Officer Murphy's hand during the shooting) *infra*; Oliveros Tr., 63:18-24, Faddis Decl., Ex. F; see ¶¶ 129-138 (silver imitation firearm with an operable red laser function, bearing blood splatter,

recovered in the vicinity of Richard's right hand and tested positive for Richards' DNA) *infra*.

**Denied. None of the evidence cited shows a silver imitation firearm in Richards's hand. Defendants' claim that there were two distinct red laser dots in the room is incorrect. The evidence Defendants cite actually shows one laser, which is emanating from Ramos's taser, being reflected, and laser movement appearing smeared and appearing in multiple locations simultaneously. The proximity of the red dots to one another clearly shows that they are coming from a single laser, i.e. Ramos's taser.**

**Defendants also cite evidence which shows a red dot landing on the back on officer Murphy's hand. Given that Richards was facing the front of Murphy's body, it is not possible for a laser emanating from his direction to land on the posterior of Murphy's hand. Further, we know that Ramos was on the floor, just in front of Murphy. Murphy Tr., 112:12-113:8, Faddis Decl., Ex. D; Oliveros BWC 18:01:02-18:01:09, Faddis Decl., Ex. K. Therefore, Ramos is directly under Murphy, pointing his taser straight upwards, resulting in the laser landing on the back of Murphy's hand.**

**Defendants' Reply:** Plaintiff claims that there is a dispute as to whether Richards was holding an imitation firearm during the encounter.  However, it must be noted that Richards himself never disputed or denied that he was holding an apparent firearm, despite being directly asked whether he was doing so.  Indeed, Richards did not respond to (1) the officers' repeated requests that Richards reveal the contents of his right hand (*See* ¶¶ 33, 41, *supra*); (2) Fleming's question, posed to Richards, asking whether he holding a *real* firearm (*See* ¶¶ 62-63, *supra*); or (3) Fleming's repeated instructions that

Richards drop the apparent firearm (*See* ¶¶ 64-65, *supra*).  Further, defendants object to plaintiff's subjective—and patently inaccurate—characterization of the evidence, and respectfully refer the Court to the overwhelming evidence cited in support of this fact. Defendants also note plaintiff's admission that the imitation firearm contained DNA (in the form of blood and non-blood samples) from only one person—Richards.  (*See* ¶¶ 135-138, *infra*.)  Defendants' also note plaintiff's admission that there was blood *splatter* on the imitation firearm. (*See* ¶ 135, *infra*.)  Obviously, the only manner by which Richards' blood would be *splattered* (as apposed to smeared) on the imitation firearm is if it were near Richards at the time he was shot.  Plaintiff's argument that the laser visible on Officer Murphy's hand in Figure 5 came from Officer Ramos' taser defies reason.  A review of Officer Ramos' camera footage makes readily apparent that in that moment—between the firing of the first and second gunshots—Ramos was standing in front of Officer Murphy, hands extended away from his body toward Richards, with his taser pointing forward.  Put simply, unless the laser on Officer Ramos' taser points in a circle, there is no way that the red light pointing at Officer Murphy came from the taser.  Because plaintiff has failed to controvert this fact with a citation to relevant, admissible evidence, it should be deemed admitted.

**Figure 4a**



**Figure 4b**



**Figure 5**



99.     After the shooting, Richards was lying on the floor, his right hand outstretched almost to the foot of the dresser. (Ramos BWC, 1:27-28, Faddis Decl., Ex. J; Murphy BWC, 14:15-24, Faddis Decl., Ex. I; Fleming BWC, 15:29-37, Faddis Decl., Ex. H; Fleming BWC Stills, "Fleming 3," Faddis Decl., Ex. H-2; see Figure 6, "Fleming 3," *infra*).

**Admitted insofar as Richards fell near the dresser. Fleming BWC 18:01:20, Faddis Decl., Ex. H.**

**Defendants' Reply:** Plaintiff does not deny this fact, and thus it should be deemed admitted in its entirety.

**Figure 6**



100.   When Richards fell to the floor, the imitation firearm fell beneath the dresser. (Oliveros BWC, 1:36-1:37, Faddis Decl., Ex. K; Oliveros BWC Stills, "Oliveros 3-46," Faddis Decl., Ex. K-2 (showing silver object beneath the dresser immediately after the shooting); Fleming BWC, 18:28, Faddis Decl., Ex. J (Officer Fleming locating the imitation firearm beneath the dresser); Murphy BWC, 17:46-17:48, Faddis Decl., Ex. I (Fleming dragging imitation pistol from under dresser with right foot); Fleming BWC Still, "Fleming 4," Faddis Decl., Ex. H-2; see Figure 7, "Oliveros 34" annotated (imitation firearm beneath dresser while Officer Fleming is disarming Richards) *infra*; Figure 8, "Fleming 4" (imitation firearm illuminated by Officer Fleming next to dresser) *infra*; Fleming Tr., 91:23-95:9, Faddis Decl., Ex. C; FID Audio Statement of Officer Fleming ("Fleming FID Stmt."), 30:10-30:39, annexed to the Faddis Decl. as Ex. L).

**Denied.** Richards never had an imitation firearm in his possession. See ¶¶ 139-213, infra. The screenshots Defendants isolated from Oliveros's body camera footage do not conclusively show an imitation firearm beneath the dresser. These few expanded pixels from a single frame of a moving bodycam are far from conclusive. They do not support Defendants' conclusion.

Fleming "locating" the firearm underneath the dresser was a ruse meant to distract from the fact that he was about to plant an imitation firearm in the bedroom to protect himself from the ramifications of shooting an unarmed man. Additionally, in Fleming's FID interview cited by Defendants, he claims that he left the imitation firearm "right where it was," i.e., underneath the dresser. FID Audio Statement of Officer Fleming 30:00 - 30:45, (produced as D001482), Faddis Decl., Ex. L. This is inconsistent with his deposition testimony, in which he claims that he moved the toy gun from beneath the dresser. Fleming Tr., 93:12-95:9, Faddis Decl., Ex. C. Lastly, in his FID interview, Fleming neglects to tell the officers interviewing him that after he claimed to locate the imitation firearm under the dresser, he left the room, interacted with McLoughlin, and re-entered the bedroom before he allegedly dragged the imitation firearm out from under the dresser. Murphy BWC 18:04:12-18:04:54, Faddis Decl., Ex. I. Fleming concealed this information from the FID officers who interviewed him because he was trying to hide the fact that McLoughlin had given him an imitation firearm to plant in Richards's bedroom in order to protect himself from the potential ramifications of shooting an unarmed man.

**Defendants' Reply:**   To the extent plaintiff's response to this fact rests on argument rather than evidence, it must be deemed admitted.  Officer Oliveros' body-worn camera footage indisputably shows a silver object underneath the dresser immediately

after the shooting—in at least 22 individual video frames.  (*See* Oliveros BWC Stills, "Oliveros 3-46," Faddis Decl., Ex. K-2).   Officer Murphy's body-worn camera footage shows Officer Fleming dragging something out from underneath the dresser.  This fact, in conjunction with the overwhelming evidence that Richards held a silver imitation firearm in his right hand during the incident and fell with his right hand outstretched to the bottom of the dresser (*See, e.g.* ¶¶ 98-99, *supra*), compels the conclusion that the imitation firearm fell underneath the dresser.  Officer Fleming testified at his deposition that, after getting down on his hands and knees, he located the imitation pistol underneath the dresser. (*See* ¶ 115, *infra*). Of note, this was in close proximity to where Richards' right hand came to rest when he fell to the floor.  (*See* ¶ 99, *supra*).  Officer Fleming testified that he dragged the imitation pistol out from underneath the left end of the dresser with his foot. (*See* ¶ 117, *infra*).  At his FID interview, Officer Fleming also stated that he found the imitation pistol underneath the dresser.  When asked by investigators if he picked up the imitation pistol, he stated, "I left it where it was."  (Fleming FID Stmt., 30:30, Faddis Decl., Ex.  L). Thus, plaintiff's suggestion that Officer Fleming attempted to mislead FID investigators as to where the imitation pistol was recovered is patently false.  Plaintiff has failed to controvert this fact with citation to relevant, admissible facts, and thus it should be deemed admitted.

**<u>Figure 7</u>**



Imitation firearm under dresser

Oliveros 34

**Figure 8**



VII.    **Securing the Scene**

101.    At approximately 18:01 hours, immediately after the shooting, Officer Ramos exited the bedroom. (Ramos BWC, 1:30, Faddis Decl., Ex. J).

>    **Admitted.**

102.    Officer Ramos did not re-enter the bedroom at any time after the shooting. (Ramos BWC, 1:30-4:55, Faddis Decl., Ex. J).

>    **Admitted.**

103.    Immediately after the shooting, Officer Fleming, Officer Murphy, and Officer Oliveros transmitted a "shots fired" message over police radio. (Oliveros BWC, 00:36-40, Faddis Decl., Ex. K).

>    **Admitted.**

104.    At approximately 18:01 hours, Officers Fleming, Murphy, and Oliveros entered the bedroom. (Fleming BWC, 15:30, Faddis Decl., Ex. H; Ramos BWC, 1:37-1:45, Faddis Decl., Ex. J).

**Admitted.**

105.    When Officers Fleming and Murphy entered the room, Richards was lying prone on the floor between the foot of the bed and the wall, with his head closer to the dresser and his right arm extended almost to the foot of the dresser. (Fleming BWC, 15:32, Faddis Decl., Ex. H).

**Admitted insofar as Richards fell near the dresser and that he was lying prone between the foot of the bed and the wall. Fleming BWC 18:01:20, Faddis Decl., Ex. H.**

**Defendants' Reply:**  Plaintiff does not deny this fact, and thus it should be deemed admitted in its entirety.

106.    When Officers Fleming, Murphy, and Oliveros entered the bedroom, Richards was still moving. (Fleming BWC, 15:30-16:05, Faddis Decl., Ex. H; Fleming Tr., 88:10-16, Faddis Decl., Ex. C).

**Denied. The officers' body-worn camera footage does not show Richards moving his arms or head, except that his arm slightly twitched as he bled to death. Fleming BWC 18:01:14-26, Faddis Decl., Ex. H.**

**Defendants' Reply:**  Plaintiff's response is unsupported by the cited evidence. Fleming's body-worn camera depicts Richards' arm twitch *and* Officer Murphy's contemporaneous statement that Richards was "reaching for something else." (Fleming BWC, 16:02, Faddis Decl., Ex. H.)  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it should be deemed admitted.

107.   When Officers Fleming, Murphy, and Oliveros entered the room, Richards was still holding the knife in his left hand. (Fleming BWC, 15:32-37, Faddis Decl., Ex. H; Fleming Tr., 87:18, Faddis Decl., Ex. C).

**Admitted.**

108.   Officer Fleming kicked the knife out of Richards' left hand. (Fleming BWC, 15:40-45, Faddis Decl., Ex. H; Fleming Tr., 88:10-16, Faddis Decl., Ex. C).

**Denied. Officer Fleming stomped on Richards's left hand to force him to let go of the knife. Fleming BWC 18:01:26-31, Faddis Decl., Ex. H; FID Audio Statement of Officer Fleming 28:30 – 29:15 (produced as D001482), Faddis Decl., Ex. L; Murphy Tr. 129:2-5, Faddis Decl., Ex. D.**

**Defendants' Reply:**  Plaintiff's response is essentially a restatement of this fact, and thus this fact should be deemed admitted.

109.   Officer Oliveros handcuffed Richards for safety. (Fleming BWC, 16:20-16:40, Faddis Decl., Ex. H; Oliveros Tr. at 44:25- 45:3, 47:8-17, Faddis Decl., Ex. F).

**Admitted that Oliveros handcuffed Richards; denied that this was done for safety as Richards posed no threat to the officers as he lay prone on the floor bleeding to death.**

**Defendants' Reply:**  Plaintiff cites no evidence to support her denial that Officers handcuffed Richards for safety.   Rather, plaintiff appears to argue about the reasonableness of Oliveros' reasoning.  Because plaintiff's response rests on argument rather than fact, this fact must be deemed admitted.

110.   After Richards was handcuffed, Officer Fleming attempted to locate the apparent firearm that Richards had been holding. (Fleming BWC, 16:40-18:30, Faddis

Decl., Ex. J; Fleming BWC Tr., 28:12-32:6, Faddis Decl., Ex. H-1; Fleming Tr., 89:22-90:9, Faddis Decl., Ex. C).

**Admitted insofar as Fleming loudly announced and acted as if he was attempting to locate an apparent firearm. Denied that Richards was actually holding an apparent firearm or that Fleming reasonably could have believed he was.**

**Defendants' Reply:** Plaintiff's response is not supported by any citation to relevant, admissible evidence. Further, as set forth *supra*, the evidence that Richards was holding an imitation firearm during the incident cannot be reasonably disputed. Because plaintiff's response rests on argument rather than fact, this fact must be deemed admitted.

111.    At approximately 18:02, about seventy-three seconds after the last gunshot, Det. Hartnett and Officer O'Rourke returned to the bedroom with their medical bag. (Fleming BWC, 16:50-16:55, Faddis Decl., Ex. H; Ramos BWC, 2:40, Faddis Decl., Ex. J; Hartnett Tr., 68:25-69:20, Faddis Decl., Ex. G).

    **Admitted.**

112.    As members of ESU, both Det. Hartnett and Officer O'Rourke were certified emergency medical technicians ("EMTs"). (Hartnett Tr., 69:8-12, Faddis Decl., Ex. G).

    **Admitted.**

113.    Det. Hartnett and Officer O'Rourke moved Richards' body toward the center of the room and began attending to Richards' injuries. (Hartnett Tr., 71:15-21, Faddis Decl., Ex. G; Fleming BWC, 17:20, Faddis Decl., Ex. H; Murphy BWC, 15:57, Faddis Decl., Ex. I).

    **Admitted.**

114. While Det. Hartnett and Officer O'Rourke were rendering medical aid to Richards, Officer Fleming continued to search for the apparent firearm. (Fleming BWC, 16:55-18:30, Faddis Decl., Ex. H; Fleming BWC Tr., 29:14-30, 31:3-1, Faddis Decl., Ex. H-1; Fleming Tr., 186:20-188:16, Faddis Decl., Ex. C).

      **Admitted.**

115. At approximately 18:04, Officer Fleming knelt down to the floor, looked under the dresser, and saw the apparent firearm. (Fleming BWC, 18:30, Faddis Decl., Ex. H; Fleming Tr., 91:23-92:21, Faddis Decl., Ex. C; Fleming FID Stmt., 30:10-30:39, Faddis Decl., Ex. L).

      **Denied. Fleming knelt down to the floor, looked under the dresser, and claimed that he saw the apparent firearm. The firearm is not visible underneath the dresser on any of the officers' body camera footage, so there is no evidence that it was actually there. Fleming BWC 18:04:11-18:04:20, Faddis Decl., Ex. H.**

      <u>**Defendants' Reply:**</u>  The evidence cited by plaintiff does not controvert this fact. Further, the imitation firearm is visible underneath the dresser on Officer Oliveros' body-worn camera footage. (*See* ¶ 100, *supra*).  Because plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, it should be deemed admitted.

116. When Officer Fleming located the apparent firearm under the dresser, he stated, "Oh, there we go," and noted, "maybe it was like a toy or something." (Fleming BWC, 18:30-33, Faddis Decl., Ex. H; Fleming BWC Tr., 31:24-32:6, Faddis Decl., Ex. H-1).

      **Denied. When Fleming claimed to locate the apparent firearm under the dresser, he actually stated, "Oh, there we go, there's a fucking, whatever, it's like a toy or something." Fleming BWC 18:04:10 - 18:04:20, Faddis Decl., Ex. H.**

**Defendants' Reply:** Plaintiff's response is essentially a restatement of this fact, and thus it should be deemed admitted.

117. Officer Fleming then dragged the apparent firearm out from under the "left end" of the dresser with his foot. (Fleming BWC, 18:33-19:02, Faddis Decl., Ex. H; Fleming Tr., 93:15-95:9, Faddis Decl., Ex. H-1; Murphy BWC, 17:46:17:48).

**Denied. Defendants are omitting the fact that after Fleming claimed to locate the apparent firearm under the dresser, he exited the room and interacted with McLoughlin, who had entered the apartment shortly after the shooting, exited the apartment and been handed an object by an unidentified plainclothes officer, and re-entered the apartment. Candela BWC 18:02:30-18:02:32, McGuinness Decl., Ex. B; Candela BWC 18:03:17-18:03:53, McGuinness Decl., Ex. B; Murphy BWC 18:04:23-18:04:34, Faddis Decl., Ex. I; Ramos BWC 18:02:25-18:02:28, Faddis Decl., Ex. J. When interacting with Fleming, McLoughlin can be seen discreetly handing him an object, which Fleming turns around and looks at. Murphy BWC 18:04:23-18:04:34, Faddis Decl., Ex. I. Fleming then re-enters the bedroom, pretends to drag the toy gun out from under the dresser with his foot, and plants the toy gun to the left of the dresser.**

**Defendants' Reply:** Plaintiff's response is unsupported by the cited evidence, and thus fails to controvert this fact. Further, in support of plaintiff's allegations, plaintiff patently misrepresents the cited body-worn camera footage. For example, Officer Candela's body-worn camera footage shows Officer McLoughlin holding his glasses (*See* Candela BWC,3:39-3:41, McGuinnes Decl., Ex. B), which he had removed from his face moments prior (*See id.*at 3:19-3:21). Similarly, the cited portions of Officer Murphy's body camera footage do not show Officer McLoughlin handing anything to Officer

Fleming.  Indeed, a moment after this alleged hand-off, Officer Murphy's body camera footage shows Officer McLoughlin still holding his glasses in his right hand.  (*See* Murphy BWC Stills, "Murphy 3-17," annexed to the Reply Declaration of Hannah V. Faddis as Ex. AC).  Defendants respectfully refer the Court to the cited footage for an accurate representation of its contents.  Plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and thus it should be deemed admitted.

118.  After dragging the apparent firearm out from under the dresser, Officer Fleming illuminated the object with his flashlight and recorded its location with his body-worn camera. (Fleming BWC, 19:02, Faddis Decl., Ex. H; Fleming BWC Stills, "Fleming 4," Faddis Decl., Ex. H-2; Fleming Tr., 195:4-23, Faddis Decl., Ex. C).

**Denied because Fleming did not, in fact, drag the apparent firearm out from under the dresser. See response to ¶ 117 supra. Admitted that Fleming illuminated the object with his flashlight and recorded its location with his body-worn camera.**

**Defendants' Reply:**  Defendants respectfully refer the Court to ¶ 117, *supra*. Plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and thus it should be deemed admitted.

119.  After dragging the apparent firearm from beneath the dresser, Officer Fleming left the bedroom. (Fleming BWC, 19:02-20:06, Faddis Decl., Ex. H).

**Denied because Fleming did not, in fact, drag the apparent firearm out from under the dresser. See response to ¶ 117 supra. Admitted that Fleming left the bedroom after planting the apparent firearm to the left of the dresser.**

**Defendants' Reply:**  Defendants respectfully refer the Court to ¶ 117, *supra*. Plaintiff has failed to controvert this fact with citation to relevant, admissible evidence, and thus it should be deemed admitted.

**VIII.   Medical Response and Autopsy**

120.   Emergency medical services ("EMS") were dispatched to the scene of the incident at approximately 17:54 hours, and were en route at approximately 17:55 hours. (FDNY PCR, D5098, Faddis Decl., Ex. U).

> **Admitted.**

121.   At approximately 18:02 hours, a sergeant from the 47th Precinct requested a second ambulance, and at approximately 18:03, the sergeant requested a third ambulance. (ICAD, D1017, Faddis Decl., Ex. E).

> **Admitted.**

122.   FDNY emergency medical services ("EMS") arrived at the Premises at approximately 18:05 hours, approximately four minutes after the shooting. (FDNY PCR, D5098, Faddis Decl., Ex. U).

> **Admitted.**

123.   Richards was pronounced dead by EMS at approximately 18:11 hours (FDNY PCR, D5100, Faddis Decl., Ex. U).

> **Admitted.**

124.   The Office of the Chief Medical Examiner ("OCME") performed an autopsy of Richards' body on September 7, 2017. (OCME Report of Autopsy ("Autopsy Rpt."), D1246, annexed to the Faddis Decl. as Ex. V).

> **Admitted.**

125.   The OCME concluded that Richards' cause of death was a gunshot wound of the torso. (Autopsy Rpt., D1247, Faddis Decl., Ex. V).

> **Admitted.**

126.    Richards sustained seven gunshot injuries, including one penetrating shot to the torso, two perforating shots to the torso, one perforating shot to the left wrist, one penetrating wound to the right hip, and two graze wounds. (Autopsy Rpt., D1249-1252, Faddis Decl., Ex. V).

**Admitted.**

127.    During the autopsy, Taser barbs were also removed from the clothing at Richards' right chest and left thigh. (Autopsy Rpt., D1255, Faddis Decl., Ex. V).

**Admitted.**

128.    The Taser barbs did not pierce Richards' skin. (Autopsy Rpt., D1255, Faddis Decl., Ex. V).

**Admitted.**

**IX.    Evidence Recovered**

129.    Following the shooting, the NYPD Crime Scene Unit ("CSU") responded to the location. (CSU Crime Scene Diagram ("CSU Diagram"), D1314, annexed to the Faddis Decl. as Ex. Y).

**Admitted.**

130.    CSU recovered the imitation firearm, silver with an operable laser function, beside the dresser inside Richards' bedroom. (CSU Photos of Imitation Firearm, D445, D448, D473, D474, annexed to the Faddis Decl. as Ex. Z; see Figure 9 *infra*).

**Admitted.**

**Figure 9**



131.    There was blood splatter on the trigger, trigger guard, upper left side, laser sight, back, grip, and all along the top of the right side of the imitation firearm. (CSU Photos Imitation Firearm, Faddis Decl., Ex. Z).

**Admitted.**

132.    CSU recovered the knife, which had an approximately 3-inch long folding blade, from inside Richards' bedroom. (CSU Photo of Knife, D443, annexed to the Faddis Decl. as Ex. AA; <u>see</u> Figure 10 *infra*).

**Admitted.**

**Figure 10**



133.    CSU vouchered the imitation pistol and knife from the scene. (NYPD Property Voucher No. 2000689803, D841-842, annexed to the Faddis Decl. as Ex. X).

**Admitted.**

134.    CSU measured and diagrammed Richards' apartment. (CSU Diagram, Faddis Decl., Ex. Y).

**Admitted.**

135.    The Office of Chief Medical Examiner conducted DNA testing on samples taken from the imitation firearm recovered from Richards' bedroom. (OCME Forensic Biology File No. FB17-05303 Laboratory Report ("OCME FB Lab. Rpt."), D4741-4746, annexed to the Faddis Decl. as Ex. W).

**Admitted.**

136.    Two out of five swabs taken from the imitation firearm contained a sufficient concentration of DNA for testing—one from "possible blood on imitation firearm" and one from "grips." (OCME FB Lab. Rpt., D4742-43, Faddis Decl., Ex. W).

**Admitted.**

137.   DNA from a single "contributor" was detected in the blood and grip samples taken from the imitation firearm. (OCME FB Lab. Rpt., D4742-43, Faddis Decl., Ex. W).

**Admitted.**

138.   The DNA profile of the single "contributor" was determined to a high degree of probability to belong to Miguel Richards. (OCME FB Lab. Rpt., D4742, Faddis Decl., Ex. W ("This DNA result is approximately 4.98 quadrillion ($4.98 \times 10^{15}$) times more probable if the sample originated from Miguel A. Richards than if it originated from an unknown person.")).

**Admitted.**

<u>**Plaintiff's Statement of Additional Facts**</u>

139.   After being assigned the wellness check, but prior to arriving at the location, Officers Murphy and Fleming stopped at an ATM so that Officer Fleming could withdraw cash, then stopped at a pizzeria where Officer Fleming ordered a pizza. Officers Fleming and Murphy then proceeded to park a few blocks away from the Premises, where Officer Fleming ate for approximately twenty to thirty minutes, during which time Officer Murphy called Mr. Carey to speak with him about the wellness check. In total, approximately an hour and nineteen minutes passed between the time the wellness check was assigned at 16:06 and the time Officers arrived at the location at 17:25. FID Audio Statement of Officer Fleming 2:10 – 4:03 (produced as D1482), Faddis Decl., Ex. L; Fleming Tr. 27:19 - 32:9, 35:23 - 36:7, Faddis Decl., Ex. C; ICAD, D01015; Faddis Decl., Ex. Q.

**<u>Defendants' Reply:</u>**  <u>Defendants deny the materiality of these allegations.</u>

140.    At the beginning of the encounter with Mr. Richards, Fleming, Murphy and the landlord walked into Richards's bedroom without realizing Richards was present. Murphy Tr. 57:15 - 58:24, Faddis Decl., Ex. D.

**Defendants' Reply:**  Defendants admit that Officer Murphy testified that he entered the bedroom, although this is not corroborated by his body-worn camera footage.  (*See* Murphy BWC *passim*, Faddis Decl., Ex. I).  Defendants deny the materiality of these allegations.

141.    Murphy entered five feet or more into Richards's bedroom towards Richards, and Fleming and the landlord entered farther into the room. Murphy Tr. 58:6-19, Faddis Decl., Ex. D.

**Defendants' Reply:**  Defendants admit that Officer Murphy testified that he entered the bedroom, but state that this is contradicted by body-worn camera footage. (*See* Murphy BWC *passim*, Faddis Decl., Ex. I; Fleming BWC, *passim*, Faddis Decl., Ex. H).  Defendants deny the materiality of these allegations.

142.    Richards's bedroom measured 13 feet by 9 feet. CSU Diagram (produced as D1314), Faddis Decl., Ex. Y.

Defendants' Reply:  Admitted.

143.    By the time the officers realized Richards was present, Fleming and the landlord were close enough to Richards that Richards could have struck them if he chose to. Murphy Tr. 58:6-19, Faddis Decl., Ex. D; FID Audio Statement of Officer Murphy 8:00 - 10:00, McGuinness Decl., Ex. G.

**Defendants' Reply:**  Defendants admit that Officer Murphy testified that he entered the bedroom, although this is not corroborated by his body-worn camera

footage.  (*See* Murphy BWC *passim*, Faddis Decl., Ex. I).  Defendants deny the materiality of these allegations.

144.    Murphy testified that Richards initially menaced the officers with the knife by extending his arm towards the officers and pointing it directly at the officers for "several minutes" until ESU arrived. Murphy later changed his sworn testimony after seeing that his body camera footage contradicted his prior testimony and admitted that Richards had not raised the knife but had kept it by his side pointed downwards. Murphy Tr. 60:20-23, 63:18 - 64:4, 65:24 - 66:25, 74:25 - 78:14, 79:5-21, 117:4-24, 209:20 - 210:14, Faddis Decl., Ex. D.

**Defendants' Reply:**  Denied.  Defendants object to the mischaracterization of Officer Murphy's testimony and respectfully refer the Court to the entirety of his testimony.  Officer Murphy testified initially that he recalled that Richards' arm had been held higher and at a slightly different angle than was captured in his body-worn camera footage.  Officer Murphy corrected his mistake, but did not retract his testimony that he found Richards' actions aggressive, threatening, or menacing.  Defendants also deny the materiality of these factual allegations.  (*See* Murphy Tr. 63:15-24, 76:23-25, 77:8-13, 79:14-16, Faddis Decl., Ex. D.)

145.    Richards's bed was between Richards and the officers for the entire encounter. Fleming BWC *passim,* Faddis Decl., Ex. H; Murphy BWC *passim,* Faddis Decl., Ex. I; Ramos Tr. 32:11-25, Faddis Decl., Ex. E.

**Defendants' Reply:**  Denied.  Defendants object to the characterization of the location of the bed as "between" Mr. Richards and the officers.  Defendants further respectfully refer the Court to the body-worn camera footage of the defendants and the

CSU crime scene diagram for an objective and accurate depiction of the layout of the bedroom and positions of the parties.

146.    Richards could not flee or retreat farther away from the officers. Fleming BWC *passim,* Faddis Decl., Ex. H; Murphy BWC *passim*, Faddis Decl., Ex. I; Ramos Tr. 34:18 - 37:3, Faddis Decl., Ex. E.

**Defendants' Reply:**  Denied.  The facts alleged by plaintiff are speculative and conclusory, insofar as plaintiff purports to posit what the decedent "could" have done, and therefore inadmissible.  Defendants further respectfully refer the Court to the body-worn camera footage of the defendants and the CSU diagram for an objective and accurate depiction of the layout of the bedroom and positions of the parties.   Additionally, defendants object that the facts alleged are not material.

147.    Nothing physically prevented Murphy or Fleming from retreating or backing up from their position. Ramos Tr. 37:4-13, 58:16-20, Faddis Decl., Ex. E.

**Defendants' Reply:**  Denied.  Defendants object that the facts alleged are not material.  Moreover, Officer Fleming testified extensively as to why he maintained his position near the door to Mr. Richards' bedroom, why he did not move farther away, and why he wanted to maintain a clear line of sight to Mr. Richards. (*See* Fleming Tr., 61:14-62:2, 64:13-65:24, 137:9-138:12, Faddis Decl., Ex. C.)   Defendants further respectfully refer the Court to the body-worn camera footage of the defendants and the CSU crime scene diagram for an objective and accurate depiction of the layout of the bedroom and positions of the parties.

148.    Murphy suggested closing the door to Richards's bedroom until additional help arrived. Fleming said that they could not, and Murphy deferred to Fleming because Fleming was a "senior officer." Murphy Tr. 67:24 - 68:10, Faddis Decl., Ex. D.

**Defendants' Reply:**  Admit that Officer Murphy asked Officer Fleming if they could close the door to the bedroom and Officer Fleming stated that they could not because it was unknown if Richards was holding a firearm in his right hand.  Additionally, defendants object that the facts alleged are not material.

149.   Fleming received de-escalation training at the police academy approximately 11 years prior to the shooting, but as of September 5, 2017, he had not received any refresher courses and could not remember any of the de-escalation training. Fleming Tr. 134:19 - 135:24, 146:6-9, Faddis Decl., Ex. C.

**Defendants' Reply:**  Admit that Officer Fleming received de-escalation training during his initial NYPD training at the Police Academy.  Defendants deny the materiality of this allegation.

150.   Within approximately two minutes of encountering Richards, Fleming identified that Richards was an emotionally disturbed person ("EDP") and that Richards was not acting rationally. Fleming Tr. 143:15 - 144:17, Faddis Decl., Ex. C.

Defendants' Reply:  Admitted.

151.   Fleming shouted commands at Richards. Fleming Tr. 146:3-5, Faddis Decl., Ex. C.

**Defendants' Reply:**   Admitted that Officer Fleming testified that he shouted at Richards, at approximately the 2:38 timestamp of his body-worn camera footage, and further stated, "I did that because, at this point, speaking calmly to him and giving him commands was ineffective.  I was wondering maybe he couldn't hear me, and if that was the case, if I raised my voice at him, it might cause him to have a different reaction than he has so far which has been nothing."  (*See* Fleming Tr. at 146:22-147:4, Faddis Decl., Ex. C.)  Defendants deny the materiality of these allegations.

152.    Fleming threatened to use deadly force on Richards several times before Murphy claimed that he saw a gun. For example, Fleming stated: "I don't want to shoot you. Put your hand up and drop that knife;" "You understand, you are seconds away from getting shot if you don't show me what's in your other hand;" "I don't want to shoot you man, but I will if you come at me with that knife;" "Put that knife on the floor so I don't have to hurt you." Fleming BWC 17:46:40- 46, 17:52:10-18, 17:52:36-41, 17:55:33-34, Faddis Decl., Ex. H.

        **Defendants' Reply:**  Admit the substance of the statements recorded, but deny the characterization of those statements as threats "to use deadly force."   Further, Officer Fleming testified, "One thing that they do teach us at CIT training that I remember is to be honest with an EDP, don't lie to them.  So, I'm telling him the truth that if he doesn't show us what's in his other hand that you [sic] he could get shot." (*See* Fleming Tr. 162:3-8, Faddis Decl., Ex. C).  Defendants deny the materiality of these allegations.

153.    Fleming knows that an officer should not shout commands at an EDP because it may "aggravate them or distress them." Fleming Tr. 146:6 - 147:7, Faddis Decl., Ex. D.

        **Defendants' Reply:**  Admit the substance of Officer Fleming's testimony, but deny the materiality of the facts asserted, insofar as what "may" happen is not relevant to what did happen.  Further, defendants respectfully refer the Court to Officer Fleming's testimony as to why he raised his voice in communicating with Mr. Richards. (*See* Fleming Tr., 146:22-147:4, Faddis Decl., Ex. C).

154.    Approximately seven minutes into the encounter with Richards, Fleming affirmatively attempted to stop the NYPD's Emergency Services Unit ("ESU") from

responding by stating into his radio when asked if he wanted ESU to respond, "I'll advise, just have a unit with a Taser come over." Murphy BWC 17:53:45-50, Faddis Decl., Ex. I.

**Defendants' Reply:**  Admit that Officer Fleming stated "I'll advise" when asked by the NYPD dispatcher if ESU was needed at the scene, but deny plaintiff's characterization of this statement as an attempt to stop ESU from responding.  Defendants further note that at the time of that statement, Officer Fleming had already requested a patrol supervisor to the scene, was awaiting further information or direction, and that ESU was dispatched. (*See* Fleming Tr., 61:3-13, 168:11-170:2, Faddis Decl., Ex. C). Defendants also deny the materiality of these factual allegations.

155.    Det. Hartnett, who has been an ESU officer for approximately eight years, testified that he has never heard of an officer not wanting ESU to respond to a scene to help with an EDP. Hartnett Tr. 18:6-12, 41:19-23, Faddis Decl., Ex. G.

**Defendants' Reply:**   Admit that Det. Hartnett testified that in his experience he had never heard of uniformed members of service not wanting ESU to come to the scene.  However, Det. Hartnett further testified that there were regular instances in which ESU units would be canceled, meaning not required to respond to a job, and further that he could not say if there were "ever a situation where [officers] have a noncompliant, armed E.D.P. where [officers] should not call ESU[.]" (*See* Hartnett Tr., 41:24-43:3, Faddis Decl., Ex. G). Defendants also deny the materiality of these factual allegations.

156.    The ESU is specially trained to handle EDPs with advanced psychological training and tools. ESU is notified on every EDP call and responds to thousands of EDP calls per year. Hartnett Tr. 18:13-21:2, Faddis Decl., Ex. G.

**Defendants' Reply:**   Admit, except deny that ESU is given "advanced psychological training," and respectfully refer the Court to the testimony cited. Defendants also deny the materiality of these factual allegations.

157.   Approximately ten minutes into the encounter with Richards, Fleming stated to Richards that if Richards did not obey Fleming by dropping the knife, Fleming would hurt him. Fleming BWC 17:55:30-33, Faddis Decl., Ex. H; Fleming Tr. 172:12 - 173:5, Faddis Decl., Ex. C.

**Defendants' Reply:**   Deny.  Plaintiff's factual assertions misconstrue both the recorded statements made by Officer Fleming and his own testimony regarding his communication with Mr. Richards.  (*See, e.g.,* Fleming Tr., 172:12-173:5, Faddis Decl., Ex. C; Fleming BWC, 9:00-10:15, Faddis Decl., Ex. H; Fleming BWC Tr., 15:25-17:8, Faddis Decl., Ex. H-1). Defendants also deny the materiality of these factual allegations.

158.   The ESU officers arrived with a Taser. Murphy knew that the ESU officers had a Taser. Murphy Tr. 70:24 - 71:12, Faddis Decl., Ex. D.

**Defendants' Reply:**   Admit the factual allegations, but deny the materiality.

159.   Neither Fleming nor Murphy asked the ESU officers to use their Taser. Murphy Tr. 71:6-24, Faddis Decl., Ex. D.

**Defendants' Reply:**   Admit the factual allegations, but deny the materiality.

160.   Fleming claims that he did not know what the ESU officers meant when they said they were going to "suit up" and that he had never heard that before and did not know whether they would come back. Fleming Tr. 177:18 - 178:10, Faddis Decl., Ex. C.

**Defendants' Reply:**  Admit that Officer Fleming did not know what Det. Hartnett and Officer O'Rourke meant when they used the expression "suit up," and that Officer Fleming did not know if or when the two ESU officers would return.  Defendants also deny the materiality of these factual allegations.

161.    Murphy knew what "suit up" meant and that ESU were coming back upstairs shortly. Murphy Tr. 95:15-18, 106:5-14, Faddis Decl., Ex. D.

**Defendants' Reply:**  Admit that Officer Murphy had an understanding of what Det. Hartnett and Officer O'Rourke meant when they used the expression "suit up"; deny that Officer Murphy knew that ESU was "coming back upstairs shortly," and respectfully refer the Court to the evidence cited.  Defendants deny the materiality of these allegations.

162.    ESU officer Det. O'Rourke saw Richards, Murphy, and Fleming moments before the shooting and felt the situation was under control. O'Rourke Tr. 27:16-17, McGuinness Decl., Ex. C.

**Defendants' Reply:**  Admit that Officer O'Rourke testified that he did not have concerns leaving Officers Fleming and Murphy in the apartment, and that he felt they "had the situation under control." Deny the subjective characterization of "moments before the shooting," and the materiality of the facts alleged.

163.    The NYPD Patrol Guide Procedure 221-113 is titled "Mentally Ill or Emotionally Disturbed Persons" and directs that "If the emotionally disturbed person is armed or violent, no attempt will be made to take the EDP into custody without the specific direction of a supervisor unless there is an immediate threat of physical harm to the EDP or others are present." PG 221-113 (produced as D001773) (emphasis in original), McGuinness Decl., Ex. D; Hartnett Tr. 30:3, Faddis Decl., Ex. G.

**Defendants' Reply:**  Admit that P.G. Section 221-113 includes the above-quoted provision and respectfully refer the Court to the document for its complete contents.  Defendants deny the materiality of these allegations.

164.    Patrol Guide Procedure 221-113 further instructs: "If an EDP is not immediately dangerous, the person should be contained until assistance arrives." PG 221-113 (produced as D001773), McGuinness Decl., Ex. D; Harnett Tr. 34:9-14, Faddis Decl., Ex. G.

**Defendants' Reply:**  Admit that P.G. Section 221-113 includes the above-quoted provision and respectfully refer the Court to the document for its complete contents.  Defendants also deny the materiality of these factual allegations.

165.    Patrol Guide Procedure 221-13 also states:

> In all [cases other than an EDP constituting an immediate threat of serious physical injury or deal to himself or others, or a unarmed, compliant and non-violent EDP], if EDP's actions do not constitute an immediate threat of serious physical injury or death to himself or others:
> (1) Attempt to isolate and contain the EDP while maintaining a zone of safety until arrival of patrol supervisor and Emergency Service Unit Personnel.
> (2) Do not attempt to take EDP into custody without the specific direction of a supervisor.

PG 221-13 (produced as D001774) (emphasis in original), McGuinness Decl., Ex. D; Hartnett Tr. 37:13 - 38:10, Faddis Decl., Ex. G.

**Defendants' Reply:**  Admit that P.G. Section 221-113 includes the above-quoted provision and respectfully refer the Court to the document for its complete contents.  Defendants also deny the materiality of these factual allegations.

166.    Richards standing with a knife in his bedroom did not constitute an "immediate" threat. Ramos Tr. 74:2-14, Faddis Decl., Ex. E.

**Defendants' Reply**:   Deny and state that the testimony cited by plaintiff does not support the fact alleged, insofar as the cited testimony elicited from Officer Ramos pertained to a hypothetical situation, not his encounter with Mr. Richards. (*See* Ramos Tr., 71:14-74:10, Faddis Decl., Ex. E).  Indeed, Officer Ramos explicitly testified that Mr. Richards posed an "immediate threat."  (*Id.* at70:5-20).  Defendants further state that Officers Fleming, Murphy, and O'Rourke also testified that they perceived the totality of Mr. Richards' behavior as an immediate threat, including but not limited to his possession of a deployed deadly weapon—the knife—his refusal to relinquish that weapon, his refusal to display his right hand, and the accompanying suspicion that he possessed a firearm.  (*See* Fleming Tr., 50:11-51:16, 55:20-56:10, 143:24-144:11, 51:24-52:11, Faddis Decl., Ex. C; Murphy Tr., 63:21-64:16, 75:7-18, 155:19-156:2, 156:9-16, Faddis Decl., Ex. D; O'Rourke Tr., 25:17-26:5, McGuinness Decl., Ex. C).  To the extent the cited testimony is speculative, defendants also respectfully submit that it is not admissible evidence upon which plaintiff may rely.

167.   Murphy knew that he needed a supervisor's approval before taking an EDP into custody when the EDP was "isolated and contained." Murphy Tr. 156:3-8, Faddis Decl., Ex. D.

**Defendants' Reply:**   Admit that Officer Murphy testified as to his understanding of NYPD guidelines, and further explicitly testified that he considered Mr. Richards a threat, such that supervisory direction was not required to take him into custody.  (*See* Murphy Tr., 155:19-156:2, Faddis Decl., Ex. D). Fleming Tr., 50:11-51:16; 55:20-56:10; 143:24-144:11; 51:24-52:11, Faddis Decl., Ex. C).  Defendants also deny the materiality of these allegations.

168.   Throughout the entire encounter with Richards, Richards was "isolated and contained." Fleming Tr. 169:23-24, Faddis Decl., Ex. C; Hartnett Tr. 35:11-17, Faddis Decl., Ex. G., (a person kept within a single room of an apartment is isolated and contained); Murphy Tr. 95:19 - 96:4, Faddis Decl., Ex. D; O'Rourke Tr. 25:12-16, McGuinness Decl., Ex. C; Ramos Tr. 48:2-6, Faddis Decl., Ex. E.

**Defendants' Reply**:  Admit that Mr. Richards, while armed with at least one known deadly weapon which he refused to relinquish, was contained within his bedroom during the incident.  Defendants deny that it was established that Mr. Richards was isolated, as Officer Fleming testified that he could not rule out the possibility that another individual was in the bedroom.  (*See* Fleming Tr., 61:19-62:11, Faddis Decl., Ex. C).  Defendants also deny the materiality of these allegations.

169.   Prior to Ramos approaching Richards with a Taser for the purpose of taking him into custody, Richards never made a threatening gesture or statement. Fleming BWC *passim*, Faddis Decl., Ex. H; Murphy BWC *passim*, Faddis Decl., Ex. I; Murphy Tr. 69:21 - 70:2, Faddis Decl., Ex. D.

**Defendants' Reply**: Deny.  Officers Fleming and Murphy perceived Mr. Richards' behavior as threatening.  Further, Officer Fleming observed that Mr. Richards moved his left arm holding the deployed knife on several occasions.  (*See* Fleming Tr., 73:12-23, 74:10-17, Faddis Decl., Ex. C).

170.   Ramos knew that anytime he used physical force, including using a Taser, he was required to make an independent assessment based on the totality of the circumstances. Ramos Tr. 40:21 - 41:10, Faddis Decl., Ex. E.

**Defendants' Reply**:  Admit that Officer Ramos testified as to his understanding of NYPD guidelines, and respectfully refer the Court to the cited evidence for an accurate recitation of his testimony.

171.   Ramos moved in to Tase Richards because Fleming and Murphy told him to do so, and Ramos did not make an independent assessment of the situation. Ramos Tr. 33:14 - 39:18, 45:8 - 52:8, 79:21 - 82:13; 120:3 - 121:5, 126:2-19, Faddis Decl., Ex. E.

**Defendants' Reply**:  Deny.  Officer Ramos explicitly testified that he considered the totality of the circumstances prior to discharging his Taser.  (*See*, Ramos Tr., 41:4-16, Faddis Decl., Ex. E).

172.   Richards was never given any warning that he would be Tased prior to Ramos firing the Taser at Richards. Ramos Tr. 101:18-25, 104:16-24, Faddis Decl., Ex. E.

**Defendants' Reply**:  Admit that Officer Ramos did not provide a warning to Mr. Richards prior to discharging his Taser.  Officer Ramos further testified that he understood that such a warning was not mandatory, and should be given when reasonable, which it was not in this situation because Mr. Richards pointed an apparent firearm at him.  (*See* Ramos Tr., 101:21-102:22, Faddis Decl., Ex. E).  Defendants also deny the materiality of these factual allegations.

173.   After Richards was shot multiple times, Oliveros placed his knee on Richards's back and handcuffed Richards as he lay incapacitated and bleeding on the ground. Oliveros saw no apparent firearm on the floor near Richards. Fleming BWC 18:02:02-27, Faddis Decl., Ex. H; Oliveros BWC 18:02:02- 36, Faddis Decl., Ex. K; Oliveros Tr. 45:4 - 48:20, Faddis Decl., Ex. F; Santana BWC 18:02:02-33, McGuinness Decl., Ex. E.

**Defendants' Reply**: Admit that Officer Oliveros did handcuff Mr. Richards.  Deny that the evidence cited supports the allegation that Officer Oliveros placed a knee on Mr. Richards' back.  Admit that Officer Oliveros testified he did not see an apparent firearm on the floor of the bedroom.  (*See* Oliveros Tr. 45:16-46:5, Faddis Decl., Ex. F).

174.    None of the officers' body camera videos show an apparent firearm in Richards's hand at any time. Candela BWC, McGuinness Decl., Ex. B; Fleming BWC, Faddis Decl., Ex. H; Murphy BWC, Faddis Decl., Ex. I; Oliveros BWC, Faddis Decl., Ex. K; Ramos BWC, Faddis Decl., Ex. J; Santana BWC, McGuinness Decl., Ex. E.

**Defendants' Reply**:  Deny and respectfully refer the Court to ¶ 98, *supra*. Officer Ramos' BWC footage shows Mr. Richards pointed an object with a red light on it in the direction of the officers.

175.    Fleming covered his own body camera for seven minutes and forty-eight seconds during the confrontation with Richards, during which time the officers Tased and fatally shot Richards. Fleming BWC 17:53:20 - 18:01:08, Faddis Decl., Ex. H; Fleming Tr. 167:4-18, Faddis Decl., Ex. C.

**Defendants' Reply**:  Deny that the evidence cited supports the facts alleged.  Officer Fleming's body camera was obscured by his left hand, in which he held a flashlight which he was using to illuminate Mr. Richards and the interior of the bedroom. (*See*, Murphy BWC, 12:43, Faddis Decl., Ex. I).

176.    After Murphy said he saw a gun in Richards's hand, Fleming continued to focus on the knife in Richards's hand. Fleming BWC 17:59:45 - 18:00:54, Faddis Decl., Ex. H.

**Defendants' Reply**:   Deny. The video evidence cited records Officer Fleming stating, *inter alia*, "drop the gun," "drop that gun," "drop that gun," "is that a real gun you got there?" "drop that gun," "drop that gun," "drop that gun and drop that knife." (*See*, Fleming BWC, 13:57-15:09, Faddis Decl., Ex. H; Fleming BWC Tr., 22:18-24:6, Faddis Decl., Ex. H-1). Defendants further object to the subjective characterization of video evidence, and respectfully refer the Court to the evidence cited.

177.    Ramos was closest to Richards and did not see a gun in Richards's hand when he entered the bedroom. Ramos Tr. 89:22 - 92:19, Faddis Decl., Ex. E.

**Defendants' Reply**:   Deny; the evidence cited does not support the facts alleged. Officer Ramos testified that the first time he attempted to approach Mr. Richards, he saw Mr. Richards' body move "towards facing the door" (Ramos Tr., 90:14-21, Faddis Decl., Ex. E) and his right hand move from behind his leg (*Id.* at 90:22-91:6). The second time that Officer Ramos attempted to approach Mr. Richards, he observed Mr. Richards raise his arm, holding an object in a pistol grip, with a red laser that Mr. Richards aimed at Officer Ramos' chest. (*Id.* at 95:20- 97:21). Officer Ramos believed the object was a gun. (*Id.* at 97:22-98:7).

178.    At the time Ramos and Oliveros claimed to see a red dot coming towards Ramos, Ramos was raising his own Taser, which projects a red laser dot. Oliveros only saw one red dot, and the red dot traveled away from Ramos, not towards him. Oliveros BWC 18:00:56 - 18:01:02, Faddis Decl., Ex. K; Oliveros Tr. 63:18 - 74:15, 81:19 - 85:15, 87:5 - 90:14, Faddis Decl., Ex. F; Ramos Tr. 88:24 - 98:24, 124:4 - 131:22, Faddis Decl., Ex. E.

**Defendants' Reply**:   Deny and state that plaintiff is willfully misconstruing and misstating the testimony of the defendants.   The testimony of Officer Oliveros cited

by plaintiff recites that in a series of still images presented during his deposition, Officer Ramos could see only one red laser which was generated by Officer Ramos' Taser.  (*See* Oliveros Tr., 69:4-11, Faddis Decl., Ex. F) ("I agree that the red dot in this picture that you are showing me is from his Taser from this picture").  Officer Oliveros further testified repeatedly that he saw a "red dot pointing back at Officer Ramos." (*Id.* at 40:20-41:11, 63:18-24, 69:12-23, 71:10-24, 73:3-17, 74:22-24, 76:14-20, 77:5-79:20).

179.   During the shooting, the red laser dot from Ramos's Taser moved around Richards's bedroom. Murphy BWC 18:01:05-07, Faddis Decl., Ex. I.

**Defendants' Reply**:  Deny and state that the BWC footage of Officer Murphy clearly shows two red laser lights, distinct in color and brightness, and at times simultaneously visible. (*See* Murphy BWC, 14:06, Faddis Decl., Ex. I).

180.   The red laser dot that moved around Richards's bedroom emanated from Ramos's direction. Murphy BWC 18:01:05-07, Faddis Decl., Ex. I.

**Defendants' Reply**:  Deny and state that the BWC footage of Officer Murphy clearly shows two red laser lights, distinct in color and brightness, and at times simultaneously visible.  (*See* Murphy BWC, 14:06, Faddis Decl., Ex. I).

181.   The red laser dot can be seen on Richards's body as Richards falls. Ramos BWC 18:01:08, Faddis Decl., Ex. J.

**Defendants' Reply**:  Deny that the evidence cited supports the facts alleged.

182.   Immediately after the shooting, when Fleming, Murphy, and Oliveros entered the bedroom, the toy gun was not present on the floor in the corner of the dresser and wall where it later appeared on Fleming's body camera. Fleming BWC 18:01:16-24,

18:03:14-30, Faddis Decl., Ex. H; Murphy BWC 18:01:50-54, Faddis Decl., Ex. I; Oliveros BWC 18:02:00-14, Faddis Decl., Ex. K.

**Defendants' Reply**:  Admit that imitation pistol was not next to the dresser immediately following the shooting, and that Officer Fleming testified that he found it under the dresser near Mr. Richards' body and moved it out with his foot. (*See* ¶ 100, *supra*).

183.    The toy gun is not visible on any bodycam footage or photograph in any location other than the corner of the dresser and the wall where it appears on Fleming's body camera at 18:04:47.

**Defendants' Reply:**  Admit that the imitation firearm is visible on Officer Fleming's body-worn camera at approximately 18:04:47 (*See* Fleming BWC, 19:02, Faddis Decl., Ex. H), but deny that it is not visible in any other video, as Officer Ramos' body-worn camera captures Mr. Richards holding an object with a red laser, and Officer Oliveros' body-worn camera captures the imitation firearm under the dresser, as discussed *supra.*

184.    After the shooting, as Fleming and Murphy searched for the gun that they claimed Richards had in his possession, Fleming stated "when we first pulled up, he had a laser pointer coming at us." Fleming BWC 18:03:15-28, 18:03:45 - 18:04:05, Faddis Decl., Ex. H.

**Defendants' Reply**:  Admit the substance of Officer Fleming's statement as recorded by his body camera and respectfully refer the Court to Officer Fleming's testimony regarding the statement. (*See* Fleming Tr., 186:7-188:16, Faddis Decl., Ex. C). Defendants deny the materiality of the facts alleged.

185.    Neither Fleming, Murphy, nor any other officers or civilians said before the shooting that they saw a laser pointer coming from Richards's direction. Candela BWC, McGuinness Decl., Ex. B; Fleming BWC, Faddis Decl., Ex. H; Murphy BWC, Faddis Decl., Ex. I; Oliveros BWC, Faddis Decl., Ex. K; Ramos BWC, Faddis Decl., Ex. J; Santana BWC, McGuinness Decl., Ex. E.

**Defendants' Reply:** Admit that no individual stated prior to the shooting that they observed a laser light from Mr. Richards' direction. Defendants deny the materiality of this fact.

186.    New York City Police Officer John "Johnny Mac" McLoughlin entered the apartment at the same time as other responding officers and stood at the entryway of the bedroom looking in and ushering other officers out. Candela BWC 18:02:30-32, McGuinness Decl., Ex. B; Ramos BWC 18:02:25-28, Faddis Decl., Ex. J.

**Defendants' Reply**:   Admit that Officer McLoughlin was present in the apartment at approximately 18:02:2.  (*See* Ramos BWC, 2:45, Faddis Decl., Ex. J).  Deny that Officer McLoughlin "ushered" anyone out of the apartment and respectfully refer the Court to the cited evidence, which does not support plaintiff's allegation in this regard.

187.    McLoughlin was present at the 2012 fatal shooting of Ramarley Graham by his then-partner Richard Haste. Haste thought that Graham had a gun, but no gun was recovered after the fatal shooting. Haste was indicted for the shooting. McLoughlin testified in front of the Grand Jury in the Haste matter. McLoughlin Tr. 51:24 - 55:19, McGuinness Decl., Ex. F.

**Defendants' Reply**:   Admit that Officer McLoughlin testified to the facts alleged and deny the materiality of the facts alleged.

188.    Ramarley Graham and Miguel Richards are the only two individuals to be fatally shot by police within the confines of the 47th Precinct in more than 10 years. Fleming Tr. 100:7- 23, Faddis Decl., Ex. C.

**Defendants' Reply**:   Admit that Officer Fleming testified to the facts alleged and deny the materiality of the facts alleged.

189.    McLoughlin was wearing a body camera but did not turn it on when entering the apartment. McLoughlin Tr. 17:8-9, McGuinness Decl., Ex. F.

**Defendants' Reply**:   Admit the facts alleged and deny the materiality of the facts alleged.

190.    After entering the apartment, walking to the bedroom and looking inside, McLoughlin left the apartment and went outside the building. Candela BWC 18:03:18-53, McGuinness Decl., Ex. B.

**Defendants' Reply:**   Deny that the evidence cited supports this allegation and deny the materiality of the facts alleged.

191.    While McLoughlin was outside, and as Fleming searched for the toy gun inside the bedroom, Murphy asked, "Where is it? Where is it?" then lowered his voice and said, "Where is he?" Murphy BWC 18:03:30-39, Faddis Decl., Ex. I.

**Defendants' Reply:** Deny that the evidence cited supports this allegation and respectfully refer the Court to the evidence cited.  (*See* Murphy BWC Tr., 28:8-17, Faddis Decl., Ex. I-1).  Defendants also deny the materiality of these allegations.

192.    Outside of the apartment, an individual in a dark hooded sweatshirt handed McLoughlin a small silver and black item, which McLoughlin held in a pistol grip. Candela BWC 18:03:50-53, McGuinness Decl., Ex. B.

**Defendants' Reply**:   Deny that the evidence cited supports this allegation and respectfully refer the Court to the evidence cited.   Defendants further state that the object Officer McLoughlin appears to be holding in his right hand while outside of the apartment seems to be a pair of eyeglasses.   (*See* Candela BWC, 3:08. 3:19, 3:20, 3:21, McGuinness Decl., Ex. B).   Defendants also deny the materiality of these allegations.

193.   McLoughlin re-entered the apartment at 18:04:24. Murphy BWC 18:04:24, Faddis Decl., Ex. I.

**Defendants' Reply**:   Admit that the portion of Officer Murphy's BWC cited shows Officer McLoughlin inside the apartment.   Defendants also deny the materiality of these allegations.

194.   After searching for the toy gun, Fleming exited the bedroom. Fleming BWC 18:04:23-29, Faddis Decl., Ex. H.

**Defendants' Reply**:   Deny.   After locating the imitation firearm underneath the dresser, Officer Fleming stepped outside of the bedroom. (*See*,   ¶¶ 115-119, *supra*).

195.   Once outside of the bedroom, Fleming was approached by McLoughlin, the only NYPD officer who re-entered the apartment. Murphy BWC 18:04:27-32, Faddis Decl., Ex. I.

**Defendants' Reply**:   Admit that Officer McLoughlin approached Officer Fleming; deny that Officer McLoughlin was the only officer who "re-entered" the apartment, which is not supported by the evidence cited.   Defendants also deny the materiality of these factual allegations.

196.    McLoughlin extended his right arm and handed a black-and-silver object to Fleming. Murphy BWC 18:04:29-32, Faddis Decl., Ex. I; McLoughlin Tr. 45:4 - 47:3, McGuinness Decl., Ex. F.

**Defendants' Reply:** Deny that the evidence cited supports this allegation and respectfully refer the Court to the evidence cited.  Defendants further note that the testimony of Officer McLoughlin upon which plaintiff purports to rely does not support this assertion. Defendants further note that the object in Officer McLoughlin's right hand inside of the apartment again appears to be a pair of eyeglasses.  (*See* Murphy BWC, 17:34-35, 18:13, Faddis Decl., Ex. I).  Defendants also deny the materiality of these factual allegations.

197.    Immediately after McLoughlin handed the object to Fleming, McLoughlin turned towards Murphy, whose body camera had just captured the handoff, and made a "cut" motion across his neck with his fingers. Murphy BWC 18:04:32-36, Faddis Decl., Ex. I; McLoughlin Tr. 19:10-20, McGuinness Decl., Ex. F.

**Defendants' Reply**:  Deny that the evidence cited supports the allegation that Officer McLoughlin handed anything to Officer Fleming, and respectfully refer the Court to the evidence cited.  Defendants further note that Officer McLoughlin testified that he signaled to Officer Murphy—whose body camera was still active—to get off the phone (*See* McLoughlin Tr., 19:13-20:3, McGuinness Decl., Ex. F), as Officer Murphy had accepted an incoming phone call.  (*See* Murphy Tr., 141:16-142:14, Faddis Decl., Ex. D).  Defendants also deny the materiality of these factual allegations.

198.    Also immediately after McLoughlin handed the object to Fleming, Fleming turned around, looked down at something in his hands, and reentered the bedroom crime scene where ESU was working to stanch the bleeding of Richards's gunshot wounds.

Fleming Tr. 194:4 - 195:3, Faddis Decl., Ex. C; Murphy BWC 18:04:41 - 18:05:12, Faddis Decl., Ex. I.

**Defendants' Reply**:  Deny that the evidence cited supports the allegation that Officer McLoughlin handed any object to Officer Fleming and respectfully refer the Court to the evidence cited.  Defendants further note that the evidence cited does not support the allegation as to what specific tasks ESU was performing at the time Officer Fleming re-entered the bedroom, and therefore those factual assertions should be disregarded. Defendants also deny the materiality of these factual allegations.

199.    Fleming entered the bedroom, passed by Richards as he bled to death, and stood to the left of the dresser facing the wall. Fleming BWC 18:04:41 - 18:05:11, Faddis Decl., Ex. H; Murphy BWC 18:04:41 - 18:05:11, Faddis Decl., Ex. I.

**Defendants' Reply**:  Admit that Officer Fleming re-entered the bedroom and walked to the left side of the dresser (*See* Murphy BWC, 17:33-17:46, Faddis Decl., Ex. I), but deny that the evidence cited supports any allegation as to Mr. Richards' precise physical condition at that time, and therefore those factual assertions should be disregarded.  Defendants also deny the materiality of these factual allegations.

200.    After a moment facing the wall, Fleming bent over to direct his body camera at the ground where the toy gun had appeared for the first time. Fleming BWC 18:04:41 - 18:05:11, Faddis Decl., Ex. H.

**Defendants' Reply**:  Admit that Officer Fleming used his body camera to record an image of the imitation firearm after dragging it out from under the dresser  (*See*, ¶ 118, *supra*), but deny that this was the first time the imitation firearm "appeared" on the ground.  (*See* ¶ 100, *supra*).

201.   Fleming testified that he was trying to "create evidence here for the investigators" by filming the toy gun. Fleming Tr. 195:11 - 196:7, Faddis Decl., Ex. C.

**Defendants' Reply:**  Admit that Officer Fleming agreed with the quoted characterization of his actions, as put to him in the form a question by counsel and respectfully refer the Court to Officer Fleming's own description of why he moved and filmed the imitation firearm.  (*See*, Fleming Tr. 195:11-196:5, Faddis Decl., Ex. C). Defendants also deny the materiality of these factual allegations.

202.   Fleming shined his flashlight on the floor to the left of the dresser where the toy gun was, then exited the bedroom a second time. Fleming BWC 18:04:41 - 18:05:11, Faddis Decl., Ex. H; Murphy BWC 18:04:41 - 18:05:11, Faddis Decl., Ex. I.

Defendants' Reply:  Admit.

203.   McLoughlin stood in the doorway to the bedroom, partially blocking Murphy's body camera, and watched as Fleming walked to the location to the left of the dresser, where the toy gun was recovered, and stood there for a moment. Murphy BWC 18:04:41 - 18:05:11, Faddis Decl., Ex. I.

**Defendants' Reply**:  Admit that Officer McLoughlin is seen standing in the doorway of the bedroom in the cited video evidence, but deny that the video evidence supports the description of what, if anything, Officer McLoughlin was watching during that time.  Defendants also deny the materiality of these factual allegations.

204.   Fleming told the Force Investigation Division investigators approximately three months after the shooting that he did not move the toy gun, and that he "left it right where it was". Fleming Tr. 117:6 - 119:7, Faddis Decl., Ex. C.

**Defendants' Reply**:  Deny.  Officer Fleming gave a statement to FID on January 19, 2018, in which he stated that he located the imitation firearm underneath the

dresser, did not pick it up, and left it right where it was.  (*See*, Fleming FID Stmt., 30:10-30:40, Faddis Decl., Ex. L).  Defendants also deny the materiality of these allegations.

205.    Although Fleming now claims that he moved the toy firearm from under the dresser, in the three years following the shooting, he never told anyone (other than possibly his attorneys) that he moved the toy gun from where he found it, nor did he make any attempt to correct his statement to FID. Fleming Tr. 95:16 - 97:7, Faddis Decl., Ex. C.

**Defendants' Reply**:  Deny.  Officer Fleming gave a statement to FID on January 19, 2018, in which he stated that he located the imitation firearm underneath the dresser, did not pick it up, and left it right where it was.  (*See*, Fleming FID Stmt., 30:10-30:40, Faddis Decl., Ex. L).  Further, Officer Fleming testified at his deposition that he believed he told FID that he had moved the imitation firearm out from underneath the dresser. (*See* Fleming Tr., 108:21-24, 120:6-121:2, Faddis Decl., Ex. C).  Defendants also deny the materiality of these factual allegations.

206.    The clearance under Mr. Richards's dresser was only a few inches. Fleming Tr. 92:5 - 95:9, Faddis Decl., Ex. C.

**Defendants' Reply**:   Admit that Officer Fleming estimated the clearance under the dresser to be a few inches.  (*See* Fleming Tr., 83:6-11, Faddis Decl., Ex. C). Defendants also deny the materiality of these factual allegations.

207.    Murphy testified at deposition that he "definitely" never saw the toy gun in the room after the shooting. Murphy Tr. 192:8-19, Faddis Decl., Ex. D.

**Defendants' Reply**:   Admit.  Defendants also deny the materiality of these factual allegations.

208.    No other officer or investigator claimed to see the toy gun under the dresser. Candela BWC, McGuinness Decl., Ex. B; Fleming BWC, Faddis Decl., Ex. H;

Murphy BWC, Faddis Decl., Ex. I; Oliveros BWC, Faddis Decl., Ex. K; Ramos BWC, Faddis Decl., Ex. J; Santana BWC, McGuinness Decl., Ex. E.

**Defendants' Reply**:  Admit.  Defendants also deny the materiality of these factual allegations.

209.    No other officer or investigator claimed to see Fleming drag the toy gun out from under the dresser using his foot, as he now claims. Candela BWC, McGuinness Decl., Ex. B; Fleming BWC, Faddis Decl., Ex. H; Murphy BWC, Faddis Decl., Ex. I; Oliveros BWC, Faddis Decl., Ex. K; Ramos BWC, Faddis Decl., Ex. J; Santana BWC, McGuinness Decl., Ex. E.

**Defendants' Reply**:  Admit.  Defendants also deny the materiality of these factual allegations.

210.    After the shooting, Fleming and Murphy rode in the ambulance together for a 10- minute trip to the hospital. Murphy Tr. 194:6 - 196:5, Faddis Decl., Ex. D.

**Defendants' Reply**:  Admit that Officer Murphy testified that he and Officer Fleming rode in an ambulance with two EMTs to the hospital following the incident. (*See* Murphy Tr., 195:3-8, Faddis Decl., Ex. D).  Defendants also deny the materiality of these factual allegations.

211.    Hours after the shooting, Ramos, Oliveros, Fleming and Murphy rode in a van together from the hospital to the precinct and discussed the incident. Ramos Tr. 139:22 - 141:18, Faddis Decl., Ex. E.

**Defendants' Reply**:  Deny.  Officer Ramos testified that he remembered traveling in a van with the other defendants after the incident, and spoke to them, but "didn't get into specifics of the incident." (Ramos Tr. 142: 19-24, Faddis Decl., Ex. E). Officer Fleming testified that he did not recall with whom he traveled back to the precinct

(*See* Fleming Tr. 129:2-11, Faddis Decl., Ex. C).  Defendants also deny the materiality of these factual allegations.

212. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

**Defendants' Reply**: ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

213. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

**Defendants' Reply**: ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

Dated: New York, New York
      April 27, 2021

                  JAMES E. JOHNSON
                  Corporation Counsel of the
                  City of New York
                  Attorney for Defendants
                  100 Church Street
                  New York, New York 10007
                  (212) 356-2486

By:   /s/_____
          Hannah V. Faddis
          *Senior Counsel*

**TO:**  **VIA ECF**
      All Counsel of Record