UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __7/31/2024__

THE ESTATE OF MIGUEL ANTONIO RICHARDS by
SAREKHI SHAMEILA STEPHENS, as Administrator of
the goods, chattels, and credit of the deceased MIGUEL
ANTONIO RICHARDS,

Plaintiff,

-against-

THE CITY OF NEW YORK, Police Officer JESUS
RAMOS, Police Officer MARK FLEMING, Police Officer
REDMOND MURPHY, and Police Officer MARCOS
OLIVEROS, individually and in their official capacities,

Defendants.

1:18-cv-11287-MKV

**OPINION AND ORDER
GRANTING
DEFENDANTS' MOTION
FOR SUMMARY
JUDGMENT**

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff, the administrator of the estate of Miguel Antonio Richards, brings this action against Defendants City of New York and Officers Jesus Ramos, Mark Fleming, Redmond Murphy, and Marcos Oliveros (collectively, "Defendants"), alleging constitutional violations and state law claims stemming from the use of deadly force against Mr. Richards in September 2017. [ECF No. 22 (First Amended Complaint ("FAC"))]. Defendants move for summary judgment.[1] [ECF No. 83].[2] For the reasons discussed herein, Defendants' motion is GRANTED.

---

[1] In January 2019, this case was stayed in its entirety pending the completion of an investigation by the New York City Police Department into the events underlying Plaintiff's claims. [ECF No. 10]. That investigation was completed as of April 1, 2019. [ECF No. 13]. Subsequently, in an Order dated January 6, 2020 and on the consent of the parties, the Court stayed discovery on Plaintiff's *Monell* claim pending the adjudication of Defendants' anticipated motion for summary judgment. [ECF No. 33]. On February 5, 2021, following the completion of non-*Monell* discovery, the Court held a Post-Discovery Conference at which it granted Defendants leave to file the present motion for summary judgment. [ECF No. 80].

[2] In support of their motion, Defendants filed a memorandum of law ("Def. Br." [ECF No. 84]), the declaration of Hannah V. Faddis, counsel to Defendants, which attaches several exhibits ("Faddis Decl." [ECF No. 86]), and a Local Civil Rule 56.1 Statement ("Def. 56.1" [ECF No. 85]). In opposition to the motion, Plaintiff filed a memorandum of law ("Pl. Opp'n" [ECF No. 98]), the declaration of Daniel McGuinness, counsel to Plaintiff ("McGuinness Decl." [ECF No. 99]), and a Local Civil Rule 56.1 Counterstatement ("Pl. 56.1" [ECF No. 97]). In reply, Defendants filed a memorandum of law ("Def. Reply" [ECF No. 102]), the declaration of Hannah V. Faddis, which attaches several exhibits ("Faddis Reply Decl." [ECF No. 103]), and a Local Civil Rule 56.1 Reply Statement ("Def. 56.1 Reply" [ECF No. 105]).

## **FACTUAL BACKGROUND**

On September 6, 2017 at about 4:00 PM, Glenmore Carey, the owner of 3700 Pratt Avenue in the Bronx, called 911 and requested a wellness check on a tenant, Mr. Richards. Def. 56.1 ¶¶ 1, 6–8; Pl. 56.1 ¶¶ 1, 6–8. The wellness check was assigned to Officers Fleming and Murphy, who were working together in the 47th Precinct. Def. 56.1 ¶¶ 2–5, 9; Pl. 56.1 ¶¶ 2–5, 9. After the officers arrived, Mr. Carey, along with another civilian, led the officers to Mr. Richards's apartment. Def. 56.1 ¶¶ 10–12, 16; Pl. 56.1 ¶¶ 10–12, 16. The officers entered the apartment and approached Mr. Richards's bedroom, but the bedroom door was locked. Def. 56.1 ¶¶ 16–17; Pl. 56.1 ¶¶ 16–17. The officers knocked on the bedroom door, but received no answer. Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18. Mr. Carey advised the officers that Mr. Richards's family had also been unsuccessful in attempting to contact him. Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.

Mr. Carey decided to force open the bedroom door, and the other civilian opened the door with a screwdriver. Def. 56.1 Reply ¶ 20.[3] When the bedroom door opened, Officers Fleming and Murphy observed Mr. Richards standing near the foot of a bed, wearing dark sunglasses and armed with a knife in his left hand. Def. 56.1 ¶¶ 21, 23; Pl. 56.1 ¶¶ 21, 23. Both officers testified that Mr. Richards's right hand was not visible to them. Def. 56.1 ¶ 22; Faddis Decl. Ex. H-1 ("Fleming BWC Tr.") 2:1–3:16; Faddis Decl. Ex. H ("Fleming BWC") 00:20–1:20; Faddis Decl. Ex. C ("Fleming Tr.") 45:6–10; Murphy Tr. 60:24–61:3. Mr. Carey also observed that Mr. Richards was

---

[3] Plaintiff contends that the officers directed Mr. Carey to force open the bedroom door. Pl. 56.1 ¶ 20. In support of this contention, Plaintiff cites the deposition testimony of Officer Murphy. *See* Faddis Decl. Ex. D ("Murphy Tr.") 55:21–23. However, Officer Murphy did not testify that he directed Mr. Carey to open the bedroom door and, in fact, explicitly testified that he did not do so. *See* Murphy Tr. 55:21–56:11. Accordingly, the Court deems the facts asserted in Defendants' statement true. *See James v. New York City Health & Hosps. Corp.*, No. 15 CIV. 6015 (PAE), 2017 WL 3923675, at *1 n.1 (S.D.N.Y. Sept. 6, 2017) ("Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.").

"holding something in his right [hand] which [they] could not see."  Def. 56.1 ¶ 24; Faddis Decl. Ex. N; Pl. 56.1 ¶ 24.

Officers Fleming and Murphy drew their firearms and stood at the sides of the doorway to Mr. Richards's bedroom.  Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.  The officers and the civilians present at the scene then repeatedly told Mr. Richards to put the knife down and to reveal what he had in his right hand.  Def. 56.1 ¶¶ 32–34; Pl. 56.1 ¶¶ 32–34.  At this time, a civilian individual whom Mr. Carey had summoned to the location, Richard Cohen, contacted a purported relative of Mr. Richards by phone.  Def. 56.1 ¶¶ 27–28, 34–35; Pl. 56.1 ¶¶ 27–28, 34–35.  Officer Fleming slid Mr. Cohen's phone into the bedroom and the person on the line asked Mr. Richards, via speakerphone, to drop the knife.  Def. 56.1 ¶¶ 36–38; Pl. 56.1 ¶¶ 36–38.[4]  Throughout this encounter, Mr. Richards did not verbally respond nor did he drop the knife.  Def. 56.1 ¶¶ 39–40; Pl. 56.1 ¶¶ 39–40.  While the officers were attempting to communicate with Mr. Richards, he looked down at his right hand several times and eventually moved so as to hide his right hand behind his back.  Def. 56.1 ¶¶ 42–43; Fleming BWC 1:03, 1:15, 2:20, 2:36.

Officer Fleming requested a taser in case the officers needed to disarm Mr. Richards.  Def. 56.1 ¶¶ 45–49, 52; Pl. 56.1 ¶¶ 45–49, 52.  Officers Ramos and Oliveros, who were working together, heard the request for the taser and responded to the location.  Def. 56.1 ¶¶ 5, 54; Pl. 56.1 ¶¶ 5, 54.

At about 5:59 PM, Officers Fleming and Murphy were approached from behind by two additional officers, Detective Hartnett and Officer O'Rourke, members of the Emergency Services Unit ("ESU").  Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55.  Defendants offer unrebutted evidence that when Detective Hartnett and Officer O'Rourke approached the bedroom, Mr. Richards moved slightly,

---

[4] Plaintiff admits this fact, but contends, without citing any evidence, that the individual on the phone was not a relative of Mr. Richards.  Pl. 56.1 ¶ 35.

and Officer Murphy observed an apparent firearm in his right hand. Def. 56.1 ¶¶ 56–57; Fleming Tr. 67:15–68:22; Murphy Tr. 78:25–79:4; Faddis Decl. Ex. I ("Murphy BWC") 12:50–56. It is undisputed that, at that time, Officer Murphy announced to the other officers that Mr. Richards had a gun. Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58. Officer Murphy described the apparent firearm to Officer Fleming as silver and stated that he did not know if it was a toy or not. Def. 56.1 ¶ 61; Pl. 56.1 ¶ 61. Officer Fleming asked Mr. Richards if he was holding a real gun, to which Mr. Richards gave no response. Def. 56.1 ¶¶ 62–63; Pl. 56.1 ¶¶ 62–63. Officer Fleming repeatedly instructed Mr. Richards to drop the gun, but Mr. Richards did not respond or comply. Def. 56.1 ¶¶ 64–65; Pl. 56.1 ¶¶ 64–65. Officer Fleming testified that he also saw an apparent firearm in Mr. Richards's right hand at that moment. Def. 56.1 ¶ 60; Fleming Tr. 70:8–18, 75:11–23.

At the same time, Officer Ramos, who was equipped with a taser, entered the apartment with Officer Oliveros. Def. 56.1 ¶¶ 66–67; Pl. 56.1 ¶¶ 66–67. Officer Ramos saw Officers Fleming and Murphy with their firearms drawn, and both Officers Ramos and Oliveros saw that Mr. Richards was holding a knife. Def. 56.1 ¶¶ 68–70; Pl. 56.1 ¶¶ 68–70. Officer Ramos approached Officers Fleming and Murphy and asked whether they wanted him to use his taser on Mr. Richards, to which they responded in the affirmative. Def. 56.1 ¶¶ 71–72; Pl. 56.1 ¶¶ 71–72.

The parties dispute what happened next. Defendants contend that as Officer Ramos stepped toward the doorway, Mr. Richards raised his right hand in the direction of Officer Ramos and the other officers, holding an object with an activated red laser on top. Def. 56.1 ¶¶ 75, 77–79; Faddis Decl. Ex. J ("Ramos BWC") 1:18–19; Faddis Decl. Ex. J-3. Once Mr. Richards raised his arm, Officer Ramos flinched backward slightly and then proceeded to move towards Mr. Richards. Def. 56.1 ¶ 76; Pl. 56.1 ¶ 76. Officer Ramos testified that as he entered the room, raising his taser, he saw Mr. Richards raise his right hand, holding an object in a pistol grip. Def. 56.1

¶ 77; Faddis Decl. Ex. E ("Ramos Tr.") 95:20–96:8.[5]  Officer Ramos testified that, at that moment, he observed a red laser originating from the object in Mr. Richards's hand move toward him and subsequently reflect off his badge.  Def. 56.1 ¶¶ 78–79; Ramos Tr. 95:20–98:22.  Officers Oliveros and Fleming also testified that they observed Mr. Richards raise an object with a red laser on it in the officers' direction.  Def. 56.1 ¶¶ 81, 83; Faddis Decl. Ex. F ("Oliveros Tr.") 74:16–75:6; Fleming Tr. 80:2–8.  Plaintiff contends that Mr. Richards was not holding an object in his right hand at the time of the shooting and that the laser seen in the body-worn camera footage instead came from Officer Ramos's taser.  Pl. 56.1 ¶¶ 75, 77–80.

It is undisputed that a moment after Officer Ramos entered the bedroom, Officer Fleming discharged his firearm at Mr. Richards.  Def. 56.1 ¶ 85; Pl. 56.1 ¶ 85.  After the first gunshot, Mr. Richards remained standing, though the parties contest whether he continued to point the apparent firearm at the officers.  Def. 56.1 ¶ 87; Pl. 56.1 ¶ 87.  After the initial gunshot, Officer Murphy discharged nine rounds, and Officer Fleming discharged seven rounds, all in the space of less than five seconds.  Def. 56.1 ¶¶ 95–97; Pl. 56.1 ¶¶ 95–97.  At the same time, Officer Ramos fell towards the left side of the door frame and discharged his taser at Mr. Richards.  Def. 56.1 ¶¶ 86, 88; Pl. 56.1 ¶¶ 86, 88.  Officer Murphy testified that as Officer Ramos was falling, Officer Murphy could see Mr. Richards still pointing the apparent firearm in the direction of the officers.  Def. 56.1 ¶¶ 90–91; Murphy Tr. 112:5–113:25.  Officers Murphy and Fleming testified that they stopped firing when they saw that Mr. Richards was no longer pointing a firearm at the officers.  Def. 56.1

---

[5] It is unclear from the record if Mr. Richards lowered his arm after the officers flinched backwards, but then raised it again once Officer Ramos entered the bedroom, or if Mr. Richards kept his arm raised throughout the encounter. Defendants' Local Rule 56.1 statement does not state that Mr. Richards lowered his hand at any point after he initially raised it to the officers.  Def. 56.1 ¶¶ 76–84.  Nonetheless, Defendants state, and the officers testified that, when Officer Ramos made his second approach into the bedroom, the officers observed Mr. Richards raise his right arm. Def. 56.1 ¶¶ 76–84; Ramos Tr. 95:20–96:8; Fleming Tr. 80:2–8; Oliveros Tr. 74:16–75:6.  The Court understands the timeline put forth by Defendants to be that Mr. Richards lowered his arm at the time that Officer Ramos flinched backwards, but that he then raised it again as Officer Ramos approached a second time. *See* Def. 56.1 ¶¶ 76–84.

¶¶ 93–94.  After the shooting, Mr. Richards fell on the floor near a dresser.  Def. 56.1 ¶ 99; Pl. 56.1 ¶ 99.

Immediately after the shooting, the officers transmitted a "shots fired" message over police radio.  Def. 56.1 ¶ 103; Pl. 56.1 ¶ 103.  Officer Ramos exited the room and Officers Fleming, Murphy, and Oliveros entered while Mr. Richards was lying prone on the floor.  Def. 56.1 ¶¶ 101, 104–05; Pl. 56.1 ¶¶ 101, 104–05.  When Officers Fleming, Murphy, and Oliveros entered the room, Mr. Richards was still holding the knife in his left hand, Def. 56.1 ¶ 107; Pl. 56.1 ¶ 107, but the parties dispute whether he was still moving, Def. 56.1 ¶ 106; Pl. 56.1 ¶ 106.  Officer Fleming kicked the knife out of Mr. Richards's hand, and Officer Oliveros handcuffed Mr. Richards.  Def. 56.1 ¶¶ 108–09; Pl. 56.1 ¶¶ 108–09.  Upon entering the room, Officer Fleming attempted to locate the apparent firearm that Mr. Richards had been holding and eventually found a toy gun underneath the dresser.  Def. 56.1 ¶¶ 110, 114–19.  Plaintiff disputes this fact, contending, without evidentiary support, that Officer Fleming planted a gun at the scene.  Pl. 56.1 ¶¶ 110, 114–19.

It is undisputed that about seventy-three seconds after the last gunshot, Detective Hartnett and Officer O'Rourke, certified emergency medical technicians ("EMTs"), returned to the bedroom with their medical bag and proceeded to attend to Mr. Richards's injuries.  Def. 56.1 ¶¶ 111–13; Pl. 56.1 ¶¶ 111–13.  Emergency medical services ("EMS") was dispatched to the location at about 5:54 PM and arrived at approximately 6:05 PM, about four minutes after the shooting.  Def. 56.1 ¶¶ 120–22; Pl. 56.1 ¶¶ 120–22.  Mr. Richards was pronounced dead by EMS at the scene of the shooting and his cause of death was later determined to be the result of a gunshot wound.  Def. 56.1 ¶¶ 123–26; Pl. 56.1 ¶¶ 123–26.

Subsequent testing of the recovered imitation firearm by the NYPD Crime Scene Unit ("CSU") found that it was covered in blood splatter, and, as subsequent DNA testing found, Mr. Richards's DNA.  Def. 56.1 ¶¶ 129–38; Pl. 56.1 ¶¶ 129–38.

Plaintiff asserts against all Defendants (1) a Section 1983 claim under the Fourth, Fifth, and Fourteenth Amendments for excessive force for the shooting and tasering of Mr. Richards, FAC ¶¶ 74–80; (2) a Section 1983 claim under the Fourth, Fifth, and Fourteenth Amendments for excessive force for handcuffing Mr. Richards after he had been shot, FAC ¶¶ 81–86; (3) a Section 1983 claim for deliberate indifference, FAC ¶¶ 87–90; and (4) a Section 1983 claim for failure to intervene, FAC ¶¶ 91–96. In addition, Plaintiff asserts a *Monell* claim against the City of New York. FAC ¶¶ 97–124. Finally, Plaintiff asserts a number of New York state law claims, including a wrongful death claim against all Defendants, FAC ¶¶ 125–30; an assault and battery claim against all Defendants, FAC ¶¶ 131–37; and a negligent screening, hiring, retention, training, and supervision claim against the City of New York, FAC ¶¶ 138–41.

## LEGAL STANDARD

A party is entitled to summary judgment when there is no "genuine dispute as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the motion for summary judgment is properly made, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

At all times, the ultimate burden remains on the party that has the burden of proof under the law. The Court must view the record "in the light most favorable to the opposing party," *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (citation omitted), and must "resolve all ambiguities and draw

all reasonable inferences against the movant," *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (citation omitted).

However, a party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate." *UMB Bank, N.A. v. Bluestone Coke, LLC*, No. 20-CV-2043 (LJL), 2020 WL 6712307, at *3 (S.D.N.Y. Nov. 16, 2020) (quoting *Am. Home Assurance Co. v. Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006)).

## **DISCUSSION**

### I.    **The Officers Did Not Use Excessive Force**

Plaintiff asserts an excessive force claim against all Defendants. Plaintiff alleges that: (1) Officers Fleming and Murphy used excessive force when they used lethal force against Mr. Richards, including by firing an excessive number of gunshots; (2) Officer Ramos used excessive

force when he used a taser on Mr. Richards; and (3) Officer Oliveros used excessive force when he handcuffed Mr. Richards.  FAC ¶¶ 74–86; Pl. Opp'n 14.

Excessive force claims arising out of an arrest, investigatory stop, or other seizure are governed by an objective reasonableness standard under the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) ("The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment's reasonableness standard." (internal quotation marks omitted)).  To determine whether the amount of force used against a plaintiff was unreasonable, courts pay "careful attention to the facts and circumstances of each particular case," and judge the "reasonableness" of the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Brown*, 798 F.3d at 100 (quoting *Graham*, 490 U.S. at 396).  Courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396–97.

"A court's role in considering [a motion for summary judgment on] excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive."  *Brown*, 798 F.3d at 103.  Where "the undisputed facts . . . demonstrate that the officers' decisions . . . were objectively reasonable, defendants are entitled to summary judgment dismissing" excessive force claims against them.  *Beckles v. City of New York*, No. 08 CIV. 03687 RJH, 2011 WL 722770, at *6 (S.D.N.Y. Feb. 25, 2011), *aff'd*, 492 F. App'x 181 (2d

Cir. 2012).  Moreover, qualified immunity protects officers from the sometimes "hazy border between excessive and acceptable force." *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009)).  Even if an officer used excessive force, "[i]f the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." *Id.* (citation omitted).

A.  <u>Officers Fleming and Murphy Did Not Use Excessive Force</u>

*1.  The Use of Deadly Force Was Objectively Reasonable*

Considering the totality of the circumstances facing Officers Fleming and Murphy at the moment they opened fire on Mr. Richards, their use of deadly force was objectively reasonable. At the time that they opened fire, the officers were faced with a suspect who was armed with a knife and an apparent gun, who had failed to comply with the repeated commands of the officers to drop what was in his hands, and who then motioned to point the apparent firearm at the officers. The threat perceived by the officers is supported by the officers' body-worn camera footage, unrebutted contemporaneous statements, undisputed subsequent testimony, and surrounding circumstances.

It is undisputed that when the officers first encountered Mr. Richards, he was standing near the foot of a bed, wearing dark sunglasses, and was armed with a knife in his left hand.  Def. 56.1 ¶¶ 21, 23; Pl. 56.1 ¶¶ 21, 23.  The uncontested record evidence is that Mr. Richards's right hand was hidden from the view of Officers Fleming and Murphy for over fifteen minutes, despite their clear and repeated requests that he show them what was in his right hand and their inquiries about whether he had a gun.  Fleming BWC 00:20–14:45; Fleming BWC Tr. 2:1–23:23; Murphy BWC 00:00–13:30; Faddis Decl. Ex. I-1 ("Murphy BWC Tr.") 2:2–21:24; Fleming Tr., 45:6–10, 65:2–23; Murphy Tr., 60:24–61:3; Faddis Decl. Ex. N.  Over the course of those fifteen minutes, Mr.

Richards looked down at something in his right hand several times, Fleming BWC 1:03, 1:15, 2:20, 2:36, and at one point, Officer Fleming saw Mr. Richards move his right arm further away, hiding something behind his back. Fleming BWC 06:15-20; Fleming Tr., 48:12–49:13. It is also undisputed that, during this time, Mr. Richards never responded verbally to the repeated attempts at communication by Officers Fleming and Murphy, or the civilians present and on the phone. Def. 56.1 ¶ 39; Pl. 56.1 ¶ 39.

The unrebutted record evidence also establishes that after ESU officers arrived, both Officers Murphy and Fleming saw an apparent firearm in Mr. Richards's right hand. Def. 56.1 ¶¶ 57, 60; Murphy Tr. 78:25–79:4; Murphy BWC 12:50–56; Fleming Tr. 70:8–18, 75:11–23. It is not disputed that Officer Murphy contemporaneously announced to the other officers that Mr. Richards had a gun and described it to Officer Fleming as silver. Def. 56.1 ¶¶ 58, 61; Pl. 56.1 ¶¶ 58, 61. Officer Murphy also stated that he was not sure whether the apparent gun was a toy. Def. 56.1 ¶ 61; Pl. 56.1 ¶ 61. It is also not disputed that Officer Fleming then asked Mr. Richards, several times, if he was holding a real gun, to which Mr. Richards still did not respond. Def. 56.1 ¶¶ 62, 63–65; Pl. 56.1 ¶¶ 62, 63–65.

The video footage from Officer Ramos's body-worn camera clearly shows that after Officer Ramos arrived with the taser, Def. 56.1 ¶¶ 66–67, 71–74; Pl. 56.1 ¶¶ 66–67, 71–74, and approached the bedroom, Mr. Richards raised his right hand in the direction of the officers, holding an object in his hand that emitted a red laser. Ramos BWC 1:18–19. After Officer Ramos initially stepped back, he then moved forward into the bedroom. Def. 56.1 ¶ 76; Pl. 56.1 ¶ 76. Although the footage from the body-worn cameras is obscured at this point, Officers Murphy, Fleming, and Ramos each testified that they observed Mr. Richards raise the object with a red laser on it in the officers' direction. Def. 56.1 ¶¶ 77–79, 81, 83; Oliveros Tr. 74:16–75:6; Fleming Tr. 80:2–8, Ramos Tr. 95:20–98:22. This evidence is also not rebutted.

11

Considering the totality of the circumstances, in that moment it was objectively reasonable for the officers to conclude that Mr. Richards possessed a gun and that he might use it. Faced with an apparent firearm wielded by an individual who seemed prepared to use it—in that he activated its laser and pointed it at police officers—it was objectively reasonable for Officers Fleming and Murphy to believe that Mr. Richards posed an immediate threat of deadly harm to Officer Ramos, themselves, and others. In that instance, the use of deadly force was objectively reasonable. *See Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010) (holding that it was reasonable to use deadly force on a student who brought a plastic air pistol to school, repeatedly ignored officer commands to drop the apparent weapon, and then pointed the apparent gun at the officers); *Bell v. City of East Cleveland*, 125 F.3d 855, at *3 (6th Cir. 1997) (unpublished) (holding that it was reasonable to use deadly force against a young boy with a toy gun where the officer had been advised that the boy was carrying a gun, the boy did not drop the weapon when commanded to by the officer, and the boy turned and pointed the apparent firearm at the officer).

Plaintiff's attempt to create a dispute of material fact, in the face of an objective view of the incident from the officers' body-worn cameras and uncontested testimony of all four responding officers, is unavailing.[6] Specifically, and central to Plaintiff's argument that a dispute of material fact exists in this case, Plaintiff contends that Mr. Richards's right hand was empty during the entire encounter, that the officers did not observe an object with a red laser in his right hand, and that the officers later planted a toy gun at the scene of the shooting to cover up an allegedly unlawful use of force. Pl. 56.1 ¶¶ 75, 77–80, 110, 114–119, 184, 186–211. In support

---

[6] The parties also dispute the subjective mindsets of the officers and the conclusions that they reached based on Mr. Richards's behavior. *See* Def. 56.1 ¶¶ 29, 30, 31, 80, 84; Pl. 56.1 ¶¶ 29, 30, 31, 80, 84. In deciding whether an officer's conduct was objectively reasonable for purposes of qualified immunity, "[a]n official's subjective intent, motivation or belief is generally irrelevant." *Duamutef v. Hollins*, 297 F.3d 108, 113 (2d Cir. 2002) (Sotomayor, J.). As such, Plaintiff's unsupported and unsupportable statement regarding the officers' subjective state of mind is an immaterial dispute of fact. *See Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990) ("[S]ummary judgment cannot be avoided by immaterial factual disputes.").

of these claims, Plaintiff cites to body-worn camera footage, taken after the shooting, of two officers outside of the apartment building passing an item between each other. Pl. 56.1 ¶ 192; McGuinness Decl. Ex. B ("Candela BWC") 3:30–42. Plaintiff speculates that this item must have been the silver toy handgun and contends that afterwards, one of the officers must have brought the item to Officer Fleming to plant in Mr. Richards's bedroom. Pl. 56.1 ¶¶ 192–200; Pl. Opp'n 3–4.

As a preliminary matter, speculation does not create a triable issue of fact. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Moreover, Plaintiff's claim that the toy gun was planted at the scene *post hoc* is undermined by the objective video evidence from Officer Ramos's camera, which clearly shows that Mr. Richards possessed an object in his hand at the time that he was shot. Ramos BWC 1:18–19. This evidence is corroborated by the testimony of the officers at the scene, all of whom saw Mr. Richards holding an object that appeared to be a firearm. *See* Def. 56.1 ¶¶ 56–57, 77–79; Fleming Tr. 67:15–68:22, 70:8–18, 75:11–23, 80:2–8; Murphy Tr. 78:25–79:4; Murphy BWC 12:50–56; Ramos Tr. 95:20–98:22; Oliveros Tr. 74:16–75:6. Lastly, it is undisputed that after the imitation firearm was recovered, it was found to be covered in blood splatter and Mr. Richards's DNA. Def. 56.1 ¶¶ 129–38; Pl. 56.1 ¶¶ 129–38. The video evidence that Plaintiff cites to merely shows what appears to be one officer providing another with a pair of glasses. Candela BWC 3:30–42. In fact, the video evidence clearly shows that the officer who received the item put the object handed to him on his face. Candela BWC 3:40–42.

As other courts in this Circuit have found, a Plaintiff cannot avoid summary judgment by making unsupported allegations of planted evidence in the face of contradictory direct and circumstantial evidence. As the court explained in *Jimenez v. City of New York*, No. 15 CIV. 3257 (BMC), 2016 WL 1092617 (E.D.N.Y. Mar. 21, 2016), if the Court were to allow a plaintiff to

avoid summary judgment through making unsubstantiated claims of evidence-planting in the face of contrary evidence, then a plaintiff could avoid summary judgment regardless of the weight of the evidence against him. *See id.* at *3. This reasoning is consistent with an abundance of cases in this Circuit. *See*, *e.g.*, *Thompson v. Hernandez*, No. 1:16-cv-1667 (FB)(RER), 2020 WL 1066252, at *2 (E.D.N.Y. Mar. 5, 2020) (holding that a plaintiff could not withstand summary judgment with unsubstantiated claims that evidence was planted where there was circumstantial evidence to the contrary); *Apostol v. City of New York*, No. 11-cv-3851, 2014 WL 1271201, at *6 (E.D.N.Y. March 26, 2014) ("Plaintiffs cannot withstand summary judgment by making unsubstantiated, convenient claims—for example, that someone must have planted the [drugs]."); *Bender v. Alvarez*, No. 06-cv-3378, 2009 WL 112716, at *9 (E.D.N.Y. Jan. 16, 2009) ("Plaintiff fails to provide any evidence demonstrating that the evidence was planted in his residence except for his unsupported statement."); *Carlisle v. City of New York*, No. 05-cv-6825, 2007 WL 998729, at *3 (S.D.N.Y. April 2, 2007) ("Plaintiff's unsupported, conclusory allegation that someone must have planted the evidence because there is no other way it could have gotten into his apartment is not sufficient to defeat a motion for summary judgment.").

In *Jimenez*, the court went further and explained that, given the circumstantial evidence in that case, the plaintiff's theory would require a jury to make a factual finding so implausible, and completely unsupported by evidence, that any verdict in the plaintiff's favor would need to be set aside. *See Jimenez*, 2016 WL 1092617, at *4. Like the plaintiff in *Jimenez*, Plaintiff's theory here would require a jury to disregard the body-worn camera footage and uniform and unrebutted testimony of the officers at the scene, and to instead accept a factual premise that is unsupported by any evidence. To accept Plaintiff's theory, a jury would have to find: (1) that within minutes of the shooting, two non-party officers knew that Defendants had shot someone they mistakenly believed had a gun; (2) those officers knew, without ever discussing the matter with Defendants,

that Defendants would accept assistance in planting an imitation firearm to justify the shooting; (3) that a conspiracy was enacted within minutes of the shooting to deliver an imitation gun to the scene of the shooting (and one that had to match Officer Fleming's description of the gun during the encounter); (4) that this conspiracy was executed in plain view of uninvolved officers, without any explicit mention of it, and in view of (but not captured on) body-worn cameras that were worn by Defendants themselves; and (5) that after all of this, Officer Fleming managed to splatter Mr. Richards's blood on the imitation firearm, plant Mr. Richards's DNA on the pistol grips, and then deposit the imitation firearm next to the dresser.   Just as in *Jimenez*, considering how such contentions would fare at trial, a jury could not reasonably find that police planted a gun at the scene of the shooting.  *Id.* at *4.  No witness would be permitted to testify to an opinion that the gun was planted, and Plaintiff's attorney would not be permitted to argue in summation that the gun was planted, because there would be no evidence that could be presented at trial to support that argument.   The unimpeached record evidence clearly shows that Mr. Richards did in fact possess and point at the officers an object with a red laser on it at the time that he was shot.  *See id.* at *4.  If a jury were to return a verdict for Plaintiff on this record, the Court would have to set aside the verdict and direct judgment for Defendants.  *See id.* at *4.  Accordingly, the Court will not withhold summary judgment from Defendants based on Plaintiff's unsupported claims.

Plaintiff also contends that there is a factual dispute as to whether Mr. Richards held an object with a red laser when he raised his arm towards the officers.  Pl. 56.1 ¶ 75.  Plaintiff asserts that the body-worn camera footage does not show any object in Mr. Richards's hand when he raised his arm.  Pl. 56.1 ¶ 75.  Plaintiff further contends, without any evidentiary support, that the red light the officers observed came from the laser site of Officer Ramos's taser, and not from anything that Mr. Richards held.  Pl. 56.1 ¶ 75.  Here too, Plaintiff's attempt to create a factual dispute in the face of objective video evidence is unavailing.  The video evidence clearly and

objectively shows that when Officer Ramos first attempted to enter the bedroom, Mr. Richards raised his arm in the direction of the officers and that he held in his hand an object emitting a red laser.  *See* Ramos BWC 1:18–19.  Although the video footage does not show what Mr. Richards did after Officer Ramos attempted to enter the room a second time, all of the officers testified that when Officer Ramos entered the room, Mr. Richards again raised his arm towards the officers with an apparent firearm in his hand.  *See* Def. 56.1 ¶¶ 56–57, 77–79; Fleming Tr. 67:15–68:22, 70:8–18, 75:11–23, 80:2–8; Murphy Tr. 78:25–79:4; Murphy BWC 12:50–56; Ramos Tr. 95:20–98:22; Oliveros Tr. 74:16–75:6.  Plaintiff contends that the statements of Officers Ramos, Fleming, and Murphy are self-serving statements that should not be credited.  *See* Pl. 56.1 ¶¶ 77–78, 83, 84.[7] However, Plaintiff cites no law to support discrediting a statement merely because it is helpful to a party, and offers no evidence to contest the officers' statements.  The Court has no reason to reject the unrebutted statements of Officers Ramos, Fleming, and Murphy.  "Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true."  *James*, 2017 WL 3923675, at *1 n.1.

As for Plaintiff's claim that the red laser came from Officer Ramos's taser, the video evidence clearly shows that a red light emanated from the object that Mr. Richards held when he raised his right arm in the direction of the officers.  Ramos BWC 1:18–19.  In fact, the video also shows that Officer Ramos did not raise his taser towards Mr. Richards until *after* Mr. Richards had raised his right hand and pointed an object emitting a red laser at the officers.  Ramos BWC 1:18–19.

---

[7] Plaintiff also contends that the Court should not accept the portion of Officer Ramos's testimony that is not corroborated by video evidence.  Pl. 56.1 ¶ 77.  But there is no requirement that a party's testimony be supported by video evidence to be admissible.

Plaintiff also attempts to create an issue of fact by contending that Officer Ramos's testimony is inconsistent because Officer Ramos testified that he did not initially see anything in Mr. Richards's right hand when Mr. Richards raised his hand. Pl. 56.1 ¶ 75; Ramos Tr. 92:10–19. But Plaintiff misstates the record. The cited testimony relates to Officer Ramos's initial attempt to enter Mr. Richards's room. *See* Ramos Tr. 90:22–92:19. Officer Ramos testified that when Mr. Richards raised his hand to the officers, he was focused on Mr. Richards's chest, not his hands, and so only saw a quick movement, which caused Officer Ramos to step back. Ramos Tr. 90:22–92:19. Officer Ramos further testified that as he made a second approach to enter the room, he saw that Mr. Richards was pointing at him an object with a red laser on top. Ramos Tr. 95:22–96:4. Plaintiff misleadingly ignores this testimony. Moreover, Plaintiff's "spin" is controverted by the objective video footage from the body-worn cameras, Ramos BWC 1:18–19, which corroborates the officers' testimony. Plaintiff cannot withstand summary judgment by claiming, without citation to evidence and in the face of testimony and objective video evidence to the contrary, that Mr. Richards did not raise his arm toward the officers while holding an object emitting a red laser at the time of the shooting.

Plaintiff also argues that there is a factual dispute regarding some of the circumstances that preceded the shooting. Plaintiff contends that the body-worn camera footage shows that when Officers Fleming and Murphy first observed Mr. Richards, Mr. Richards's right hand "*may*" have been visible. Pl. 56.1 ¶ 22 (emphasis added). However, the body-worn camera footage clearly shows that Mr. Richards's right hand was hidden behind a bag, and later behind Mr. Richards's back, until he raised his arm when Officer Ramos entered the room. Fleming BWC 00:20–14:45; Murphy BWC 00:00–13:30. Indeed, in Plaintiff's Local Rule 56.1 statement, Plaintiff admits that Mr. Richards did not show the officers his right hand until the moment he raised his arm toward the officers immediately preceding the gunshots. Pl. 56.1 ¶ 41. Plaintiff also claims, without

citation to any evidence in the record, that Mr. Richards did not look down at his right-hand several times during the encounter.  Pl. 56.1 ¶ 42.  Again, this claim is directly refuted by the body-worn camera footage, which provides an objective view of the incident.  Fleming BWC 1:03, 1:15, 2:20, 2:36.

Although Plaintiff contends that there are factual issues that preclude judgment as a matter of law in favor of Defendants, Plaintiff does not offer any evidence to support its claim that Mr. Richards was in fact unarmed at the time he was shot by police and that officers later planted a fake weapon in his room to justify their use of force.  Rather, the factual record establishes, without contradiction, that Mr. Richards pointed an object emitting a red laser in the direction of the officers at the time they fired upon him.  This objective video evidence and the corroborating testimony from the officers at the scene make clear that the officers' use of force was objectively reasonable.  Accordingly, on the record before the Court, there are no genuine disputes of material fact and Defendants are entitled to judgment as a matter of law on Plaintiff's claim for excessive force by Officers Fleming and Murphy.

### 2.  The Number of Gunshots Fired Was Not Excessive

Plaintiff, for the first time in opposition to Defendants' motion, asserts that even if Defendants' use of deadly force was justified, the number of shots the officers discharged was excessive.  Pl. Opp'n 14.  Significantly, Plaintiff's First Amended Complaint does not assert a claim that the number of shots fired was excessive.  FAC ¶ 78.  As a preliminary matter, the Court will not consider allegations raised for the first time in opposition to summary judgment.  *See Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (holding that district court did not abuse its discretion by declining to consider claim raised for the first time in opposition to summary judgment); *Lewis v. Lee*, 737 F. App'x 24, 29 (2d Cir. 2018) ("A party is not entitled to amend his complaint on summary judgment."); *Smith v. P.O. Canine Dog Chas*, No. 02 6240 KMW DF,

2004 WL 2202564, at *11 (S.D.N.Y. Sept. 28, 2004) (collecting cases).  Accordingly, the Court will not consider this new theory raised for the first time in opposition to Defendants' motion for summary judgment.

Nonetheless, even if the Court were to consider this theory, it would not withstand summary judgment because Officers Fleming and Murphy did not act unreasonably when they fired upon Mr. Richards.  It is undisputed that during the shooting, Officer Murphy discharged nine rounds and Officer Fleming discharged seven rounds, all in the span of less than five seconds. Def. 56.1 ¶¶ 95–97; Pl. 56.1 ¶¶ 95–97.  Both Officers Murphy and Fleming testified that they stopped firing at Mr. Richards once they perceived that he was no longer a threat.  Fleming Tr. 80:25–81:10, 85:3–12; Murphy Tr. 114:16–115:5.  Plaintiff contends that the number of shots fired was excessive because, within the span of those five seconds, the officers fired several rounds as Mr. Richards began to fall to the ground.  Pl. Opp'n 21; Pl. 56.1 ¶¶ 93–94.  Plaintiff argues that during this brief moment—as Mr. Richards was falling, but before he hit the ground—the officers continued to fire at him despite the fact that he was not a threat.  Pl. Opp'n 21; Pl. 56.1 ¶¶ 93–94.

Plaintiff's argument amounts to scrutinizing the actions of the officers one fraction of a second at a time.  However, in considering whether the use of force is excessive, "[i]t is . . . important that courts not isolate a particular act of force by an officer if it was intertwined with other acts of force in rapid succession where there was no reasonable opportunity to re-assess." *Jones v. Treubig*, 963 F.3d 214, 236 (2d Cir. 2020).  As discussed *supra*, the officers acted reasonably when they initially fired on Mr. Richards.  Given that the initial use of force was reasonable and the short time period between that use of force and the subsequent shots fired, Def. 56.1 ¶¶ 95–97; Pl. 56.1 ¶¶ 95–97, there was no reasonable opportunity for the officers to reassess the situation until Mr. Richards was subdued.  While in hindsight, Plaintiff can isolate individual frames of the body-worn camera footage to highlight a fraction of a second when Mr. Richards

may have no longer posed a threat, Pl. 56.1 ¶ 93, the Court must judge the reasonableness of the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Brown*, 798 F.3d at 100 (quoting *Graham*, 490 U.S. at 396). Accordingly, the Court will not second-guess the officers' split-second judgment to continue to fire upon Mr. Richards during the brief five second window as the officers assessed whether the threat continued. Defendants are therefore entitled to judgment as a matter of law on this untimely claim.

      B.  <u>The Use of a Taser by Officer Ramos Was</u>
           <u>Not Excessive Force</u>

Defendants are also entitled to summary judgment because Officer Ramos's use of less-than-lethal force in the form of a taser to subdue Mr. Richards was objectively reasonable. The Second Circuit has held that an officer's decision to use a taser in order "to subdue an actively non-compliant suspect . . . who posed a real and imminent threat to the safety of the officers and any bystanders," is reasonable. *See MacLeod v. Town of Brattleboro*, 548 F. App'x. 6, at *8 (2d Cir. 2013); *see also Est. of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 435 (S.D.N.Y. 2015), *aff'd* (2d Cir. 2017) (finding use of taser reasonable where decedent who had been seen with knife in his hand approached officers and refused instructions to show them his hands). As discussed *supra*, considering the totality of the circumstances facing the officers at the time that Officer Ramos fired his taser at Mr. Richards, it was objectively reasonable for Officer Ramos to believe that Mr. Richards posed an immediate threat of deadly harm to the officers. Indeed, Plaintiff seemingly concedes in its First Amended Complaint that the use of less-than-lethal force was reasonable. Specifically, Plaintiff alleges that "[f]orce less than lethal force could have been used [by Officers Murphy and Fleming] to safely extricate RICHARDS from the bedroom." FAC ¶ 78. Accordingly, the Court finds that, as a matter of law, Officer Ramos's use of less-than-lethal force

was objectively reasonable and Defendants are entitled to summary judgment on Plaintiff's claim

for excessive force by Officer Ramos.

C.    It Was Not Excessive Force for Officer Oliveros
      to Handcuff Mr. Richards

Officer Oliveros's actions in handcuffing Mr. Richards immediately after the shooting

were objectively reasonable, because there was probable cause to believe that Mr. Richards still

posed a threat to the safety of the officers.   The Second Circuit has held that "the Fourth

Amendment occasionally will permit handcuff usage during a *Terry* stop when the 'police have a

reasonable basis to think that the person detained poses a present physical threat *and* that

handcuffing is the least intrusive means to protect against that threat.'"   *United States v. Fiseku*,

915 F.3d 863, 871 (2d Cir. 2018) (quoting *United States v. Bailey*, 743 F.3d 322, 340 (2d Cir.

2014)).   To that end, "officers act[] reasonably in using handcuffs when they act[] based on reliable

information that a suspect was armed and possibly dangerous."   *Fiseku*, 915 F.3d at 872.

Under the circumstances, it was reasonable for Officer Oliveros to handcuff Mr. Richards.

Officer Oliveros knew that Mr. Richards had been armed with a knife at the time of the encounter,

Def. 56.1 ¶ 70; Pl. 56.1 ¶ 70, and he was still holding the knife when the officers entered the room

after the shooting, Def. 56.1 ¶ 107; Pl. 56.1 ¶ 107.   Moreover, immediately prior to handcuffing

Mr. Richards, Officer Oliveros observed Mr. Richards raise an object with a red laser in the

direction of the officers, Def. 56.1 ¶ 81; Oliveros Tr. 74:16–75:6, and after the officers entered the

bedroom (before the handcuffing), they could not immediately locate the apparent gun that Mr.

Richards had just pointed at the officers, Def. 56.1 ¶ 110; Pl. 56.1 ¶ 110.   Although the officers

later discovered that the apparent firearm was not on Mr. Richards's person after the shooting, the

Court must judge the reasonableness of the use of force "from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight." *Brown*, 798 F.3d at 100

(quoting *Graham*, 490 U.S. at 396).

Despite Officer Oliveros's unrebutted testimony, Plaintiff contends that there is an issue of

fact as to whether Officer Oliveros observed Mr. Richards raise an object in the direction of the

officers. Pl. 56.1 ¶ 81. Plaintiff argues that Officer Oliveros provided conflicting testimony on

this point because he testified that when the officers initially flinched, he could not see what caused

the officers to so react. Oliveros Tr. 62:6–63:17. But Officer Oliveros's testimony was not

inconsistent. Rather, he testified that when the officers initially flinched, he could not see inside

the room, but that he later observed Mr. Richards raise an object toward the officers at the time of

the shooting. Oliveros Tr. 62:12–19, 74:20–76:13. It was therefore objectively reasonable for

Officer Oliveros to believe that Mr. Richards still posed a threat and should be restrained.

Defendants are therefore entitled to summary judgment on Plaintiff's claim for excessive force by

Officer Oliveros.

## II.    The Officers Were Not Deliberately Indifferent
##         to a Serious Medical Need

Plaintiff asserts a Section 1983 claim for deliberate indifference against all Defendants,

claiming that they violated the Mr. Richards's constitutional rights when they failed to promptly

attend to Mr. Richards's injuries after the shooting. FAC ¶¶ 87–90. A plaintiff's claim for

deliberate indifference to a serious medical need is governed by the same standard applicable to a

pretrial detainee when its claim arises from an arrest. *See Maldonado v. Town of Greenburgh*, 460

F. Supp. 3d 382, 394–95 (S.D.N.Y. 2020); *see also Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir.

2000) (noting that a Fourth Amendment seizure, or arrest, occurs when, as here, "in view of all of

the circumstances surrounding the incident, a reasonable person would have believed that he was

not free to leave" (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Accordingly,

Plaintiff's claim for deliberate indifference to medical need falls under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Generally, to state a claim for deliberate indifference to a serious medical need, a plaintiff must satisfy a two-prong test. First, "the alleged deprivation of adequate medical care must be 'sufficiently serious.'" *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Second, the defendant must act with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

With respect to the seriousness of the deprivation, where a deliberate indifference claim involves a delay in treatment as opposed to a denial of treatment, the analysis of the detainee's medical need "focus[es] on the challenged delay . . . rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks omitted). The seriousness of a delay in medical treatment is determined by reference to its effect, considering the "seriousness of the medical need, . . . whether the delay worsened the medical condition, and . . . the reason for delay." *See Ridge v. Davis*, No. 18 CIV. 8958 (JCM), 2022 WL 357020, at *14 (S.D.N.Y. Feb. 7, 2022). Nonetheless, even absent evidence that a delay in treatment worsened the detainee's condition, allegations of a "condition of urgency" that "may produce . . . extreme pain" satisfy the objective prong of the analysis. *Dotson v. Fischer*, 613 F. App'x 35, 38 (2d Cir. 2015) (internal quotation marks omitted).

A plaintiff can satisfy the second prong of a deliberate indifference claim if he can show that an objectively reasonable person in the defendant's position would have known, or should have known, that the defendant's actions or omissions posed an excessive risk of harm to the detainee. *See Darnell*, 849 F.3d at 35. "In other words, the second element of a deliberate

indifference claim under the Fourteenth Amendment 'is defined objectively,' and a plaintiff is not required to show subjective awareness by the defendant that '[his] acts (or omissions) have subjected the pre-trial detainee to a substantial risk of harm.'" *Ryan v. Cnty. of Nassau*, No. 12-CV-5343(JS)(SIL), 2018 WL 354684, at *3 (E.D.N.Y. Jan. 10, 2018) (quoting *Darnell*, 849 F.3d at 35) (alteration in original).  Nevertheless, "[a] detainee must prove that an official acted intentionally or recklessly, and not merely negligently." *Darnell*, 849 F.3d at 36.  Whether a defendant acted with the requisite state of mind "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Charles v. Orange Cnty.*, 925 F.3d 73, 87 (2d Cir. 2019).

On the undisputed record, Plaintiff cannot establish that Defendants acted intentionally or recklessly in addressing Mr. Richards's medical needs in the moments immediately following the shooting.  It is undisputed that immediately after the shooting, Officers Fleming, Murphy, and Oliveros transmitted a "shots fired" message over police radio.  Def. 56.1 ¶ 103; Pl. 56.1 ¶ 103.  It is also undisputed that within seventy-three seconds of the final gunshot, two ESU officers, who were certified EMTs, arrived and began attending to Mr. Richards's injuries.  Def. 56.1 ¶¶ 111–13; Pl. 56.1 ¶¶ 111–13.  Four minutes after the shooting, EMS arrived at the scene.  Def. 56.1 ¶¶ 120–22; Pl. 56.1 ¶¶ 120–22.  Courts within this Circuit have generally limited findings of deliberate indifference to far more extreme delays in treatment—"cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years." *Ridge*, 2022 WL 357020, at *14 (citation omitted); *Ransom v. Banks*, No. 1:20-CV-10232 (MKV), 2022 WL 769344, at *5 (S.D.N.Y. Mar. 14, 2022) (holding the same).  Plaintiff's allegations fall far short of this standard.  Moreover, courts have consistently rejected deliberate indifference claims when, as here, faced with a dearth of evidence that the plaintiff's pain or medical condition worsened as

a result. *See*, *e.g.*, *Davis v. Furey*, No. 3:19-CV-1867 (JCH), 2021 WL 2827366, at *6 (D. Conn. July 6, 2021) ("[Plaintiff] has not presented any evidence that he experienced any serious risk of harm as a result of the asserted two-hour delay in receiving treatment . . . ."); *Liverpool v. Davis*, 442 F. Supp. 3d 714, 737 (S.D.N.Y. 2020) (granting summary judgment where plaintiff waited three hours for medical treatment but did "not allege[] that the delay in treatment caused his condition to worsen").

Plaintiff contends that Officers Fleming, Murphy, Oliveros, and Ramos were obligated to immediately attend to Mr. Richards themselves given his life-threatening injuries. Pl. Opp'n 25–26. Plaintiff takes this position despite providing no evidence that any of these officers had the requisite training to attend to Mr. Richards's injuries in the first place. Regardless, as other courts in this Circuit have held, a police officer's obligation to provide necessary medical treatment to a detainee "is satisfied when the police summon medical assistance; they have no duty to provide that assistance themselves." *Rasmussen*, 766 F. Supp. 2d at 414; *Campbell v. City of Yonkers*, No. 19 CV 2117 (VB), 2020 WL 5548784, at *11 (S.D.N.Y. Sept. 16, 2020) (holding the same). Officers Fleming, Murphy, Oliveros, and Ramos did just that when they transmitted the "shots fired" message over police radio immediately after the shooting ended, Def. 56.1 ¶ 103; Pl. 56.1 ¶ 103, and trained emergency professionals attended to Mr. Richards within less than two minutes. Def. 56.1 ¶¶ 111–13; Pl. 56.1 ¶¶ 111–13. Police might actually have interfered with trained emergency personnel had they tried to attend to Mr. Richards at that point. Accordingly, there is no dispute of material fact on Plaintiff's deliberate indifference claim and Defendants are entitled to judgment as a matter of law.

### III.    The Officers Did Not Fail to Intervene

Plaintiff alleges that the officers violated the constitutional rights of Mr. Richards by failing to intervene and stop the other responding officers from using force against Mr. Richards. An

officer can be held liable under Section 1983 for preventable harm caused by actions of other officers where that officer observes or has reason to know that: "(1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted). However, a plaintiff cannot succeed on a claim for failure to intervene under Section 1983 when there is no underlying constitutional violation. *Wieder v. City of New York*, 569 F. App'x 28, 30 (2d Cir. 2014) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim."). Moreover, "for liability to attach" for failure to intervene, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557.

As a preliminary matter, the Court has already determined that there was no underlying constitutional violation, and, for that reason alone, Defendants are entitled to summary judgment on this claim. Nonetheless, even if the actions of the officers constituted a constitutional violation, there was no realistic opportunity for any of the other officers to potentially intervene because the alleged violation—the shooting of Mr. Richards—lasted a brief five seconds. Def. 56.1 ¶ 97; Pl. 56.1 ¶ 97. It is "virtually impossible for an officer to intervene to prevent a shot given the fraction of time that it takes to pull a trigger." *Hill v. Quigley*, No. 12 CIV. 8691 (AKH), 2017 WL 11637815, at *3 (S.D.N.Y. Jan. 25, 2017); *see also Cerbelli v. City of New York*, No. 99-CV-6846 ARR RML, 2008 WL 4449634, at *11 (E.D.N.Y. Oct. 1, 2008) (dismissing failure to intervene claims because defendant officers could not have interjected themselves during "the exceedingly compressed time frame" when other officers shot plaintiff). For this same reason, there was also no realistic opportunity for any of the officers to potentially intervene to stop Officer Ramos from tasering Mr. Richards, because Officer Ramos fired a taser at Mr. Richards once for a period of less than two seconds. Def. 56.1 ¶ 89; Pl. 56.1 ¶ 89.

Plaintiff contends that Officers Fleming and Murphy had fifteen minutes—the entire duration of the standoff—to prevent each other from using deadly force against Mr. Richards. Pl. Opp'n 27. But Plaintiff does not contend that any constitutional violations preceded the shooting itself. And as Plaintiff concedes, the shooting lasted only a brief five seconds. Def. 56.1 ¶ 97; Pl. 56.1 ¶ 97. Even if the officers' use of force proved to be an unconstitutional violation, the short window of time in which it occurred did not afford either officer a realistic opportunity to potentially intervene. *See Hill*, 2017 WL 11637815, at *3; *Cerbelli*, 2008 WL 4449634, at *11. Accordingly, there is no dispute of material fact as to Plaintiff's failure to intervene claim and Defendants are entitled to judgment as a matter of law.

### IV.    Defendants Are Entitled to Judgment on Plaintiff's *Monell* Claim

Plaintiff also brings a *Monell* claim against the City of New York. FAC ¶¶ 97–124. Under the Supreme Court's decision in *Monell v. Department of Social Service*, local governments and individuals in their official capacity may be held liable in Section 1983 actions when it can be shown that "the denial of a constitutional right [ ] was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019). The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right. *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). Although Plaintiff has not had the opportunity to conduct *Monell* discovery in this case [ECF No. 70], the Court has concluded that there was no underlying constitutional violation and as such, Plaintiff's *Monell* claim is precluded. *See Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019) ("It is well-settled that a *Monell* claim cannot succeed without an underlying constitutional violation, and here there is no constitutional

violation."). Accordingly, Defendants are entitled to summary judgment on Plaintiff's *Monell* claim. Plaintiff's request for *Monell* discovery is moot.

### V.    Defendants Are Entitled to Judgment on Plaintiff's State Law Claims

Defendants are also entitled to judgment as a matter of law on Plaintiff's state law claims. In addition to its federal Section 1983 claims, Plaintiff asserts New York state law claims for wrongful death, for assault and battery, and for negligent screening, hiring, retention, and supervision. FAC ¶¶ 125–37. Plaintiff concedes that it cannot challenge Defendants' motion for summary judgment with respect to its negligent screening, hiring, retention, training, and supervision claim. Pl. Opp'n 33 n.11. That claim is therefore dismissed. Plaintiff's other state law claims fail as a matter of law.

### A.    Wrongful Death

Defendants are entitled to summary judgment on Plaintiff's wrongful death claim. "The elements of a cause of action to recover damages for wrongful death are (1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." *Freeland v. Erie Cnty.*, 204 A.D.3d 1465, 1466, 167 N.Y.S.3d 683 (2022*)* (quoting *Chong v. New York City Transit Auth.*, 83 A.D.2d 546, 547, 441 N.Y.S.2d 24, 25 (2d Dep't 1981)); *see Lara-Grimaldi v. Cnty. of Putnam*, No. 17-CV-622 (KMK), 2018 WL 1626348, at *23 (S.D.N.Y. Mar. 29, 2018).

Plaintiff has failed to satisfy the third element of a wrongful death claim under New York law because it has not identified or disclosed proof that any "distributee" of the decedent suffered any economic loss by reason of Mr. Richards's death. In opposition to Defendants' motion, Plaintiff merely states, without citing to any record evidence, that "at trial, Plaintiff will readily

establish pecuniary loss suffered by the surviving distributees." Pl. Opp'n 34. However, in opposing summary judgment, Plaintiff has the burden to set forth specific facts showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 250. Discovery is closed in this matter [ECF No. 80] and Plaintiff has failed to adduce any facts to support this necessary element of a *prima facie* wrongful death claim. Accordingly, Defendants are entitled to summary judgment on this claim. *See Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 317 (S.D.N.Y. 1998) (dismissing wrongful death claim on summary judgment where plaintiffs failed to prove pecuniary loss).

     B.  <u>Assault And Battery</u>

The parties agree that, except for the requirement in a Section 1983 claim that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially the same. *See* Def. Br. 33; Pl. Opp'n 33; *see also Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991). For the reasons set forth above, the Court finds that the officers' use of force was not excessive. Thus, Defendants are entitled to summary judgment with respect to Plaintiff's assault and battery claim.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff is unable to demonstrate that there is a genuine dispute of material fact with respect to its Section 1983 and New York state law claims. Although this incident was tragic, the record is clear that Defendants did not act unreasonably when they responded to the call in Mr. Richards's apartment. Accordingly, Defendants are entitled to judgment as a matter of law on all of Plaintiff's claims.

Defendants' motion for summary judgment [ECF No. 83] is GRANTED and Plaintiff's First Amended Complaint is DISMISSED with prejudice.

The Clerk of Court is respectfully requested to terminate the motions pending at docket entries 83, 110, and 112 and to close this case.

**SO ORDERED.**

**Date:  July 31, 2024**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**